Paul C. Echo Hawk (ISB # 5802)
ECHO HAWK LAW OFFICE
P.O. Box 4166
Pocatello, Idaho 83205
Telephone: (208) 705-9503
Facsimile: (208) 904-3878
paul@echohawklaw.com

William F. Bacon, General Counsel (ISB # 2766)
SHOSHONE-BANNOCK TRIBES
P.O. Box 306
Fort Hall, Idaho 83203
Telephone: (208) 478-3822
Facsimile: (208) 237-9736
bbacon@sbtribes.com

Jill E. Grant (DCB #358306) (*pro hac vice*)
JILL GRANT & ASSOCIATES, LLC
1319 F Street, NW
Washington, D.C. 20004
Telephone: (202) 821-1950
Facsimile: (202) 459-9558
jgrant@jillgrantlaw.com

*Attorneys for the Shoshone-Bannock Tribes*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| SHOSHONE-BANNOCK TRIBES OF THE FORT HALL RESERVATION, | ) ) ) | Case No. 4:20-cv-00553 |
| Plaintiff, | ) ) | |
| v. | ) ) | **SHOSHONE-BANNOCK TRIBES'** |
| | ) | **MEMORANDUM IN SUPPORT OF** |
| LAURA DANIEL-DAVIS, Principal Deputy | ) | **MOTION FOR SUMMARY** |
| Assistant Secretary for Land and Mineral | ) | **JUDGMENT** |
| Management, UNITED STATES | ) | |
| DEPARTMENT OF THE INTERIOR and | ) | |
| UNITED STATES BUREAU OF LAND | ) | |
| MANAGEMENT, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| J.R. SIMPLOT COMPANY, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

Plaintiff Shoshone-Bannock Tribes (Tribes) submit this memorandum in support of its motion for summary judgment.

## INTRODUCTION

In this case, the Tribes challenge the August 12, 2020 Blackrock Land Exchange Record of Decision (ROD) issued by the United States Department of the Interior (DOI) to approve a land exchange that will result in the long-term expansion of the Simplot Don Plant phosphogypsum stacks (gypstacks) located on the Eastern Michaud Flats (EMF) Superfund site.[1] The ROD was issued following publication of a Final Environmental Impact Statement (FEIS or EIS) on May 15, 2020.[2] The land exchange approves the acquisition by J.R. Simplot Company (Simplot) of 719 acres of federal land managed by the Bureau of Land Management (BLM) in exchange for 667 acres of non-federal land owned by Simplot. The federal land selected for the exchange is on Howard Mountain adjacent to the existing Simplot Don Plant and partially within the EMF Superfund site. The non-federal land parcels owned by Simplot are located south of Pocatello, Idaho in the Blackrock Canyon area.[3]

The Fort Hall Reservation is adjacent to the lands on Howard Mountain and the EMF Superfund Site. Moreover, the federal lands subject to the challenged land exchange are entirely within the Tribes' aboriginal territory as set forth in the 1868 Fort Bridger Treaty with the Eastern Band of Shoshoni and Bannock Tribes of Idaho[4] and entirely within the portion of the original Fort Hall Reservation ceded by the Tribes in 1898 (1898 Agreement), which was ratified

---

[1] A copy of the August 12, 2020, Record of Decision is at AR0039166.

[2] The 3-volume FEIS and related federal documents, including the ROD, can be accessed here: https://eplanning.blm.gov/eplanning-ui/project/119626/570. *See also* AR0029528-30766.

[3] A map showing the federal land and Simplot land parcels subject to the land exchange can be found in Appendix A of the Record of Decision. (AR0039189).

[4] *See* Fort Bridger Treaty of 1868, 15 Stat. 673. (AR0055982).

by the Act of June 6, 1900, ch. 813, 31 Stat 672 (1900 Act).[5] The 1900 Act limits the disposal of these ceded lands in three specific ways that the BLM ignored and violated in transferring the ceded land to Simplot in this case.

Article 4 of the Fort Bridger Treaty of 1868 and the 1900 Act recognize the Tribes' off-reservation usufructuary rights on the ceded lands, which include the federal lands obtained by Simplot in the challenged land exchange. The EIS does not properly analyze and consider the requirements of the 1900 Act or the reasonably foreseeable and indirect environmental impacts resulting from the expansion of the Simplot gypstack on the selected exchange lands. These impacts include negative effects on groundwater, air quality, human health and safety, plants, animals, a Tribal cultural site, and Tribal off-reservation treaty rights. The EIS also does not properly analyze and consider the cumulative effects of the land exchange on the environment and public interests.

The Tribes submit this appeal based on Defendants' failure to: 1) comply with the specific requirements of the 1900 Act for disposal of the ceded lands; 2) comply with the requirements of Federal Land Policy and Management Act (FLPMA); 3) prepare an EIS that satisfies the requirements of the National Environmental Policy Act (NEPA); and 4) uphold the federal government's trust responsibility to the Shoshone-Bannock Tribes guaranteed by the Fort Bridger Treaty of 1868, the 1898 Agreement, and 1900 Act.

## FACTUAL AND PROCEDURAL BACKGROUND

### The 1898 Agreement and 1900 Act

The federal land transferred to Simplot in the challenged land exchange consists entirely of tribal land ceded to the United States under the 1898 Agreement later ratified by

---

[5] *See* **Exhibit A** (1898 Cession Agreement and 1900 Act, 31 Stat. 672).

Congress in 1900.[6] In the Indian Appropriations Act of 1896, ch. 398, 29 Stat. 321, Congress authorized the Secretary of the Interior to appoint a commission to negotiate with the Indians of the Fort Hall Reservation for "the surrender of any portion of their . . . reservation[], or for such modification of existing treaties as may be deemed desirable by said Indians and the Secretary of the Interior."[7] In 1898, the commission negotiated an agreement with the Tribes, which was ratified by Congress in Section 1 of the 1900 Act.[8]

The 1898 Agreement provided for a cession of a portion of the Fort Hall Reservation while also protecting tribal rights on that cession and on the diminished Reservation.[9] The Agreement distinguishes the "ceded lands" from "the diminished reservation" and provides that new boundary lines between those two areas will be "properly surveyed and permanently marked."[10] The Agreement also expressly reserves the Tribes' rights to cut timber, pasture livestock, and hunt and fish on the ceded lands so long as any of the ceded lands remain part of the public domain.[11] The Agreement also specifically reserves tribal members' water rights "which is necessary for irrigating on land actually cultivated and in use . . . so long as said Indians remain where they now live."[12] The Agreement also preserves all preexisting treaty

---

[6] The Final EIS acknowledges that "[t]he proposed exchange lands are within the area ceded to the Federal Government under the Agreement of February 5, 1898." AR0029919. *See also* AR0029615: "Both the Federal and non-Federal lands are within the ceded boundary of the Fort Hall Indian Reservation." EIS Section 3.4.2.2. A map of the ceded lands is available at AR0029757.

[7] 29 Stat. 321, 341-42.

[8] 31 Stat. 675.

[9] 1898 Agreement, Art. I, 31 Stat. 672-73.

[10] *Id.* Art. V, 31 Stat. at 674.

[11] *Id.* Art. IV, 31 Stat. at 674.

[12] *Id.* Art. VIII, 31 Stat. at 674.

SHOSHONE-BANNOCK TRIBES' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 4

rights not incompatible with the Agreement, which would include the Tribes' rights on the diminished Reservation.[13]

When it ratified the 1898 Agreement, Congress also enacted several provisions describing how the Agreement would be carried out. Section 5 of the 1900 Act places specific limitations on how the federal government may dispose of ceded lands, three of which apply to the challenged land exchange in this case.[14] First, the 1900 Act requires that ceded lands "shall be subject to disposal under homestead, townsite, stone and timber, and mining laws of the United States <u>only</u>." 1900 Act, Sec. 5, 31 Stat. 672, 676 (emphasis added). Second, the 1900 Act states that "no purchaser shall be permitted in any manner to purchase more than one hundred and sixty acres of the [ceded] land," *Id.* Third, the 1900 Act provides that "all of said [ceded] lands within five miles of . . . Pocatello shall be sold at public auction . . . for not less than ten dollars per acre." *Id.*

### *The Eastern Michaud Flats Superfund Site*

In the summer of 1987, the U.S. Environmental Protection Agency (EPA) detected elevated levels of heavy metals in sediments of the unlined ponds that served both the Simplot and former FMC phosphate processing operations and in wastewater at the Simplot Don Plant facility. In addition, arsenic, cadmium, and selenium were detected in monitoring wells in the deep confined aquifer. In all, 2,530 acres of land including and surrounding the Simplot and FMC phosphate facilities were found to have contamination at levels of concern and were made part of a superfund site, the EMF Superfund site, that was listed on the National Priority List (NPL) in 1990 due to the severity of contamination. The Simplot portion of the EMF Superfund

---

[13] *id.* Art. VI, 31 Stat. at 674.

[14] 1900 Act, Sec. 5, 31 Stat. 672, 676.

SHOSHONE-BANNOCK TRIBES' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 5

site is located adjacent to the Fort Hall Reservation, the Portneuf River, and the Cities of Pocatello and Chubbuck. The FMC facility, located within the reservation itself, closed in December of 2001, but the Simplot facility is still an active operating facility.

The Simplot Don Plant and the EMF site as a whole are sources of substantial environmental contamination and pollution of the local area and reservation environment affecting important natural resources and human health. Groundwater contamination caused by the existing gypstacks at the Simplot Don Plant was one of the major justifications for designating the site as a Superfund site. Public and private wells within three miles of the area provide drinking water to an about 55,000 people and are used to irrigate over 2,000 acres of crops.

In 1994, Simplot submitted a land exchange proposal to the BLM Pocatello Field Office for Simplot to acquire from BLM lands adjacent to Simplot's Don Plant for a buffer zone area and future gypstack construction. In 1996, the exchange process moved forward and an Environmental Assessment (EA) to analyze impacts of the proposed exchange was initiated. Shortly thereafter, the land exchange was put on hold. In 2002, Simplot renewed talks with the BLM and asked that the proposed land exchange include additional lands. The proposed land exchange contemplated an exchange of 718.56 acres of public land adjacent to the Simplot Don Plant for 666.92 acres of private land in the Blackrock and Caddy Canyon areas.

On March 7, 2005, April 3, 2007, and June 19, 2007, the Tribes sent letters to the BLM outlining several objections to the proposed land exchange and requesting a response from the BLM. On December 21, 2007, the BLM Pocatello Field Manager issued a Decision Record, Finding of No Significant Impact (FONSI), and Environmental Assessment (EA) with a determination to approve the land exchange between the BLM and Simplot. On February 5,

2008, the Tribes sent the BLM a letter protesting the decision to issue a FONSI for the land exchange. The letter identified numerous concerns which were inadequately addressed in the EA and requested clarification regarding the Tribes' opposition to the land exchange. On February 21, 2008, the EPA sent BLM a letter expressing several concerns about the potential significant impacts that may result from construction of an additional phosphogypsum stack on the selected federal lands. On February 25, 2008, the Tribes sent the BLM a supplemental letter of protest reiterating and presenting additional information regarding the numerous Tribal concerns with the land exchange and gypsum stack expansion.

On October 2, 2008, the BLM Idaho State Director issued a letter dismissing the Tribes' protest of the land exchange. On October 3, 2008, the BLM sent EPA a letter rejecting EPA's recommendations relating to the land exchange. The Tribes filed a Notice of Appeal and Petition for Stay on October 30, 2008. Simplot submitted a Motion for Intervention and Response to Petition for Stay on November 25, 2008. On February 9, 2009, the Interior Board of Land Appeals (IBLA) issued an order permitting Simplot to intervene and denying the Tribes' request for a stay. On June 5, 2009, the IBLA issued a decision affirming the decision of the BLM State Director dismissing the Tribes' protest of the December 21, 2007, Decision Record/FONSI/EA. The Tribes then appealed to this Court from the BLM/IBLA decisions.

On May 3, 2011, this Court, after considering briefing and legal argument, ordered the BLM to prepare a full EIS. *Shoshone-Bannock Tribes v. U.S. Dep't of the Interior*, 2011 WL 1743656 (AR0064797-AR0064819). The land exchange rejected by this Court in 2011 is nearly identical to the land exchange challenged in this case. Simplot appealed to the Ninth Circuit

Court of Appeals from this Court's 2011 decision. On September 17, 2012, the Ninth Circuit entered an Order dismissing Simplot's appeal.[15]

In 2018, Simplot contacted the Idaho delegation to the United States Congress and requested legislation that would mandate the land exchange, circumventing this Court's decision requiring completion of an EIS. Because the proposed legislation was for a mandatory transfer, there would have been no discretionary authority to determine under FLPMA or other laws whether the transfer was in the best interest of the public. The legislation did not make it through committee or to the floor for a vote.

On May 20, 2019, the BLM issued a scoping document for the proposed Blackrock Land Exchange. A draft EIS (DEIS) was released on December 13, 2019. In early January 2020, the Tribes engaged in government-to-government consultation with the BLM and communicated their continued and longstanding opposition and concerns with the proposed land exchange. On January 31, 2020, the Tribes submitted written comments to the DEIS opposing the proposed land exchange.[16] On February 7, 2020, the Tribes also submitted a DEIS comment letter specifically addressing Tribal cultural resource concerns.[17] A final EIS (FEIS or EIS) was released on May 15, 2020.[18] The Tribes submitted written comments to the FEIS in opposition to the land exchange on July 16, 2020.[19]

On August 12, 2020, the ROD approving the land exchange was signed by the Principal Deputy Assistant Secretary for the Department of the Interior "Exercising the authority of the

---

[15] *See* Order Dismissing Appeal, Dkt. 16, 9th Cir. Case No. 8325726, September 17, 2012.

[16] *See* January 31, 2020, Letter from Tribes, Comments on DEIS (AR0039086-39120).

[17] *See* February 7, 2020, Letter from Tribes, Cultural Resource Concerns. A copy of this letter is attached as Exhibit 1 to the Declaration of Nathan Small.

[18] FEIS at AR0029528-30766.

[19] *See* July 16, 2020, Letter from Tribes, Comments on FEIS (AR0065167-65182).

SHOSHONE-BANNOCK TRIBES' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 8

Assistant Secretary, Land and Minerals Management." The signature page of the ROD states: "I approve the Blackrock Land Exchange Decision for the reasons explained above. The approval of this decision constitutes the final decision of the DOI and, in accordance with the regulations at 43 CFR § 4.410(a)(3), is not subject to appeal under Departmental regulations at 43 CFR Part 4. Any challenge to this decision must be brought in Federal District Court."[20] On December 5, 2020, the Tribes initiated this action. (Dkt. 1).

**STANDING**

To satisfy the requirements of Article III standing, a plaintiff must have suffered an injury in fact that is fairly traceable to the defendant's conduct and that is likely to be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). "Tribes, like states, are afforded 'special solicitude in [Article III] standing analysis.'" *Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 463 (2d Cir. 2013) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007)). The land exchange at issue here injures the Shoshone-Bannock Tribes, and these injuries can be redressed by this Court's vacatur of the ROD approving the land exchange. As discussed in this brief and described in the declarations of Kelly Wright, the Program Manager for the Tribes' Environmental Waste Management Program,[21] and Nathan Small, a member of the Fort Hall Business Council,[22] the land exchange would exacerbate and prolong the pollution of the Tribes' reservation by the Simplot Don Plant, harm the health of Tribal members, and adversely impact the Tribes' cultural resources and treaty rights.

---

[20] *See* August 12, 2020, Record of Decision at 16 (AR0039166).

[21] The Declaration of Kelly Wright is filed herewith.

[22] The Declaration of Nathan Small is filed herewith.

## STANDARD OF REVIEW

The APA, 5 U.S.C. § 706(2), authorizes a court to hold unlawful and set aside agency action found to be: (1) outside the scope of the agency's authority, (2) not in compliance with prescribed procedures, and (3) otherwise arbitrary, capricious or an abuse of discretion. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-17 (1971). Agency action will be set aside if "the agency has . . . entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. v. State Farm*, 463 U.S. 29, 43 (1983). Although this standard of review is ultimately narrow and agency action is "entitled to a presumption of regularity," review must nevertheless be "searching and careful," and "thorough, probing, and in depth." *Overton Park*, 401 U.S. at 415-16. Under the APA, reviewing courts "*shall . . . set aside* agency action" found to be unlawful. 5 U.S.C. § 706(2) (emphasis added). Vacatur is the "usual" remedy when an agency action is arbitrary and capricious or otherwise not in accordance with law. *Guertin v. United States*, 743 F.3d 382, 388 (2d. Cir. 2014); *accord Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) ("vacatur is the normal remedy" for an APA violation).

## ARGUMENT

I.      **The Federal Defendants' approval of the challenged land exchange violates the 1898 Agreement and 1900 Act's specific requirements that 1) lands ceded by the Tribes must be "subject to disposal under homestead, townsite, stone and timber, and mining laws of the United States <u>only</u>," 2) No purchaser can purchase more than 160 acres of ceded lands in the 1900 cession area, and 3) the ceded lands within five miles of Pocatello must be sold at public auction.**

In 1867, President Johnson established the Fort Hall Reservation by Executive Order. The following year, the 1868 Fort Bridger Treaty (Treaty) was negotiated and affirmed by the United States Senate, reaffirming the reservation as the Tribes' permanent home. The Treaty reserved to the Tribes the right to exercise off-reservation hunting, gathering, and fishing rights. Subsequently, the Tribes entered into a series of cession agreements with the United States and,

in 1900, the Tribes ceded approximately 416,000 acres of the reservation to the federal government. The federal land transferred to Simplot in the challenged land exchange is part of the ceded lands affected by the 1898 Cession Agreement and 1900 Act (referred to herein as the "ceded lands"). The Tribes maintain and practice their Treaty rights on the current Fort Hall Reservation, the ceded lands, aboriginal territory, and unoccupied lands of the United States.

Pursuant to the 1900 Act, the Tribes retain certain rights on the ceded lands. Article IV of the 1898 Agreement ratified by the 1900 Act states:

> So long as any of the lands ceded, granted, and relinquished under this treaty remain part of the public domain, Indians belonging to the above-mentioned tribes, and living on the reduced reservation, shall have the right, without any charge therefor, to cut timber for their own use, but not for sale, and to pasture their livestock on said public lands, and to hunt thereon and to fish in the streams thereof.

1900 Act, 31 Stat. 672, 674.[23] Thus, the Tribes expressly reserved specific usufructuary rights on the ceded lands remaining in the public domain, including retained priority rights to hunt, fish, graze, and cut timber for personal use. The Federal ceded lands and resources located on it are an integral component of the Tribes' contemporary subsistence and traditional cultural practices. Tribal members actively hunt on this land and maintain traditional and cultural practices on it. In addition, this land likely contains burial sites, as discussed within the Cultural Resource letter submitted to the BLM by the Tribes.[24]

When it ratified the 1898 Agreement, Congress also enacted several provisions describing how the Agreement would be carried out. Of particular interest here, Section 5 of the 1900 Act, 31 Stat. at 676, places qualifications on how the federal government may dispose of

---

[23] *See* **Exhibit A** (1900 Act, 31 Stat. 672).

[24] Letter from Shoshone-Bannock Tribes to BLM dated February 7, 2020, attached as Exhibit 1 to Declaration of Nathan Small.

ceded lands. The Tribes relied on Section 5 in comments to the BLM and in their complaint to assert that the transfer of land to Simplot violates the 1900 Act and is therefore contrary to law. *See* Compl. ¶¶ 67-69 (Dkt. 1). Section 5 provides that, after portions of the ceded lands are allotted to Indians who have settled in the ceded area and wish to remain there:

> . . . *the residue of said ceded lands shall be opened to settlement by the proclamation of the President, and shall be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States **only***, excepting as to price and excepting the sixteenth and thirty-sixth sections in each Congressional township, which shall be reserved for common-school purposes and be subject to the laws of Idaho . . . *but no purchaser shall be permitted in any manner to purchase more than one hundred and sixty acres of the land hereinbefore referred to*.

31 Stat. at 676 (emphasis added). Section 5 further provides that:

> No lands in sections sixteen and thirty-six now occupied, as set forth in article three of the agreement herein ratified, shall be reserved for school purposes, but the State of Idaho shall be entitled to indemnity for any lands so occupied: *Provided*, That none of said lands shall be disposed of under the town-site laws for less than ten dollars per acre; *And provided further*, That *all of said lands within five miles of the boundary line of the town of Pocatello shall be sold at public auction, payable as aforesaid, under the direction of the Secretary of the Interior for not less than ten dollars per acre*.

*Id.* at 676 (emphasis added).

The 1900 Act and its ratification of the 1898 Agreement created a legislative scheme under which the lands within the 1900 Act's cession area (ceded lands) were alienated from the Tribes and the Reservation was diminished, but at the same time certain treaty rights on those lands were reserved, and on-Reservation treaty rights were reaffirmed and maintained. Moreover, the scheme was designed to ensure that the land was settled by small landowners, such as individual homesteaders and their families, who would make specified productive uses of the land that were compatible with the Tribes' continued interests in the residue of the ceded

lands and in the adjacent reservation. That scheme as realized in the 1900 Act is primarily enforced through the three requirements highlighted in the text above:

- Lands ceded by the Tribes in the 1900 cession area must be "subject to disposal under homestead, townsite, stone and timber, and mining laws of the United States only,"
- No purchaser can purchase more than 160 acres of ceded lands in the 1900 cession area, and
- The ceded lands within five miles of Pocatello must be sold at public auction.

All the federal lands that are part of the challenged land exchange are within the Tribes' ceded territory and are therefore subject to the requirements of the 1900 Act. The challenged land exchange violates each of these three statutory limitations on disposal of the Tribes' ceded lands, and this Court should enforce these clear requirements. *See McGirt v. Oklahoma*, 140 S. Ct. 2452, 2468-69 (2020) ("When interpreting Congress's work in this arena, no less than any other, our charge is usually to ascertain and follow the original meaning of the law before us. That is the only 'step' proper for a court of law. . . . There is no need to consult extratextual sources when the meaning of a statute's terms is clear. Nor may extratextual sources overcome those terms."). Even if the terms of the 1900 Act are deemed ambiguous in meaning, the Court should resolve any ambiguities in favor of the Tribes. *See Navajo Nation v. United States Dep't of the Interior*, 26 F.4th 794, 802 (9th Cir. 2022) (quoting *Winters v. United States*, 207 U.S. 564, 576 (1908) ("Indian canons of construction, under which ambiguities in agreements and treaties with tribes 'will be resolved from the standpoint of the Indians.'").

First, the 1900 Act requires that ceded lands "shall be subject to disposal under homestead, townsite, stone and timber, and mining laws of the United States <u>only</u>," but the BLM/Simplot land exchange in this case was done pursuant to FLPMA, which did not become law until 1976. Even if the 1900 Act did not use the term "only" to limit the applicable federal

laws, 19th and early 20th century laws allowed settlers to obtain ownership of lands for specific purposes, and in some cases the lands would revert to the United States if they were not put to those purposes. *See, e.g.*, Timber Culture Act of 1873, §§ 2-3, ch. 277, 17 Stat. 605, 606 (allowing individuals to obtain public domain land on which they swore to grow and maintain timber for ten years; failure to grow timber caused land to revert back to United States); Homestead Act of 1862, §§ 2, 5, ch. 75, 12 Stat. 392, 392-93 (providing that homesteads would be allotted to settlers who swore to use the land for actual settlement and cultivation of land; abandoned lands would revert to the United States).[2] The challenged land exchange in this case must be rejected because the terms of the 1900 Act limit the purposes for which lands can be obtained to "only" those named in the Act.

Second, the 1900 Act states that "no purchaser shall be permitted in any manner to purchase more than one hundred and sixty acres of the [ceded] land," but the challenged land exchange in this case transferred 719 acres of land to Simplot. The August 12, 2020, ROD issued by the DOI approving the challenged land exchange which disposes of ceded lands in excess of 160 acres violates this clear restriction set forth in Section 5 of the 1900 Act.

Third, the 1900 Act provides that "all of said [ceded] lands within five miles of . . . Pocatello shall be sold at public auction . . . for not less than ten dollars per acre," but no public auction occurred for the ceded lands transferred to Simplot in the challenged land exchange.[25] The three violations of the 1900 Act described above each provide an independent basis for invalidating the land exchange approved by the DOI in the August 12, 2020, record of decision.

---

[25] It is noteworthy that the BLM was aware of the Tribes desire to acquire the federal lands subject to the land exchange. As early as 2007, the Tribes' general counsel contacted the BLM and expressed the Tribes' desire to acquire the lands. (AR0063796).

Notably, neither the 1898 Cession Agreement nor the 1900 Act is contained in the administrative record, which demonstrates the Defendants failed to adequately consider their legal impact on the challenged land exchange. The 1900 Act is a cession-specific act that was clearly intended to protect the Tribes' interests, both off and on the Reservation. The 1900 Act, read as a whole, preserves and protects tribal rights in the 1900 cession area and those protections were never repealed. The 1900 Act provides an exclusive list of ways that purchasers can obtain land from the federal government in the 1900 cession area, and the uses to which lands obtained from the federal government can be put: homesteads, townsites, timber and stone harvesting, and mining on 160 acres or less. These uses are in harmony with tribal rights off- and on-reservation. Obtaining federal land as a massive toxic dump site for an industrial processing facility is not one of those uses.

The Tribes raised concerns relating to the ceded land disposal requirements under the 1900 Act during the NEPA process, but the Defendants simply ignored the impact of the 1900 Act on the challenged land exchange. *See* AR0039091-39093 (usufructuary rights and title issues); AR0065170 (BLM failure to comply with the terms of the 1900 Act and request for a formal opinion on the applicability of Section 5 of the 1900 Act); AR0030107 (BLM refusal to investigate and resolve Tribal disputes related to the 1900 Act). The FEIS acknowledges tribal rights on the ceded lands but does not properly analyze or consider those rights. *See* AR0029615-29617, 29919-29912.

The Defendants were aware of the Tribes' objection to the land exchange involving ceded lands subject to the 1900 Act, but rather than address these concerns the Defendants stated the concerns were "beyond the scope of this EIS, and will ultimately be determined by the courts, or by the Department of the Interior Solicitor's Office pursuant to Department of

Justice title standards." (AR0030107). In this respect, the EIS completely fails to address the Tribes' legitimate objection to subjecting ceded lands under the 1900 Act to a land exchange that conflicts with the clear restrictions of the Act. Because the August 12, 2020, ROD issued by the DOI violates the clear provisions of the 1900 Act, the Court should grant the Tribes' motion for summary judgment on this point and reverse DOI's August 12, 2020, decision.

## II.   The ROD relied on an insufficient FLPMA analysis and therefore should be invalidated.

Under FLPMA, the BLM had a responsibility to provide an accurate representation of the environmental impacts of its proposed land exchange and to detail the impact of the exchange on established land uses. 43 U.S.C. § 1701–87. Because the BLM failed to do so, as evidenced by the FLPMA analysis in the ROD, DOI's decision to proceed with the land exchange was an abuse of discretion and not in accordance with the law, thereby violating the APA, 5 U.S.C. § 706(2). *Oregon Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1124–25 (9th Cir. 2007). This Court should therefore find DOI's approval of the land exchange to be unlawful and set it aside.

FLPMA asserts Congress's intent for public lands be managed:

in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use.

43 U.S.C. § 1701(a)(8). Before BLM exchanges land with a private company, the agency must make five determinations, 43 U.S.C. §§ 1715–17, two of which are relevant to this case. First, Section 1716(a) requires that "the public interest will be well served by making that exchange." Second, the statute requires that "the values of the lands … shall be equal," or shall be "equalized by the payment of money to the grantor or to the Secretary." 43 U.S.C. § 1716(b).

A.  <u>The Public Interest Is Not Well Served By The Land Exchange</u>.

In determining whether the public interest is well served, the BLM must "give full consideration to better Federal land management and the needs of State and local people, including needs for lands for the economy, community expansion, recreation areas, food, fiber, minerals, and fish and wildlife," and the agency must conclude that "the values and the objectives which Federal lands or interests to be conveyed may serve if retained in Federal ownership are not more than the values of the non-Federal lands or interests and the public objectives they could serve if acquired." 42 U.S.C. § 1716(a). The regulations require two specific findings in this regard:

> (1) The resource values and the public objectives that the Federal land or interests to be conveyed may serve if retained in Federal ownership are not more than the resource values of the non-Federal lands or interests and the public objectives they could serve if acquired.

> (2) The intended use of the conveyed Federal land will not significantly conflict with established management objectives on adjacent Federal land and Indian trust lands.

43 C.F.R. § 2200.0-6(b).

In addition, the Ninth Circuit has determined that a FLPMA analysis is "fatally flawed" when it does not have "an accurate picture of the environmental consequences of the land exchange." *Ctr. for Biol. Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 647 (2010). In *Nat'l Audubon Soc. v. Hodel*, for example, the court vacated a land exchange because the agency's determination that an oil support facility within a refuge "would be compatible with this refuge's strict environmental objectives" was a "clear error of judgment." 606 F. Supp. 825, 842 (D. Alaska 1984). The court found that "overall national wildlife conservation and management objectives will not be advanced." *Id*. at 845.

The BLM's FLPMA analysis here did not account for the uses and objectives of the land at issue, contrary to 42 U.S.C. § 1716(a) and 43 C.F.R. § 2200.0-6(b)(1). The ROD emphasized the value of the Simplot land that the federal government would be acquiring, ROD at 3 (AR0039171), but it failed to consider the uses and historical context of the land being relinquished. The land being relinquished has considerable cultural and historical value that was not adequately considered in the FLPMA analysis, despite the general assertion in the ROD that the boundary was drawn to avoid cultural impacts. ROD at 3 (AR0039171). The Tribes consider the area of the land exchange as a whole to be culturally significant, which they explained in their comments on the DEIS. *See* discussion in Part III.A.4, *infra.* The Tribes' uses of the now relinquished federal land also are recognized and protected by the Fort Bridger Treaty. AR0055983; *see also* discussion in Part III.A.3, *infra.* Yet the ROD does not mention these uses at all in the public interest analysis conducted pursuant to FLPMA § 206(a) and 43 C.F.R. § 2200.0-6(b)(1)-(2). ROD at 4-6 (AR0039172–74). It also does not mention them when considering impacts to public access in accordance with Secretarial Order 3373.[26] ROD at 6–7 (AR0039174–75). Nor does it discuss the likely disturbance of burial grounds and impacts on the Tribes' cultural landscape.

The FLPMA analysis also ignored the impact that the land exchange – and the subsequent construction of the gypstack and cooling ponds – would have on the Tribes' plans to offer membership housing in the Michaud Creek area. *See* Part III.A.2, *infra*. In fact, the land exchange will "significantly conflict with established management objectives on adjacent . . . Indian trust lands," in contravention of 43 C.F.R. § 2200.0-6(b)(2). By ignoring this impact, the

---

[26] DOI Order No. 3373, "Evaluating Public Access in Bureau of Land Management Land Disposals and Exchanges." Mar. 21, 2019. https://www.doi.gov/sites/doi.gov/files/elips/documents/s0_3373.pdf. This Order was issued under the authority of FLPMA as well as various other laws.

BLM did not give "full consideration" to local needs. 42 U.S.C. § 1716(a). And it did not consider the impacts of the land exchange on the Tribes' Policy for Management of Snake River Basin Resources, referenced in the FEIS at 3-21 (AR0029614), in particular in light of its expansion of the gypstack and extension of the operating life of the Simplot Don Plant, which are discussed in Part III, *infra*.

Similarly, the FLPMA analysis does not adequately consider various federal management objectives. For example, as discussed in Part III, *infra*, one of the major purposes of the land exchange is to expand the gypstack (and thereby extend the life of the Simplot Don Plant). But the gypstack is a major cause of groundwater contamination, which EPA has been attempting to address ever since listing the EMF Superfund site on the NPL, most recently through its 2010 amendment to its original remedy determination for the site (the 2010 Interim ROD Amendment, or IRODA). The BLM does not weigh this impact in its FLPMA analysis.

The ROD in this case also fails to conform the 2012 BLM Approved Resource Management Plan (ARMP) for the Pocatello Field Office.[27] Under FLPMA, BLM's land management decisions must be "in accordance with the land use plans." 43 U.S.C. § 1732(a); *see also* 43 C.F.R. § 1610.5-3(a) (2003); *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 67 (2004); *Western Watersheds Project v. Bennett*, 392 F.Supp.2d 1217, 1227-28 (D. Idaho 2005). If a proposed action is not consistent with the land use plan, BLM must rescind its ROD and amend the plan. 43 C.F.R. §§ 1610.5-3, 1610.5-5. The DOI's approval of the ROD conflicts with the 2012 BLM Pocatello Field Office ARMP of 2012 (ARMP) in at least two ways. First, ARMP Goal SW-2 (Soils and Water) is to "[p]rotect and maintain watersheds so that they

---

[27] The approved 2012 ARMP for the Pocatello Field Office is available at: https://eplanning.blm.gov/public_projects/nepa/32803/39074/40977/Pocatello_508_ARMP_doc.pdf.

appropriately capture, retain and release water of quality that meets state and national standards and do not impair source water protection areas." Action SW-2.1.1 is for the protection of groundwater and delisting impaired water bodies. (ARMP-20). ARMP Goal TR-1 is to "Provide for Tribal Treaty Rights and Interests on unoccupied lands and public lands with[in] the ceded reservation boundary." (ARMP-19). The ARMP and above-referenced goals also create specific federal agency duties that were violated by the approval of the challenged land exchange. *See* Section IV *infra*.

Finally, the FLPMA analysis overlooked numerous environmental and health impacts that will result from the land exchange. These impacts are discussed in Part III below in the context of NEPA and include groundwater contamination and an increase in radioactive air emissions and particulate matter, the health impacts such pollution triggers, and impacts to wildlife including migratory birds, among others. The public interest analysis therefore was fatally flawed and cannot stand. *Ctr. for Biological Diversity*, 623 F.3d at 647.

B.   The Equal Value Appraisal Did Not Reflect Environmental Justice Concerns or the BLM's Trust Responsibility.

FLPMA further requires that "the values of the lands … shall be equal," or shall be "equalized by the payment of money to the grantor or to the Secretary." 43 U.S.C. § 1716(b). In this case, given the adverse impacts the land exchange would have on the Shoshone-Bannock Tribes, an environmental justice community, *see* Part III.D, *infra*, a mere comparison of dollar amounts is inadequate. DOI's own Environmental Justice Strategic Plan provides for environmental justice to be included in management and planning processes and made a part of regulatory review. Plan at 12.[28] DOI also was a signatory to the Memorandum of Understanding

---

[28] DOI's EJ Plan is available at
https://www.doi.gov/sites/doi.gov/files/uploads/doi_ej_strategic_plan_final_nov2016.pdf.

on Environmental Justice and Executive Order 12898 (2011). *See generally* E.O. 12,898, which requires every federal agency to "make achieving environmental justice part of its mission." Environmental justice principles should be considered in valuing the land exchange.

Furthermore, the BLM owes a trust responsibility to the Tribes, *see* Part IV, *infra*, which includes recognizing and protecting tribal resources. A land exchange that will have multiple significant adverse impacts on those resources, as discussed below in Part III as well as in the FEIS, cannot be valued solely from a monetary standpoint. Moreover, the fact that "Simplot will issue the BLM, at exchange closing, a cash equalization payment of $10,000," ROD at 8 (AR0039176), will not have any benefit to the Tribes. Likewise, Simplot's donation of "voluntary mitigation Parcel A" to the BLM will have no benefit to the Tribes. The two land areas simply are not equal from the Tribes' perspective, and that fact should be considered in valuing the land exchange. *See Nat'l Audubon Soc.*, 606 F. Supp. at 835 ("'Public interest' exchanges under ANILCA are exceptions to the general congressional requirement that the Secretary only enter into exchanges of equal monetary value. It therefore was reasonable for the Secretary to conclude that Congress intended that he take nonmonetary benefits into account in determining whether the overall public interest would be furthered by an exchange.").

III.    **The Court should overturn the Record of Decision approving the land exchange because it relied on a deficient Environmental Impact Statement.**

The DOI ROD approving the Blackrock Land Exchange was based on the EIS prepared by the BLM. ROD at 3 (AR0039166). The EIS did not, however, comply with NEPA and its implementing regulations. The EIS did not sufficiently identify or discuss all the impacts on the environment and human health that will result from the land exchange, nor did it adequately consider impacts on the Tribes' Treaty rights and cultural resources or discuss mitigation

measures. It also did not take into account Simplot's history of noncompliance at the Don Plant and the fact that the facility plan evaluated in the EIS is not binding or enforceable and may change over time. Further, despite a requirement to address environmental justice, it did not address the disproportionate impacts of the land exchange on the Tribes and on their land. The ROD therefore is invalid because it was based on a flawed EIS, rendering the DOI's approval of the land exchange arbitrary, capricious, an abuse of discretion, and not in accordance with the law in violation of the APA, 5 U.S.C. § 706(2)(A).

A.   The BLM Failed to Adequately Evaluate and Consider All Significant Direct and Indirect Impacts of the Land Exchange, Reasonable Alternatives to the Proposed Action, and Its Reasonably Foreseeable Cumulative Impacts.

1.   *NEPA Required the BLM to Take a "Hard Look" at the Proposed Land Exchange and Consider All Significant Impacts, Alternatives, and Mitigation Measures.*

An EIS has "twin functions": preparation of the EIS requires an agency to take a hard look at the consequences of its proposed action, and distribution of the EIS provides important information about the proposed action to the public for notice and comment. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 356 (1989). An adequate EIS is essential to the informed agency decision-making and informed public participation required by NEPA. *S. Fork Band Council of W. Shoshone Of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 725 (9th Cir. 2009). The EIS must "provide full and fair discussion of significant environmental impacts" arising from the proposed action, 40 C.F.R. § 1502.1, and describe reasonable alternatives "that would avoid or minimize adverse impacts or enhance the quality of the human environment," *id*. § 1502.14(a).[29] These environmental impacts must include the direct, indirect, and cumulative impacts of the proposed action, including health impacts. *Id*. §§ 1508.7-1508.8. An EIS also

---

[29] Citations to the Council on Environmental Quality's NEPA regulations are to the 2019 version of those regulations because that was the version in effect when the BLM prepared the EIS.

must discuss impacts on natural resources and historic and cultural resources, among others, *id*. § 1502.16(f)-(g), and cultural, economic, social, and health impacts, *id*. § 1508.8.

General statements about possible effects and risks do not constitute the hard look required by NEPA without a justification for why the agency could not supply more definitive information. *Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1191 (9th Cir. 2019); *Te-moak Tribe of Western Shoshone of Nevada v. U.S.,* 608 F.3d 592, 602 (9th Cir. 2010). "[S]ome quantified or detailed information is required. Without such information, neither the courts nor the public...can be assured that the [agency] provided the hard look that it is required to provide." *Id.*; *Shoshone-Bannock Tribes,* 2011 WL 1743656 at *9 (AR0064813). Conclusory statements that the effects will be minimal or are inevitable are also insufficient under NEPA. *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014); *Defs. of Wildlife v. N. C. Dep't of Transp*., 762 F.3d 374, 394 (4th Cir. 2014). Moreover, "an agency may not rely on incorrect assumptions or data in an EIS." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005).

An EIS also must contain a detailed discussion of possible mitigation measures. *Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 581-82 (9th Cir. 2016); 40 C.F.R. § 1502.14(f). "Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects." *Methow Valley Citizens Council*, 490 U.S. at 352. Agencies also may not "postpone analysis of an environmental consequence to the last possible moment"; they must consider impacts "as soon as it can reasonably be done." *Kern v. BLM*, 284 F.3d 1062, 1072 (9th Cir. 2002). Importantly, NEPA requires consideration of the potential impacts of an action before the action takes place. *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).

2.      *The BLM Failed to Consider Significant Environmental and Health Impacts Likely to be Caused by the Land Exchange.*

The EIS did not adequately consider many of the environmental and health impacts that may result from the land exchange, even though the Tribes identified these impacts in their comments. A major flaw in the BLM's analysis stems from the BLM's selection of a different alternative (Alternative B) in the FEIS from Simplot's proposed action, which was the option evaluated in the DEIS. The federal land being provided to Simplot under Alternative B is located farther east than the federal land that would have been provided under the proposed action, *see* DEIS Appx. C, Map 2 (AR0000329), yet the BLM failed to evaluate significant potential water quality, air quality, and related health impacts from this change. Instead, the BLM frequently dismisses these impacts in the FEIS, stating merely that they would be the same as for the other alternatives. *See*, *e.g.*, FEIS summary table at 2-19 (AR0029584) (no direct effects on air or climate change regardless of the alternative selected); 2-20 (AR0029585) (same effects on hazardous and solid wastes as the proposed alternative); FEIS at 2-21 (AR0029586) (same effects on public health and safety regardless of the alternative).

The Tribes have suffered for decades from substantial surface water and groundwater contamination on the Fort Hall Reservation stemming from the Simplot Don Plant. According to the 2019 Annual Report on the Groundwater/Surface Water Remedy at the Simplot Don Plant (AR0030767), even after lining the gypstack, replacing leaking sumps and pipes, and operating an extraction system that removes contaminated water from the underlying aquifer, significant amounts of contamination are entering the Portneuf River and flowing onto the reservation. *See*, *e.g.*, *id*. at 257, 264 (AR0031049, AR0031056); *see also* Tribes' FEIS Comments ¶ 2(a) (AR0065168). These impacts were described in the FEIS, *see*, *e.g.*, FEIS at 2-26 (AR0029591), but inadequately studied. *See* Tribes' FEIS Comments ¶ 1 (AR0065168) (hydrologic studies and

models not performed or provided). Moreover, even to the extent these impacts were analyzed in the DEIS for the proposed action, Alternative B is in a different, unstudied portion of the Portneuf River watershed. *Id*.

In a similar vein, Alternative B would move and increase the sources of fluoride and particulate matter emissions closer to residences east of the Don Plant, but the consequences of this change were not analyzed in any detail. The BLM merely noted that "Because the gypsum stacks would be closer to residences east of the Don Plant, Alternative B could result in slightly higher ambient concentrations of fluoride and particulate matter as well as higher fluoride in forage concentrations closer to residences." FEIS § 3.2.4.3 (AR0029606). These emissions will impact not only a greater number of people, since there are more residences to the east of the site, but also more grazing animals, yet the increase was neither modeled for human health nor was an ecological risk assessment conducted. Tribes' FEIS Comments ¶ 2(a) (AR0065169). There also may be increased concentrations of particulate matter in the vicinity of the residences, since the gypstack expansion will be located closer to them than the proposed alternative would have been. *Id*. Particulate matter can trigger asthma and heart disease.[30]

In addition, under Alternative B, the expected construction of cooling ponds and gypsum stacks on the federal lands would alter the existing visual character of the east mountainside. These actions under the proposed alternative already would convert an estimated 290 acres of federal lands and 189 acres of Simplot-owned private lands from a generally natural landscape to an industrial landscape, a consequence that was not addressed by the BLM. While acknowledging that this change "would be in contrast with surrounding undeveloped lands to the west, south and east of the Federal lands," the BLM dismissed the impacts because "the planned

---

[30] *See*, *e.g*., https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm

facilities would be similar in appearance to the existing gypsum stack and Don Plant facilities." FEIS at § 3.9.4.1 (AR0029689). Alternative B would convert even more land to industrial – an estimated 326 acres of the Federal lands and 174 acres of Simplot private lands – and the gypsum stacks would be more visible, but no discussion of the change was provided. FEIS § 3.9.4.3 (AR0029689).

On top of its failure to evaluate the change in location of the land exchange, the BLM failed to fully evaluate the environmental, health, and socioeconomic impacts of the land exchange. For example, the amount of waste that will be stored in the new gypstack is not quantified; only the land area for the gypstack expansion is provided. FEIS § 2.1.3.1.2 (AR0029570). Generalities and substantial uncertainties remain about the gypstack planning, design, and construction. *Id*. (AR0029570-71); FEIS § 3.5.4.1 (AR0029623). Evaluation of groundwater flows under the canyon that might add to the existing contamination are demonstrably insufficient: the BLM contends that there would be almost no additional contamination, even though previous uses resulted in significant groundwater contamination leading EPA to amend its original remedy determination for the site, and the 2010 IRODA still is not solving the groundwater contamination problems.

Additionally, the Tribes have observed that ducks, geese, migratory birds, and deer frequent the area of the Simplot Don Plant, Tribes' FEIS Comments (AR0065176-77), and this area will be expanded by the land exchange. The BLM nevertheless did not monitor or otherwise analyze the extent and nature of their presence in the area, and the EIS did little to analyze the impacts on them of the gypstack expansion or provide the specific and accurate information required in an EIS. Instead, the FEIS "assumed" the expansion would "pose minimal risk of drowning, entrapment, and toxicity for migratory birds and other wildlife species." FEIS §

3.16.1.2 (AR0029664). The BLM's assumption was based on statements of Simplot's staff that they had not observed wildlife issues at the existing gypstack, but Simplot had not done any formal monitoring of wildlife either. *Id.*

Even if the observations of Simplot's staff prove to be correct, moreover, it does not follow that an expanded gypstack would similarly not impact wildlife. The BLM's assumption also does not take into account that wildlife are accustomed to using the land where the gypstack expansion would be located. In particular, birds may have flight routes through the area, and the FEIS concedes that the gypstack does not have mechanisms to exclude or deter wildlife. FEIS at 3-71 (AR0029664). The FEIS also is silent as to the impacts on wildlife, including migratory birds, from increased contamination of surface water and groundwater, including in the wetlands area of the Fort Hall Bottoms, due to the gypstack expansion.

Notably, the FEIS fails to provide any detailed information regarding how the BLM complied with the requirements of the Migratory Bird Treaty Act, 16 U.S.C. §§ 703-712, which prohibits the taking of protected migratory bird species without prior authorization by the Fish & Wildlife Service (FWS). On the contrary, there is no indication in the FEIS that the BLM has initiated consultation with the FWS nor does it indicate any intention to seek review by the Migratory Bird Conservation Commission. Yet several species protected by the Act (including the red-tailed hawk and the red-winged blackbird) have been observed during field studies, making an evaluation necessary. Moreover, the FEIS notes that Simplot "anticipates installing new electrical powerlines" and acknowledges that "[c]ollisions with powerlines represent a major source of bird mortality in the United States," yet it does not indicate that it will ensure

compliance with the Act, noting only that Simplot "could" implement measures from federal guidelines if the powerlines are above ground. FEIS at 3-77.[31]

The BLM also failed to consider the environmental impacts of constructing the proposed Industrial Business Park within one mile of the expanded gypstack. Likewise, the FEIS does not address the additional health impacts the community and tribal members will be exposed to as a result of the land exchange. Wind carries fine particles of radioactive material from the gypsum stacks to the reservation and toward the cities of Chubbuck and Pocatello. Expansion of the gypstack will increase its surface area, leading to an increase in surface emissions, but the FEIS does not disclose this fact nor does it adequately evaluate the health impacts, both physical and mental, that may ensue, particularly from the construction of this source closer to residential neighborhoods. No information has been disclosed regarding exposure of the public to arsenic in the groundwater, or the health impacts from the industrial business park proposed to be developed on the federal lands. In addition, the FEIS should have included a complete analysis of the possibility of a catastrophic failure of the gypstacks and where the materials and water from them would be expected to flow.

Expanding the gypstack and constructing the cooling ponds would change not only the visual character but the very nature of the reservation from one that is primarily residential and agricultural to one that would become increasingly industrial, contrary to the Tribes' cultural values and overall governing plans. Building these facilities closer to residential areas also

---

[31] Subsequent to issuance of the ROD, the FWS published a rule limiting the scope of the incidental take prohibition in the Migratory Bird Treaty Act. *See* discussion in 86 Fed. Reg. 54642 (Oct. 4, 2021). That rule did not become effective until March 8, 2021 and was revoked on October 4, 2021 because it did "not reflect the best reading of the MBTA's text, purpose, and history. . . is also inconsistent with the majority of relevant court decisions addressing the issue . . . [and] raises serious concerns with Canada, a United States' treaty partner, and for the migratory bird resources protected by the MBTA and underlying treaties." *Id.*

adversely affects the Tribes' plans to offer housing to Tribal members in the Michaud Creek area. The FEIS nevertheless did not consider these socioeconomic impacts on the Tribes; it merely looked at impacts on housing in the surrounding communities of Chubbuck and Pocatello. *See* FEIS §§ 3.18.3.4.1, 3.18.4.1.1 (AR0029692, AR0029695).

       3.     *The BLM Failed to Consider Significant Impacts on the Tribes' Treaty Rights, Due Both to the Adverse Environmental Impacts of the Land Exchange and to the Resulting Loss of Public Land Adjacent to the Fort Hall Reservation.*

Article 2 of the Fort Bridger Treaty (AR0055983) guarantees to the Tribes the "absolute and undisturbed use and occupation" of the Fort Hall Reservation, and Article 4, *id.*, states that the reservation shall be the Tribes' "permanent home, and they will make no permanent settlement elsewhere." Moreover, Article 5, *id.*, requires a "prompt and diligent inquiry into such matters of complaint . . . as may be presented . . . under the provisions of [the] treaty stipulations" and a finding on whether there is a "depredation on person or property." *See also* Tribes' FEIS Comments at ¶ 16 (AR0065178).

Protection of the Tribes' reservation and its resources and the health of Tribal members living on the reservation is both mandated by the Treaty, which constitutes the highest law of the land, U.S. Constitution, Art. VI, cl. 2, and essential to the Tribes' preservation. Treaty rights are, moreover, property rights that require federal protection.[32] For these reasons, the BLM was required to thoroughly consider, as part of its NEPA analysis, the multiple negative impacts, described both above and below in this brief, resulting from Simplot's proposed land exchange. In this regard, it was essential that the FEIS weigh the request of a private, for-profit company seeking an accommodation to continue its significantly polluting industrial operations against the

---

[32] *Washington v. Washington State Comm. Passenger Fishing Vessel Ass'n*, 443 U.S. 658 (1979); *Menominee Tribe of Indians v. U.S.*, 391 U.S. 404 (1968).

treaty-protected rights and needs of the Shoshone-Bannock people. Furthermore, the gypstack expansion would have impacts for decades and even centuries on a people who will reside on the impacted land forever. Yet the BLM failed to adequately conduct this analysis.

Additionally, Article 4 of the Fort Bridger Treaty recognizes the Tribes' off-reservation hunting and fishing rights on the Tribes' ceded lands that remain in the public domain, including on the federal land selected for exchange in this case. The Tribes also reserved specific usufructuary rights to gather, graze animals, and cut timber for personal use. *Herrera v. Wyoming*, 139 S. Ct. 1686, 1694-1701 (2019) (repudiating the holding in *Ward v. Racehorse*, 163 U.S. 504, 516 (1896), that tribal off-reservation treaty rights terminate at statehood); *Swim v. Bergland*, 696 F.2d 712 (9th Cir. 1983) (recognizing these off-reservation treaty rights); *State v. Tinno*, 94 Idaho 759, 497 P,2d 1386 (1972) (same). These rights will be extinguished on the federal land at issue once the land becomes private.

The federal land at issue and the resources located on it have been integral components of the Tribes' contemporary subsistence and traditional cultural practices; Tribal members hunted on this land and maintained traditional and cultural practices on it. Although the BLM received land from Simplot in exchange for the federal land, which will be taken into the public domain, the land that Simplot obtained is adjacent to the reservation and therefore the area was more heavily used by the Tribes. The FEIS does not adequately analyze this impact nor does it consider mitigation of this consequence, other than noting that Simplot will pay $25,000 to the Tribes' Language Program for taking NRHP-eligible Site 10PR979 (a site eligible for the National Register of Historic Places) out of federal administration. FEIS § 2.3 (AR0029576).[33]

---

[33] The FEIS states that Simplot also would provide 950 acres of private property within the Fort Hall Reservation to the Tribes or to DOI for the benefit of the Tribes, but only if the land

To top things off, the prior Simplot land includes a former shooting area that undoubtedly is contaminated by lead shot and likely other debris, which the EIS did not assess. Tribes' FEIS Comments (AR0065172).[34]

       4.     *The BLM Failed to Consider Impacts on the Tribes' Cultural Resources.*

The entire area at issue in the land exchange is within the Tribes' aboriginal homelands, as set forth in the 1868 Fort Bridger Treaty and the 1898 Cession Agreement, ratified by the Act of June 6, 1990, and the Tribes maintain significant historical and cultural ties to this land. The area as a whole is considered by the Tribes to be a significant cultural landscape that provides a picture of the Tribes' ancestors' relationship to their homeland. Tribes' FEIS Comments (AR0065175). Based in part on archaeological reports prepared by BLM contractors, FEIS § 3.3.2 (AR0029608-09), it is very likely that the federal land that Simplot would acquire contains burial sites, spiritual sites, spring sites, waterways, archaeological sites, campsites, trails, healing locations, battlegrounds, and Tribal hunting, fishing, and gathering locations. Tribes' FEIS Comments (AR0065174).

For example, historically, the Shoshone and Bannock people placed deceased individuals in rock features such as cliffs and crevices. Within one mile of the federal land, there is a documented cliff burial. In 2014, bone fragments were found on an FMC-owned parcel that had been interred in a rock crevice, and the Tribes' Heritage Tribal Office (HeTO) and Language and Cultural Preservation staff have found other rock crevices in the area. Tribes' FEIS Comments

---

exchange is approved and any administrative or judicial appeals have been resolved. FEIS §§ 2.2-2.3 (AR0029575-76).

[34] The ROD also failed to ensure that the Tribes would have access to the newly acquired lands in the Blackrock Canyon area during the Tribes' hunting seasons and to all known cultural sites in the Howard Mountain area, despite the Tribes' request.  Tribes' FEIS Comments (AR0065181).

(AR0065175 -76). Additional burial sites are likely to be located in these areas, yet this concern is not addressed in the FEIS. *See* FEIS § 3.4.3 (AR0029617-18). Further evidence of the Tribes' use of the entire area is provided by a culturally significant cave dwelling. *See* photographs included in Tribes' DEIS Comments, Att. #2 (AR0039114). This cave dwelling has a view of the Bannock Creek area and Bannock Peak, and immediately nearby Tribal members could see the entire Pocatello Valley to the east and view the neighboring buttes to the north. Tribes' FEIS Comments (AR0065175).

In addition, for the past century, Tribal members have used the open rangelands on the reservation and ceded lands, including the federal exchange lands, for their cattle herds, using traditional methods of grazing, feeding, calving, branding, and roundup. A historical site eligible for the National Register of Historic Places (10PR666), which is on the federal land being provided to Simplot, represents a key period for the Shoshone and Bannock people demonstrating their persistence and successful transition to Indian ranching. Tribes' FEIS Comments (AR0065175). Simplot's proposed expansion of the gypsum stacks would destroy many of these resources and the integrity of the landscape.

By transferring the federal land at issue to Simplot, it will lose the protections for tribal cultural resources that are provided by federal laws and executive orders, including the Native American Graves Protection and Repatriation Act, the National Historic Preservation Act (NHPA), the Archaeological Resources Protection Act, and the American Indian Religious Freedom Act, in addition to FLPMA and NEPA, as well as E.O. 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations (Feb. 11, 1994) and E.O. 13007, Indian Sacred Sites (May 24, 1996). Simplot would not be required to protect places of cultural and historical significance to the Tribes on the land nor to provide

information about the impacts of its activities in the expanded gypstack area on these cultural resources. *See* FEIS § 3.3.4 (AR0029612).[35]

     5.     *The BLM Failed to Consider Cumulative Impacts from the Land Exchange.*

A cumulative impact is an "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions," 40 C.F.R. § 1508.7; *Shoshone-Bannock Tribes,* 2011 WL at *8 (AR0064812). As part of its EIS, the BLM was required to measure the cumulative environmental effects of the proposed action. 40 C.F.R. §§ 1508.8, 1508.25(a)(2), (c). Moreover, a cumulative impacts analysis "must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment." *Te-moak Tribe*, 608 F.3d at 602; *accord Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 868 (9th Cir. 2005); *Shoshone-Bannock Tribes*, 2011 WL at *9 (AR0064813). Cumulative impact analyses are insufficient when they discuss only the direct effects of the project at issue on a small area and merely contemplate other projects without any quantified assessment of their combined impacts. *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 872-73 (9th Cir. 2020); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 994 (9th Cir. 2004). Furthermore, "It is not appropriate to

---

[35] Pursuant to 36 C.F.R. § 800.4(a), which implements NHPA § 106, the BLM was required to determine the area of potential effects (APE) for its identification efforts. APE is defined as "the geographic area or areas within which an undertaking may directly or indirectly cause alterations in character or use of historic properties." 36 C.F.R.16(d). However, the areas that the BLM analyzed, AR0012411, AR0065333-34, did not include reservation areas downgradient from the proposed cooling ponds and gypstack expansion zones, even though cultural areas, historic properties, and places of traditional and religious significance to the Tribes on the reservation are likely to be impacted, and despite the fact that the Tribes brought this to BLM's attention in their EIS comments. (AR0030104, AR0039091).

defer consideration of cumulative impacts to a future date when meaningful consideration can be given now." *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1014 (9th Cir. 2006).

As discussed at the beginning of this brief, the Simplot Don Plant, which includes the plant itself and all its supporting facilities, such as the gypstacks and the cooling ponds currently at issue, is part of the EMF Superfund site, which is listed on the NPL due to its significant and substantial adverse environmental and health impacts. Yet the BLM failed to adequately consider the cumulative water quality, air quality, and health impacts that will result from an expansion of the gypstack and addition of 97 acres of cooling ponds.[36]

First and foremost, the FEIS should have discussed the environmental and health impacts of extending the operating life of the existing gypstacks and thereby of the Don Plant in general, which is stated to be the purpose of the land exchange, *see* FEIS at ES-1, 1-3 (AR0029544, AR0029560). Extending the life of the plant will not only prolong contamination of the area, with all the ensuing negative impacts on health and the environment, but also delay remediation of the site. Both consequences also adversely impact natural resource restoration efforts and alter the residential and agricultural nature of the reservation.

The FEIS cumulative effects analysis for water resources is inappropriately limited to the EMF Site and a small portion of the Portneuf River, before it enters the reservation. FEIS at 3-87 to 3-88 (AR0029680-81); Appx. H at H-74 to H-80 (AR0030025-31). Even though this Court noted previous concerns over "the potential significant cumulative impacts that could result from an additional gypsum stack (gyp-stack) added to the existing contamination from the current gyp-stack," *Shoshone-Bannock Tribes*, 2011 WL at *4 (AR0064804), the FEIS does not analyze

---

[36] *See*, *e.g.*, FEIS at 2-19, 3-11 to 3-13 (AR0029584, AR0029604-06), which, other than noting the change in location of Alternative B, state that cumulative impacts on air quality would be the same as for the proposed alternative, which in turn discusses compliance with the National Ambient Air Quality Standards but ignores potential health impacts.

these cumulative impacts on the reservation at all. It states instead that "The Portneuf River enters Fort Hall Reservation fewer than 2 miles downstream from Batiste Spring. Because site-affected groundwater enters the Portneuf River within a small stretch of the river between Swanson Road Spring and Batiste Spring, water quality impacts in the river at Fort Hall would be similar to the water quality impacts at Batiste Spring." FEIS at 3-88 (AR0029681). This statement is precisely the type of conclusory statement that violates the "hard look" required by NEPA and that prevents informed decision-making. *Ocean Advocates*, 402 F.3d at 868; *Bark*, 958 F.3d at 872-73.

In addition, remedial actions at the EMF Site are insufficient and releases of contaminants from the existing gypstacks continue to this day. Even though quantities of arsenic, sulfate, and phosphorous are being removed, significant amounts remain. *See*, *e.g.*, Groundwater/Surface Water Remedy 2019 Annual Report (AR0031049, AR0031056). The FEIS discusses past violations, *see*, *e.g.*, FEIS at 3-29 to 3-30 (AR0029622-23), but stops the discussion with releases that occurred in 2017. The FEIS does not directly address these violations, but instead relies on future remedial efforts to address the additional surface and groundwater pollution coming from the land exchange actions. *See*, *e.g.*, FEIS at 3-89 (AR0029682) ("Phosphorus concentrations in the Portneuf River will continue to be assessed by EPA and IDEQ and will be considered during subsequent permitting of the reasonably foreseeable actions. In addition, evaluation of data by EPA and IDEQ related to water quality and Clean Water Act requirements is ongoing and additional response actions may be found necessary"). Deferring consideration of cumulative impacts is yet another way the FEIS violates NEPA. *Envtl. Prot. Info. Ctr.*, 451 F.3d at 1014.

Without adequate or sufficiently detailed information on the cumulative impacts of the project, it also is impossible to assess how the potential harms coming from the land exchange could be mitigated. The BLM said it had no authority to impose mitigation actions because they would take place on private land, but even so it was required to consider them. *Protect Our Communities Found. v. Jewell*, 825 F.3d at 581-82.

6.  *The BLM Failed to Consider Reasonable Alternatives to the Proposed Action*.

NEPA requires that an agency "[r]igorously explore and objectively evaluate all reasonable alternatives" to the proposed action. 40 C.F.R. § 1502.14(a). An agency must consider a range of alternatives "sufficient to permit a reasoned choice among the options." *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1243 (10th Cir. 2011) (quoting *Ass'ns Working for Aurora's Residential Env't v. Colo. Dep't of Transp.*, 153 F.3d 1122, 1130 (10th Cir. 1998)). An agency cannot reject alternatives that standing alone do not achieve the project's goals or that do not offer a complete solution to the purpose and need. *Nat. Res. Def. Council v. Morton*, 458 F.2d 827, 836 (D.C. Cir. 1972).

FEIS § 2.5 (AR0029578) lists various alternatives that it claims were considered, but its analysis as to why these alternatives were eliminated from consideration does not constitute the rigorous examination that NEPA requires. For example, FEIS § 2.5.2.2 states that a fluoride process condensate alternative (which would have reduced fluoride emissions from the cooling towers, thereby reducing the need for such extensive cooling ponds) was eliminated from further consideration because it "would not be economically feasible." (AR0029579). The feasibility study it references does not, however, contain an economic analysis to support this statement. *See* FEIS Appx. E (AR0029768-0029851). Indeed, the other fluoride reduction alternatives that are mentioned, FEIS §§ 2.5.2.1-2.5.2.2 (AR0029579), also were rejected on the basis of

economic infeasibility without support in the record for that finding, since FEIS Appx. E in fact contains no economic analysis.

In addition, the BLM rejected other alternatives because they, standing alone, did not completely meet the stated purpose and need, despite established law that an agency may not reject alternatives on that basis. *E.g.*, *Nat. Res. Def. Council*, 458 F.2d at 836. Thus, FEIS § 2.5.5 (AR0029580) incorrectly eliminates from further consideration the potential of offsite waste disposal (in lieu of expansion of the gypstack) based on an assertion that it "would not meet the purpose and need associated with the Proposed Action or the applicant's objective." *See also* FEIS § 2.5.1 ("Simplot and the BLM considered other land exchange alternatives that would further reduce the acreage of Federal land included in the exchange. However, further reductions in the Federal land exchange area would generally not support Simplot's purpose and need for the land exchange. As a result, alternatives that include further reductions in the Federal land exchange area were eliminated from further detailed analysis.") (AR0029578). Dismissal of the offsite waste disposal alternative in FEIS § 2.5.5 (AR0029580) also was flawed because it was based on an assertion that it "would not address necessary fluoride reductions at the Don Plant," but that finding depended in turn on the inadequate analysis performed for the fluoride reduction alternatives discussed above.

7.   *At the Least, the BLM is Required to Prepare a Supplemental EIS to Consider Impacts from Alternative B.*

Pursuant to 40 C.F.R. § 1502.9(c), agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if:

(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

The development of a new alternative involving a new and unstudied location both is a "substantial change[s] in the proposed action that [is] relevant to environmental concerns" and raises "significant new circumstances or information," as discussed in the sections above. The BLM is therefore required to supplement the FEIS and provide a draft of the supplement for comment prior to selecting a preferred action and prior to the DOI issuing a ROD. By adopting a new alternative without fully analyzing and disclosing its potential effects, which also amounted to denying the public and the Tribes an opportunity to effectively comment (and preventing the Tribes from consulting) on those issues, the BLM violated the twin functions of NEPA.

In addition, to provide the "full and fair discussion" NEPA requires, 40 C.F.R. § 1502.1, the BLM must provide "some quantified or detailed information." *Or. Nat. Desert Ass'n*, 921 F.3d at 1191; *Te-moak Tribe,* 608 F.3d at 602. The BLM therefore should conduct supplemental studies on the impacts of the new location and adequately analyze them prior to making a recommendation on the land exchange.

B.    <u>The BLM Failed to Consider the Real Possibility that Simplot Will Develop a Different Plan for the Gypstack and Ponds Once the Land Exchange is Completed.</u>

The FEIS acknowledges that "Simplot has provided *preliminary conceptual locations* of the gypsum stacks and cooling ponds for Alternative B *based on current information*." FEIS at ES-4 (AR0029547). *See also* FEIS at 3-30 (AR0029623) ("Information required to fulfill the requirements of [the Idaho Department of Environmental Quality (IDEQ)] Consent Orders will likely be more detailed and may differ from information provided to the BLM in Appendix E for purposes of the Blackrock Land Exchange EIS."). Instead of confronting this issue and incorporating it into the analyses it performed, the BLM simply eliminated consideration of

design options for the cooling ponds and expanded gypstacks precisely because they could change. FEIS § 2.5.6 (AR0029580) ("Requirements for a more specific review of design options for the cooling ponds and expanded gypsum stacks that may be necessary under existing or future consent orders with the IDEQ and/or EPA is [*sic*] beyond the scope of this EIS because these facilities would be on private land following the land exchange. Following transfer of the Federal lands into private ownership Simplot would be responsible for determining final engineering and design details of the gypsum stack expansions and the cooling ponds and permitting these facilities in accordance with other Federal and State requirements."). The BLM was required to consider this possibility, however, and not to postpone its consideration to some unspecified future date. *Envtl. Prot. Info. Ctr.*, 451 F.3d at 1014.

The BLM's lack of authority to prescribe or enforce the location and design of the gypstack expansion and cooling ponds because they will be on private land is, moreover, a significant factor that the agency should have addressed and discussed in the FEIS. In addition, many of the alternatives rejected from consideration involved different design options, including different types of liners for the gypstacks. *See*, *e.g.*, FEIS § 2.5.6 (AR0029580). The liners (and lack thereof) at the gypstacks proved to be a significant issue at the site in the past, *see* FEIS at 3-84 (AR0029677) (2010 IRODA required Simplot "to control releases at the source areas (the existing gypsum stack and phosphoric acid plant) by lining the gypsum stacks and implementing management controls and infrastructure improvements at the phosphoric acid plant"), and substantial groundwater contamination is still being addressed. FEIS at 3-86 (AR0029679) ("Arsenic and nitrate currently exceed Idaho and Federal primary drinking water standards and sulfate exceeds Idaho and Federal secondary groundwater drinking water standards at the site Additionally metals such as cadmium and chromium exceed Idaho and Federal drinking water

standards in areas associated with low pH conditions resulting from process releases."). Indeed, the FEIS anticipates continued leakage from liners. *See, e.g.*, FEIS at 3-88 (AR0029681) ("[T]he reasonably foreseeable actions would result in minor incremental increases in arsenic and phosphorus due to leakage through liners.").

   C.   <u>The BLM Failed to Consider Simplot's History of Non-Compliance at the Don Plant</u>.

   The Don Plant has historically been and in fact is still in violation of its state-issued permit for fluoride emissions. Persons living on Cottage Avenue and within the City of Chubbuck are regularly notified that fluoride particles have exceeded the permit standards. Moreover, many of these people own grazing animals who may be affected by increased fluoride in forage. Tribes' FEIS Comments ¶ 2(a) (AR0065169). In some instances, livestock (and potentially wildlife) that consumed the contaminated flora have suffered from fluorosis, as indicated by tooth loss and bone density loss. The FEIS acknowledges that "Annual fluoride in forage reports submitted to the IDEQ for 2012 and 2013 indicate apparent violations of the fluoride in forage standard established by Idaho Administrative Procedures Act 58.01.01.577.06." FEIS at 3-8 (AR0029601). It also states that for 2018, the most recent year of measurements, one of the four target areas in the vicinity (the one closest to residences) "shows that nearly all locations exceed the annual standard." *Id*. Its only response to this issue, howeveris that "Simplot is under a Consent Order to reduce these fluoride concentrations (IDEQ 2016)." *Id*.

   In 2013, IDEQ issued a Notice of Violation to Simplot for violations of the fluoride forage standards. *See, e.g.*, FEIS Appx. E at 1-1 (AR0029778). In 2016, Simplot and IDEQ agreed to a Consent Order, in which IDEQ detailed Simplot's noncompliance over the years. *Id.*; Consent Order (AR0051184–200). In that Consent Order, Simplot agreed to reduce emissions,

*id*. (AR0051189), but, as the purpose of the land exchange indicates, Simplot still is not in compliance with that order. *See*, *e.g.*, FEIS at 2-4 (AR0029569). Indeed, the Consent Order gives Simplot until 2026 to reduce its fluoride emissions. FEIS at 1-3 (AR0029562).

In addition, on August 30, 2007 the EPA notified Simplot of ongoing violations of the Resource Conservation and Recovery Act (RCRA) at the Simplot Don Plant. *See* EPA Letter attached to the Complaint as Doc. 1-7. The RCRA violations concerned Simplot's treatment, storage, and disposal of waste at the Don Plant, including at the gypstacks. *Id*. at 9-10. The challenged land exchange will result in expanded gypstacks at the Simplot site, even though these violations still have not been resolved.[37]

Simplot's noncompliance is a significant factor that the BLM failed to consider, even though it recited its history. Instead, the FEIS states – entirely contrary to the evidence in the record – that "the BLM must assume that the transferred lands will be managed in conformance with all applicable statutes, regulations, and rules governing the actions and/or inactions of private, local, State, tribal, and Federal interests that acquire jurisdiction in some capacity over said lands." FEIS at ES-2 (AR0029545). Such a fundamentally incorrect assumption violates NEPA. *Native Ecosystems Council*, 418 F.3d at 964. It does not provide accurate information to the public, it precluded the BLM from considering the violations and analyzing their impact, especially in light of the gypstack expansion scheduled to take place, and it prevented the public from commenting on the issue.

---

[37] The same notice of violation notified Simplot of violations at the Don Plant of the Clean Air Act and implementing regulations. In 2015 the EPA and U.S. Department of Justice reached a settlement with Simplot to resolve these violations. *United States v. J.R. Simplot Co.*, No. 15-cv-00562, Lodging of Consent Decree (D. Idaho Dec. 30, 2015) (AR0050090–172).

D.     The BLM Did Not Adequately Consider Environmental Justice Concerns when Conducting the NEPA Process

Executive Order 12,898 requires every federal agency to "make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations[.]" The CEQ has issued guidance on considering environmental justice impacts under NEPA, directing that "[a]gencies should consider the composition of the affected area, to determine whether minority populations, low-income populations, or Indian tribes are present in the area affected by the proposed action, and if so whether there may be disproportionately high and adverse human health or environmental effects on minority populations, low-income populations, or Indian tribes." Environmental Justice Guidance Under the National Environmental Policy Act, at 9 (Dec. 10, 1997). The analysis requires examination of qualitative as well as quantitative factors:

> Agencies should recognize the interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the proposed agency action. These factors should include the physical sensitivity of the community or population to particular impacts; the effect of any disruption on the community structure associated with the proposed action; and the nature and degree of impact on the physical and social structure of the community.

*Id.* at 6; *see also id.* at 14; DOI, Environmental Justice Strategic Plan.[38] DOI's Plan references Secretarial Order 3335 (August 2014), which includes, as "Principle 5": "Work with Indian tribes and individual Indian beneficiaries to avoid or resolve conflicts to the maximum extent possible in a manner that accommodates and protects trust and restricted fee lands, trust resources, and treaty and similarly recognized rights." *Id.* at 15. As with all NEPA requirements,

---

[38] Available at
https://www.doi.gov/sites/doi.gov/files/uploads/doi_ej_strategic_plan_final_nov2016.pdf.

agencies must "take a 'hard look' at environmental justice issues." *Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017).

Recently, moreover, President Biden expanded on the federal government's commitment to environmental justice and issued Executive Order No. 13,990, Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (Jan. 20, 2021), explaining the goal of prioritizing environmental justice and for the federal government to "pursue a comprehensive approach to advancing equity for all, including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality." 86 Fed. Reg. 7,037 (Jan. 25, 2021).

The challenged land exchange has a disproportionate impact on the Shoshone-Bannock Tribes, a federally recognized Indian tribe. There is no dispute that Simplot's Don Plant is contaminating reservation water, polluting the air, and harming reservation plants, fish, animals, and the cultural use of traditional areas of the reservation. Indeed, these multiple adverse impacts are the reason the EMF Superfund Site was listed on the Nation Priorities List of Superfund sites. For decades the Tribes have been shouldering the direct and indirect effects of ongoing contamination from the EMF Site, which already poses environmental justice concerns. The land exchange, by expanding Simplot's gypstack, extends the life of the Simplot facility and will exacerbate these adverse impacts on the Tribes. The expansion and increased lifespan of the Simplot Don Plant will increase contaminants to waters that flow directly onto the reservation, have the potential to impact residential groundwater resources on the reservation, and increase air pollution across thousands of acres of reservation land.

The EIS nevertheless fails to address the disproportionate impacts of the land exchange on the reservation, leaving tribal members and their posterity to bear a disproportionate burden

of Simplot's industrial contamination. The BLM also failed to consider "the interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects" of the land exchange. The BLM also should have considered alternatives to the land exchange that would have lesser adverse health impacts on an environmental justice community. *See* Part III.A.7, *supra*.

E.  The BLM Failed to Adequately Respond to Many of the Tribes' Significant Comments.

The Tribes raised all of the concerns discussed here in their comments on the DEIS and FEIS. Yet, as also discussed here, the BLM failed to adequately address these comments, and in some instances did not address them at all, even though they raised significant issues. For example, the BLM did not address the Tribes' request for information on groundwater impacts in the area being provided to Simplot under Alternative B. *See* Tribes' FEIS Comments ¶ 1 (AR0065168). Nor did it examine the health impacts due to Alternative B consisting of land closer to a residential area. *See* Tribes' FEIS Comments ¶ 2(a) (AR0065169). The BLM's failure to meaningfully address these and other comments is discussed in detail in the Tribes' FEIS Comments (AR0065167-182).

The BLM had a duty to respond to all significant comments that the Tribes made, and its failure to do so is yet another reason for this Court to find that the EIS violated NEPA and therefore for the Court to vacate the ROD and the land exchange. Furthermore, as this Court found, the BLM committed previously that the land exchange would be "closely coordinated with the Tribes." *Shoshone-Bannock Tribes,* 2011 WL at *11 (AR0064818). BLM had meetings and site visits with the Tribes, but those did not amount to close coordination. The Tribes expressed serious concerns that were not properly addressed or resolved by the BLM. Instead,

the BLM issued the FEIS without first working with the Tribes to resolve their substantial issues.

*See* Tribes' FEIS Comments (AR0065167-82).

IV.   **The Defendants' approval of the Blackrock Land Exchange breached the United States' trust responsibility to regulate the disposal of the Tribes' ceded territory in accordance with the 1898 Agreement and the 1900 Act.**

Article IV of the Fort Bridger Treaty of 1868 states that the Shoshone-Bannock Tribes "will make said reservations their permanent home, and they will make no permanent settlement elsewhere; but they shall have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon." Art. IV, Fort Bridger Treaty of 1868 (AR0055983); FEIS § 3.4.2.2 (AR 29615). The Tribes' off-reservation Treaty rights are also recognized by the 1898 Agreement and 1900 Act, which expressly reserve the Tribes' rights to cut timber, pasture livestock, and hunt and fish on the ceded lands so long as any of the ceded lands remain part of the public domain.[39] The 1898 Agreement also specifically reserves tribal members' water rights "necessary for irrigating on land actually cultivates and in use . . . so long as said Indians remain where they now live."[40] The Agreement further preserves all preexisting treaty rights not incompatible with the Agreement.[41] These provisions of the Fort Bridger Treaty, the 1898 Agreement, and the 1900 Act together create a specific trust responsibility of the United States to protect those treaty rights and regulate the disposal of the ceded lands as plainly required by the 1898 Agreement and the 1900 Act. By approving the Blackrock Land Exchange without adhering to the specific restrictions of the 1898 Agreement and the 1900 Act, the DOI and BLM breached that trust responsibility.

---

[39] *Id.* Art. IV, 31 Stat. at 674.

[40] *Id.* Art. VIII, 31 Stat. at 674.

[41] *Id.* Art. VI, 31 Stat. at 674.

SHOSHONE-BANNOCK TRIBES' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 45

The United States bears a trust responsibility toward Indian tribes, and federal agencies share in that fiduciary responsibility. *United States v. Mitchell (Mitchell II)*, 463 U.S. 206, 225 (1983); *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 574 (9th Cir. 1998) (citing *Inter Tribal Council of Arizona, Inc. v. Babbitt*, 51 F.3d 199, 203 (9th Cir. 1995); *Covelo Indian Community v. FERC*, 895 F.2d 581, 586 (9th Cir. 1990)). The EIS in this case recognizes this trust responsibility: "The Federal Government has a unique trust relationship with federally recognized American Indian tribes, including the Shoshone and Bannock Tribes. The BLM has a responsibility and obligation to consider and consult on potential effects on natural resources related to the tribes' treaty rights, uses, and interests under the Federal laws, executive order, and treaties noted above." FEIS § 2.5.4 (AR0029919).

The Ninth Circuit, in *Navajo Nation v. U.S. Dept. of the Interior*, recently outlined the requirements a tribe must meet to bring a breach of trust action for non-monetary relief. *See Navajo Nation*, 26 F.4th 794, 807-809 (9th Cir. 2022). The Court stated: "unless there is a specific duty that has been placed on the government with respect to Indians, this responsibility is discharged by the agency's compliance with general regulations and statutes not specifically aimed at protecting Indian tribes." *Id.* at 807-08 (quoting *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 574 (9th Cir. 1998)). The Court further explained: "an Indian tribe cannot force the government to take a specific action *unless a treaty, statute or agreement imposes, expressly or by implication, that duty.*" *Id.* at 808 (quoting *Gros Ventre Tribe v. United States*, 469 F.3d 801, 810 (9th Cir. 2006)) (emphasis in original).

In both *Morongo* and *Gros Ventre*, the Ninth Circuit rejected tribal breach of trust claims because neither tribe could identify a treaty, statute, or agreement that imposed (expressly or by implication) a specific duty that had been placed on the government with respect to Indians. In

*Morongo*, which involved the tribe's claim for non-monetary relief under the APA for alleged violations of various statutes and FAA regulations, the Court rejected the tribe's breach of trust assertion based on the absence of a specific duty placed on the government with respect to Indians. *Morongo*, 161 F.3d at 574. In *Gros Ventre*, the Court rejected the tribes' claim that the federal government breached its trust responsibility to the tribes by approving, permitting, and failing to reclaim certain mines. *See Gros Ventre*, 469 F.3d at 806. Because the tribes in *Gros Ventre* could not point to any specific statutory or regulatory duty to the tribes, the Court held, "the Tribes cannot allege a common law cause of action for breach of trust that is wholly separate from any statutorily granted right." *Id.* at 810.

After discussing the Court's decisions in *Morongo* and *Gros Ventre*, the Ninth Circuit in *Navajo Nation* distinguished those cases and recognized the tribe's breach of trust claim because the tribe "identified specific treaty, statutory, and regulatory provisions that impose fiduciary obligations" on the federal government to ensure that the tribe had an adequate water supply. *Navajo Nation*, 26 F.4[th] at 809-810.

The Tribes' current claim for breach of trust is distinctly different from that in *Morongo* and *Gros Ventre*, and squarely satisfies the Ninth Circuit's legal standard articulated recently in *Navajo Nation*. In this case, the Tribes have alleged a breach of trust claim based on a specific agreement and statute. The February 5, 1898, Agreement between the Shoshone-Bannock Tribes and the United States specifically reserved to the Tribes "the right, without any charge therefor, to cut timber for their own use, but not for sale, and to pasture their live stock on said public lands, and to hunt thereon and to fish in the streams thereof." Art. IV, 1898 Agreement, 31 Stat. 674. This Agreement was ratified by Congress on June 6, 1900. 31 Stat. 675. As discussed above, the 1898 Agreement and 1900 Act impose three specific limitations on the disposal of the

Tribes' ceded lands which encompass the federal lands that are part of the challenged land exchange in this case. First, the 1900 Act requires that ceded lands "shall be subject to disposal under homestead, townsite, stone and timber, and mining laws of the United States <u>only</u>."[42] Second, the 1900 Act states that "no purchaser shall be permitted in any manner to purchase more than one hundred and sixty acres of the [ceded] land,"[43] Third, the 1900 Act provides that "all of said [ceded] lands within five miles of . . . Pocatello shall be sold at public auction . . . for not less than ten dollars per acre."[44]

The 1898 Agreement and 1900 Act are together a specific agreement and statute that set forth particular duties of the United States undertaken for the benefit of the Tribes and the preservation and protection of the ceded lands. The 1898 Agreement and 1900 Act name or reference the Shoshone-Bannock Tribes over 25 times. The obligations of the United States in the 1900 Act include the government's duties of restricting disposal of the ceded lands to certain laws (not land exchanges), 160-acre limits for purchasers, and the public auction requirement. The 1898 Agreement and 1900 Act clearly satisfy the Ninth Circuit's legal standard for a tribe's breach of trust claim. By ignoring the restrictions and requirements of the 1900 Act in the challenged Blackrock Land Exchange, the United States breached its trust responsibility to protect the ceded lands through enforcement of the 1898 Agreement and 1900 Act. The Court should therefore vacate the Defendants' August 12, 2020, ROD.

The Defendants' approval of the challenged land exchange also breaches the guarantee in Article 2 of the 1868 Fort Bridger Treaty for an "absolute and undisturbed use and occupation" of the Fort Hall Reservation. The promise of off-reservation Treaty rights reserved in Article 4

---

[42] 1900 Act, Sec. 5, 31 Stat. 672, 676.

[43] *Id.*

[44] *Id.*

begins by stating that "[the Tribes] will make said reservations their permanent home, and they will make no permanent settlement elsewhere." The Tribes are permanently situated on the Fort Hall Reservation. Accordingly, protecting the lands, water, and air of the Reservation is of critical importance. Permitting ceded lands to be exchanged by the federal government to increase the size of and pollution from a Superfund site violates the Treaty guarantee of a permanent homeland on the Fort Hall Reservation. The Tribes should not be subjected to long-term and persistent risks because of a discretionary land exchange that will allow for the growth of contamination that has been demonstrated to be hazardous to human health for generations to come.

At the heart of this land exchange is the interest of a private company seeking an accommodation to continue industrial operations that create substantial and permanent pollution and contamination of the Fort Hall Reservation's water and valuable resources. This interest must be viewed considering United States' obligation to preserve a permanent homeland for tribal members, who will reside on the Reservation land forever. Expansion of industrial operations, which have resulted in an existing and unremediated Superfund site, threatens and directly impacts the Tribes' health and welfare, economic security, political integrity, and the Tribes' ability to utilize affected areas due to enhanced risks to groundwater, air, and other pollutants beyond the foreseeable future. Facilitating the continued operation of the Simplot Don Plant through the challenged land exchange also extends the contamination to the Fort Hall Bottoms Area, which is a vital location for Tribal member subsistence hunting, fishing, and gathering, as well as important cultural practices.

**CONCLUSION**

For the foregoing reasons, the Court should grant the Tribes' motion for summary judgment, vacate the Defendants' August 12, 2020, Blackrock Land Exchange Record of Decision, and order titles to the land at issue transferred back to the respective owners before the Record of Decision on August 12, 2020.

Dated: April 29, 2022

Respectfully submitted,

 /s/ Paul C. Echo Hawk
Paul C. Echo Hawk

 /s/ Jill E. Grant
Jill Elise Grant
*Attorneys for the Shoshone-Bannock Tribes*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of April 2022, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Devon Lehman McCune, Attorney for Defendants
devon.mccune@usdoj.gov

Shannon Boylan, Attorney for Defendants
shannon.boylan@usdoj.gov

Steven B. Andersen, Attorney for J.R. Simplot Company
sandersen@kmclaw.com

Thomas C. Perry, Attorney for J.R. Simplot Company
tom.perry@gov.idaho.gov

Jennifer Marie Reinhardt, Attorney for J.R. Simplot Company
jtessmer@kmclaw.com

 /s/ Paul C. Echo Hawk
Paul C. Echo Hawk