Steven B. Andersen, ISB # 2618
**KIRTON MCCONKIE**
999 W. Main Street, Ste. 100
Boise, Idaho 83702
Telephone: (208) 370-3325
E-mail: sandersen@kmclaw.com

Thomas C. Perry, ISB #7203
**J.R. SIMPLOT COMPANY**
1099 W. Front Street
Boise, Idaho 83707
Telephone: (208) 780-7430
E-mail: thomas.perry@simplot.com

Stephen J. Odell, OSB # 903530 (admitted *Pro Hac Vice*)
**MARTEN LAW, PLLC**
1050 SW Sixth Ave., Ste. 2150
Portland, Oregon 97204
Telephone: (503) 241-2648
E-mail: sodell@martenlaw.com

*Attorneys for Defendant-Intervenor J.R. Simplot Company*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| SHOSHONE-BANNOCK TRIBES OF THE FORT HALL RESERVATION, | ) ) ) | Case No.: 4:20-cv-00553-BLW |
| Plaintiff, | ) ) ) | **DEFENDANT-INTERVENOR J.R. SIMPLOT COMPANY'S BRIEF IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT PURSUANT TO THE APA AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| LAURA DANIEL-DAVIS,[1] Principal Deputy Assistant Secretary for Land and Minerals Management; UNITED STATES DEPARTMENT OF THE INTERIOR; and UNITED STATES BUREAU OF OF LAND MANAGEMENT, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |
| and | ) ) | |
| J.R. SIMPLOT COMPANY | ) ) | |
| Defendant-Intervenor. | ) ) ) | |

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Ms. Daniel-Davis is being automatically substituted for her predecessor in the official public position she now holds for the U.S. Department of the Interior.

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND ............................................................................... 3

I.   BLM Approved the 2020 Exchange and Prepared Its EIS Based on Nearly 30 Years of Data and with the Benefit of Significant Public Input and Tribal Involvement. ..................... 3

A.   The 2020 Exchange consolidated federal lands, brought superior wildlife habitat into the public domain, and will allow for a reduction in air pollution emissions. ..................... 3

B.   BLM prioritized Tribal input throughout development and evaluation of the 2020 Exchange. .......................................................................................... 5

C.   BLM developed Alternative B largely in response to the Tribes' concerns. .................. 6

D.   BLM provided extensive opportunities for public involvement in developing the Blackrock EIS. .................................................................................... 6

II.   The FEIS Properly Analyzes the Cumulative Effects regarding the 2020 Exchange. ......... 8

A.   The FEIS thoroughly evaluates the effects of several significant new developments that have occurred since the 2007 Environmental Assessment. .................................... 8

B.   The FEIS meaningfully addresses the issues the Court identified in *Blackrock I.* .......... 9

1.   The Feasibility Study provides a conceptual design of Simplot's RFAs. ..................... 10

2.   The Water Report analyzes impacts to water quality and projects that the RFAs will allow for continuation of ongoing environmental improvement. ........................... 11

3.   Data from the regulatory agencies' oversight of the plant continues to yield valuable data related to all aspects of human health and the environment. ......................... 13

III.   The 2020 Exchange Was Approved Under FLPMA's Land Exchange Authority. ....... 14

IV.   Simplot Must Obtain Further Approvals and Meet Environmental Requirements Before Implementing the RFAs. ....................................................................... 15

STATUTORY FRAMEWORK ........................................................................... 17

I.   National Environmental Policy Act ("NEPA") .................................................. 17

II.   Federal Land Policy & Management Act of 1976 ("FLPMA") ......................... 18

STANDARD OF REVIEW ................................................................................ 19

ARGUMENT .................................................................................................... 19

I.   BLM Complied Fully with NEPA. ................................................................. 19

A.   The FEIS takes a hard look at water quality effects on the Portneuf River. ................. 20

B.   The FEIS amply discloses and analyzes projected effects to air quality. .................... 24

C.   The FEIS discloses and analyzes projected effects to cultural resources. ................... 26

D.   The FEIS considers environmental justice impacts consistent with applicable guidance…...................................................................................................... 28

E.   The FEIS addresses the Tribes' off-reservation treaty rights.......................................... 30

F.   BLM fully evaluated the effects of Alternative B in both the DEIS and FEIS, and neither a revised or supplemental EIS is required. ............................................... 31

G.   The FEIS considers reasonable alternatives to the Proposed Action. .......................... 35

II.   BLM Properly Authorized the Land Exchange Under FLPMA ...................................... 36

A.   The Blackrock Land Exchange well serves the public interest**...........................**36

III.   BLM Approved the 2020 Exchange Pursuant to its Authority in FLPMA and Section 5 of the 1900 Act Does Not Apply to the Exchange. ................................................... 40

A.   BLM approved the 2020 Exchange using its authority under FLPMA. ....................... 40

B.   Section 5 of the 1900 Cession Agreement Act does not apply to the 2020 Exchange. . 41

C.   Section 5 does not prevent BLM from utilizing Section 206 of FLPMA. .................... 43

IV.   The Land Exchange is Consistent with the Trust Duties of the United States............... 45

V.   The Tribes Have Not Shown They are Entitled to any Remedy on Summary Judgment.  48

CONCLUSION.................................................................................................................... 50

# TABLE OF AUTHORITIES

**Cases**

*American Water Works Ass'n v. EPA*, 40 F.3d 1266 (D.C. Cir. 1994).........................................45

*Andrus v. Utah*, 446 U.S. 500 (1980)...........................................................................................43

*Association of Pub. Agency Customers v. Bonneville Power Admin.*, 126 F.3d 1158 (9th Cir. 1997).......18

*Baltimore Gas & Elec. v. Natural Res. Def. Council*, 462 U.S. 87 (1983).................................19

*California v. Block*, 690 F.2d 753 (9th Cir. 1982) .......................................................................17

*City of Alexandria v. Slater*, 198 F.3d 862 (D.C. Cir. 1999) ......................................................36

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142 (9th Cir. 1997)...............35

*City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205 (9th Cir. 2004) .............................................19

*Center for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633 (9th Cir. 2010).....................19, 33

*Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095 (9th Cir. 2016) ...................23

*Gros Ventre Tribe v. United States*, 469 F.3d 801 (9th Cir. 2006) ..................................45, 46, 47

*Havasupai Tribe v. Robertson*, 943 F.2d 32 (9th Cir. 1991) ......................................................32

*Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230 (D. Or. 2013)................39

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976)...............................................................................24

*Lands Council v. McNair*, 629 F.3d 1070 (9th Cir. 2010) ..........................................................19

*League of Wilderness Defenders v. U.S. Forest Serv.*, 689 F.3d 1060 (9th Cir. 2012)...............36

*Lodge Tower Condo. Assn. v. Lodge Prop.*,
      880 F. Supp. 1370 (D. Colo. 1995), *aff'd*, 85 F.3d 476 (10th Cir. 1996) .............................19

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990). ...................................................................18

*Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360 (1989) .........................................................32

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010).....................................................49

*N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006).............................................31

*National Coal Ass'n v. Hodel*, 825 F.2d 523, 532 (D.C. Cir. 1987) ...........................................38

*Nat'l Coal Ass'n v. Hodel*, 675 F.Supp. 1231 (D. Mont. 1987)..................................................39

*Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337 (9th Cir. 1995).......................................................49

*Native Village of Point Hope v. Jewell*, 740 F.3d 489 (9th Cir. 2014) .......................................34

*Natural Res. Def. Council, Inc.v.Morton*, 458 F.2d 827 (D.C. Cir. 1972)...................................36

*Navajo Nation v. U.S. Dept. of the Interior*, 26 F.4th 794 (9th Cir. 2022) .....................45, 47, 48

*Northern Plains Res. Council v.Lujan*, 874 F.2d 661 (9th Cir. 1989) ........................................39

*Northern Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011).......................22

*Oregon Nat. Desert Ass'n v. Cain*, 17 F. Supp. 3d 1037 (D. Or. 2014) .....................................39

*Paloma Inv. Ltd. Partnership v. Jenkins*, 978 P.2d 110 (Ariz. App. 1998) .................................47

*Quechan Indian Tribe v. U.S. Dep't of Interior*, 547 F. Supp. 2d 1033 (D. Ariz. 2008) ...........26

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 349 (1989) .................................17, 31

*Safari Club Int'l v. Haaland*, 31 F. 4th 1157 (9th Cir. 2022) ...........................................28

*Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476 (D.C. Cir. 1995). ..................................46, 47

*Shoshone-Bannock Tribes v. United States Dep't of the Interior,*
   4:10–CV–004–BLW, 2012 WL 314038 (D. Idaho Feb. 1, 2012). ..................................34

*Shoshone-Bannock Tribes v. United States Dep't of the Interior,*
   Case no. 4:10-cv-004-BLW, 2011 WL 1743656 (D. Idaho May 3, 2011) ("*Blackrock I*") ..........1, 9, 47

*Stryker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223 (1980)...................................17

*Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078 Cir. 2004) .....................................28

*Wild Earth Guardians v. Provencio*, 923 F.3d 655 (9th Cir. 2019) ...................................26

*Wilderness Soc'y v. Morton*, 479 F.2d 842 (D.C. Cir. 1973)...........................................18

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008).......................................49

*Winters v. United States*, 207 U.S. 564 (1908) ......................................................47

## Statutes

Federal Statutes and Public Laws

5 U.S.C. § 706.......................................................................................19

5 U.S.C. § 706(2)(A)...............................................................................19

25 U.S.C. § 2201(4)................................................................................38

28 U.S.C. § 2401(a)................................................................................39

42 U.S.C. § 4332(2)(c)............................................................................17

42 U.S.C. §§ 7411–12..............................................................................16

42 U.S.C. §§ 7661–7661f..........................................................................24

43 U.S.C. § 1715(a)...............................................................................44

43 U.S.C. § 1701(a)(10)...........................................................................41

43 U.S.C. § 1701(a)(12)...........................................................................39

43 U.S.C. § 1716(a)....................................................................14, 18, 41, 44

43 U.S.C. § 315f...................................................................................43

54 U.S.C. § 302706(a).............................................................................26

54 U.S.C. § 306108................................................................................26

54 U.S.C. §§ 300308 & 300311.....................................................................26

Act of May 20, 1862, 37th Cong., ch. 75, § 1, 12 Stat. 392........................................42

Pub. L. No. 58-153 (Mar. 30, 1904) ..............................................................43

Pub. L. No. 94–579 (Oct. 21, 1976)..........................................................................18

<u>State Statutes</u>

Idaho Code § 39-176E.............................................................................................16

Idaho Code §39-176F..............................................................................................16

## Other Authorities

Council on Envtl. Qual., *Environmental Justice Guidance Under the National Environmental Policy Act* (Dec. 10, 1997) ........................................................................................29

Council on Envtl. Qual., *Guidance on the Consideration of Past Actions in Cumulative Effects Analysis* (June 24, 2005)...................................................................................22

Exec. Order 14,017, *America's Supply Chains*, 86 Fed. Reg. 11,849 (Mar. 1, 2021) ................50

Exec. Order 6910 (Nov. 26, 1934)...........................................................................43

Fort Bridger Treaty of 1868 ...........................................................................46, 47

Library of Congress, *Indian Land Cessions in the U.S., 1784-1894*........................45

Paul W. Gates, *History of Public Land Law Development* 49–57, 75–86 (1968) ...................18

*President Biden Announces New Actions to Address Putin's Price Hike, Make Food More Affordable, and Lower Costs for Farmers* (May 11, 2022);.....................................................50

Robert L. Wrigley, Jr., The Early History of Pocatello, Idaho, 34 Pacific Northwest Q. 353 (1943). ...42

S. Doc. No. 169, 55th Cong., 2nd Sess. (1898)......................................................44

Sen. Comm. On Energy & Nat. Resources, 95th Cong., 2d Sess.

Legislative History of FLPMA (1978)..................................................................40

## Regulations

40 C.F.R. § 1502.14(a).............................................................................................35

40 C.F.R. § 1502.22(a).............................................................................................22

40 C.F.R. § 1502.9...................................................................................................32

43 C.F.R. § 1601.0-5(b)..........................................................................................38

43 C.F.R. § 2200.0-6(b)(2)......................................................................................37

43 C.F.R. § 2400.0-3...............................................................................................43

43 C.F.R. §§ 2200, 2201..........................................................................................19

59 Fed. Reg. 7629 (Feb. 11, 1994)...........................................................................28

84 Fed. Reg. 22,893 (May 20, 2019) ........................................................................5

87 Fed. Reg. 15,191 (Mar. 17, 2022)........................................................................50

## Constitutional Provisions

U.S. CONST., art. IV, § 3, cl. 2.................................................................................44

## GLOSSARY

| | |
|---|---|
| **BLM** | United States Bureau of Land Management |
| **DEIS** | Draft Environmental Impact Statement |
| **EA** | Environmental Assessment |
| **EIS** | Environmental Impact Statement |
| **EPA** | United States Environmental Protection Agency |
| **FEIS** | Final Environmental Impact Statement |
| **FLPMA** | Federal Land Policy & Management Act |
| **Gypsum Stack** | Phosphogypsum (or gypsum) stack |
| **IDEQ** | Idaho Department of Environmental Quality |
| **NAAQS** | National Ambient Air Quality Standards |
| **NEPA** | National Environmental Policy Act |
| **NHPA** | National Historic Preservation Act |
| **NRHP** | National Register of Historic Places |
| **RFAs** | Reasonably Foreseeable Actions |
| **ROD** | Record of Decision |
| **Simplot** | J.R. Simplot Company |
| **Tribes** | Plaintiff Shoshone-Bannock Tribes of the Fort Hall Reservation |

## INTRODUCTION

Much has changed in the decade since this Court's review of an earlier iteration[2] of the Blackrock Land Exchange between the United States and J.R. Simplot Company ("Simplot") at issue in this action.  First and most significantly, pursuant to the Court's direction the Bureau of Land Management ("BLM") prepared a comprehensive environmental impact statement ("EIS") to fully inform its evaluation and approval of the 2020 version of the exchange.  The EIS addressed the issues the Court raised in its previous review and took the requisite "hard look" at the cumulative effects of the land exchange and reasonably foreseeable actions ("RFAs") Simplot plans to take on the acquired lands.  These RFAs include a fully lined lateral expansion of the existing phosphogypsum stack ("gypsum stack") adjacent to Simplot's Don Plant, along with construction of cooling ponds designed to reduce fluoride emissions from plant operations.

The analysis in the EIS is robust.  It draws from more than a quarter-century of extensive monitoring data and government studies specifically compiled to track the primary categories of environmental effects relevant to the plant's operations, in particular water and air.  Its analysis relies upon two new technical documents prepared in direct response to the Court's inquiries.  One is a feasibility study Simplot commissioned to develop conceptual designs of the RFAs.  This study afforded BLM a sound basis for projecting their potential effects.  The other is a water resources technical report that specifically and quantitatively projects the RFAs' effects on groundwater and the Portneuf River.  This report, reviewed by both the U.S. Environmental Protection Agency and Idaho Department of Environmental Quality, found that the projected

---

[2] *Shoshone-Bannock Tribes v. U.S. States Dep't of the Interior*, Case no. 4:10-cv-004-BLW, 2011 WL 1743656 (D. Id. May 3, 2011) ("*Blackrock I*").

incremental effects from RFAs on water resources will be so small as to be effectively immeasurable.

Second, the land exchange itself underwent several meaningful changes. Unlike the 2007 iteration, the 2020 Exchange provides for a net gain in the acreage of public lands on which Plaintiff Shoshone-Bannock Tribes of the Fort Hall Reservation ("Tribes") are able to exercise their off-reservation treaty rights. In addition, the federal lands were shifted to the east to avoid cultural resources of importance to the Tribes. This shift also served to move the planned gypsum stack expansion farther away from the Fort Hall Reservation while also allowing the expansion to avoid steeper canyon terrain. At the same time, the 2020 Exchange still importantly provides for consolidated and more efficient federal lands management as well as improved recreational opportunities and enhanced wildlife habitat to benefit the general public.

Third, extensive monitoring data firmly establishes a significant improvement to environmental conditions at and around the Don Plant from myriad new source control measures Simplot has implemented. As analyzed in the EIS for example, Simplot invested $50 million to install an intermediate liner in its existing gypsum stack that has led to an 85 percent reduction of phosphorous concentration in the Portneuf River since 2008. Much greater regulatory certainty also exists in the standards that will govern future permitting of the RFAs. For example, Idaho law now prescribes design, construction, and quality assurance requirements for new or expanded gypsum stacks. In combination, these changes reveal a much improved and clearer environmental picture than was present at the time of this Court's previous review and decision.

Armed with this greater understanding of environmental impacts, BLM carefully considered all relevant factors and approved the 2020 Exchange pursuant to its explicit authority in the Federal Land Policy and Management Act ("FLPMA") based on its finding that the

exchange well serves the public interest.  BLM also approved the exchange in a manner wholly consistent with the Tribes' treaty rights.  Based on that approval, BLM and Simplot completed the exchange in December 2020.  BLM has therefore done all this Court and the law require of it.

The Tribes largely ignore these changes in their opening brief, and instead premise their arguments on the flawed assumption that the 2020 Exchange will simply allow for continuation of the kind and level of environmental effects that occurred decades ago.  Nor do they point to anything in the extensive record to render BLM's rigorous effects analysis or approval of the exchange arbitrary and capricious, but rather simply recount their vigorous disagreements with each.  The Tribes further selectively fail to acknowledge BLM's broad statutory authority to conduct land exchanges under FLPMA, and instead invite this Court to limit the agency to disposing of ceded lands under an obsolete and antiquated regime.  This Court should decline this deeply flawed invitation and grant summary judgment in favor of Defendants.

## FACTUAL BACKGROUND

I.     **BLM Approved the 2020 Exchange and Prepared its EIS Based on Nearly 30 Years of Data and with the Benefit of Significant Public Input and Tribal Involvement.**

BLM engaged in a thorough environmental review process that involved extensive public and Tribal involvement.  The agency relied on vast amounts of data and studies stretching as far as back as 1994, when Simplot first proposed the exchange.  FEIS at 1-1 (AR0029560).  The agency therefore had a particularly rich record to inform not only its environmental analysis, but also for designing and approving the ultimate footprint of the 2020 Exchange.

A.   **The 2020 Exchange consolidated federal lands, brought superior wildlife habitat into the public domain, and will allow for a reduction in air pollution emissions.**

Simplot first proposed the Blackrock Land Exchange in 1994 to secure adjacent land to its Don Plant to meet its environmental obligations and allow plant operations to continue

beyond the near term.  FEIS at 1-1 - 1-3 (AR0029560-62).  The plant has operated for nearly eighty years and is a fixture of the local economy, producing high-quality phosphate fertilizer essential for Western agriculture and the nation's food security.  *See, e.g.*, AR0012340 (Letter of support from Pocatello Chamber of Commerce).  The 2020 Exchange will also enable Simplot to decommission its current cooling towers at the Don Plant and replace them with lower-emission cooling ponds.  This extensive effort will comply with a 2016 Consent Order with the Idaho Department of Environmental Quality ("IDEQ") that requires Simplot to achieve significant fluoride reductions by June 2026.  FEIS at 1-3 (AR0029562); AR0012355 (IDEQ letter of support for 2020 Exchange because it will allow for "reduc[ing] air pollutant emissions in the area to ensure compliance with state law and the federal Clean Air Act").

Well before approving the 2020 Exchange, BLM identified the lands at issue as suitable for exchange in its 2012 Pocatello Resource Management Plan ("Pocatello RMP").[3] AR0065396-0065805.  The Pocatello RMP designates the area within a "Zone 3 land tenure adjustment zone" that places a priority on consolidating ownership to maximize public values, provide public access, and improve efficiencies in public land administration.  Record of Decision ("ROD") at 8 (AR0039176).  It provides that the means for achieving this priority expressly include "[a]cquisition, primarily through exchange . . . to add high resource value lands that improve the manageability of public land."  *Id.*  The Pocatello RMP provides further direction calling for acquisition of private lands within the Blackrock Canyon Big Game Wildlife

---

[3] BLM had actually identified these lands as a prime target for federal acquisition as early as 1995 in its Chinese Peak/Blackrock Canyon Resource Activity Plan.  AR0062809.

Area, which the 2020 Exchange also effectuated.  *Id.*  The Tribes participated in development of the Pocatello RMP, having served on the interdisciplinary team that prepared it.[4]  AR0047839.

**B.  BLM prioritized Tribal input throughout development and evaluation of the 2020 Exchange.**

The first step BLM took in evaluating the 2020 Exchange was commencing government-to-government consultation with the Tribes.  AR0033009.  BLM developed a Tribal Consultation Plan that outlined protocols to guide such efforts.  The consultation included meetings between BLM and the Tribes and numerous meetings with the Tribes' cultural staff.  *See, e.g.*, ROD at 8, 12–13 (AR0039176, AR0039180–81); FEIS at 3-22, 4-3–4-4 (AR0029615, AR0029704–05).

Only after meeting with the Tribes did BLM commence its broader public engagement process, publishing a Notice of Intent to prepare an EIS in the Federal Register in May 2019. FEIS at 1-4, 1-6 (AR0029563, AR0029565); 84 Fed. Reg. 22,893 (May 20, 2019).  The notice initiated a 45-day scoping period during which BLM actively solicited input on the issues and alternatives to be addressed in the EIS.  *Id.*

BLM held two public scoping meetings, including one on the Fort Hall Reservation attended by tribal representatives.  FEIS at 1-6 (AR0029565); *see also* AR0033051.  The Tribes submitted scoping comments requesting that the EIS address effects from the expanded gypsum stack and impacts to water quality, tribal resources, cultural resources and geography, wildlife, air quality, environmental justice, and the federal government's tribal trust responsibilities. AR0064991–99.  Each of these parallels one of the seventeen principal categories of resource

---

[4] In fact, the Tribes specifically requested that BLM defer consideration of the Blackrock Land Exchange until after the agency completed its 2012 amended Pocatello RMP "to provide [an] opportunity to consult with the Tribes on transferring/disposal of public lands, especially those public lands within the original boundaries of the Fort Hall Indian Reservation."  AR0063840. This is precisely the chronology that has been followed with respect to the 2020 Exchange.

values or interest explicitly addressed in the Final Environmental Impact Statement ("FEIS") with the purpose of determining the "real issues."   FEIS at 3-3–3-14 (AR0029596–29607), 3-14–3-20 (AR0029607–13), 3-20–3-28 (AR0029613–21), 3-34–3-37 (AR0029627–30), 3-71–3-79 (AR0029664–72), 3-79–3-91 (AR0029672–84), 3-92–3-105 (AR0029685–98).

**C.  BLM developed Alternative B largely in response to the Tribes' concerns.**

In addition to evaluating the Proposed Action and No-Action alternative, BLM developed two new alternatives for detailed analysis and public comment in the Draft and Final EIS based in large measure on early Tribal input.  First, the Tribes expressed concern that the federal lands included in the Proposed Action encompassed cultural sites and Tribal resources of importance to them.  See AR0064994-97.  In response, BLM crafted Alternative B to adjust the federal lands to avoid this area altogether and shift them further away from the Reservation.  ROD at 11 (AR0039179)(Measures to Minimize Impacts).  Second, the Tribes objected that the Proposed Action would result in a 52-acre net loss of federal lands  that Tribal members  can exercise their off-reservation treaty rights.  AR0064991.  In response, BLM prepared Alternative B,  providing a  net gain of public lands for the exercise of such rights.[5]  ROD at 4 (AR0039172).

**D.  BLM provided extensive opportunities for public involvement in developing the Blackrock EIS.**

BLM initially published a comprehensive 170-page Draft EIS ("DEIS") analyzing the Proposed Action, No Action Alternative, and Alternatives A and B along with eight appendices comprising nearly another 1000 pages.  *See* DEIS (AR0026289-27182).   After considering

---

[5] In addition to this 113-acre net gain in public lands, Simplot has also committed in connection with the 2020 Exchange to arrange for the  donation to the Bureau of Indian Affairs for the benefit of the Tribes, or to the Tribes directly, an additional 950-acre parcel inholding within the Fort Hall Reservation.  This donation is to be effectuated upon resolution of any and all administrative and judicial challenges to the 2020 Exchange.  AR0029575.

public comments, FEIS at 1-4 (AR0029563), BLM issued the FEIS that provides a thorough

evaluation of impacts across seventeen resource categories as well as an 82-page table that

addresses each substantive comment and highlights changes between the DEIS and FEIS.  *Id.* at

I-13–I-94 (AR0030050–131).  BLM provided another 60-day public availability period during

which the Tribes and others submitted comments on the FEIS.  AR0065167–82.  BLM

considered the comments submitted on the FEIS prior to issuing the ROD.  AR0039182-83.

The FEIS examined all the major issues raised during scoping and in public comments on

the DEIS and made a series of findings regarding projected environmental effects of the RFAs

under the 2020 Exchange, including that they are expected to result in the following:

• a net decrease in annual fluoride and particulate air emissions, FEIS at 3-11 – 3-13

(AR0029604-606);

• a decrease in fluoride concentrations in nearby forage in all sampling areas with no

exceedances of state standards, *id.* at 3-12 – 3-13 (AR0029605-06);

• a slight increase of less than one-tenth of one percent of Idaho's overall greenhouse gas

emissions based on additional power consumption at the Don Plant during its extended life, *id.*;

• a continued decreasing trajectory of phosphorus and arsenic concentrations in groundwater

and the Portneuf River notwithstanding accounting for potential projected incremental increases

so small as to be effectively immeasurable, *id.* at 3-88 – 3-91 (AR0029681-84);

• no adverse impact to fisheries in the area, *id.* at 3-77 – 3-78 (AR0029670-71);

• avoidance and complete mitigation of adverse impacts on cultural resources due to the

shifted land exchange boundary provided for in Alternative B, *id.* at 3-20 (AR0029613);

• a net increase in lands on which the Tribes are able to exercise off-reservation treaty rights,

*id.* at 3-25 – 3-26 (AR0029618-19);

• improved recreational opportunities and access, *id.* at 3-41 – 3-43 (AR0029634-36); and

• increased crucial mule deer habitat on public lands, *id.* at 3-75 –3-76 (AR0029668-69).

By examining each of these issues in detail, BLM ensured that the Tribes and public were fully apprised of each of the principal environmental factors relevant to the 2020 Exchange.

## II.    The FEIS Properly Analyzes the Cumulative Effects regarding the 2020 Exchange.

### A.   The FEIS thoroughly evaluates the effects of several significant new developments that have occurred since the 2007 Environmental Assessment.

In defining the environmental baseline, the FEIS systematically accounts for the measures Simplot has taken pursuant to direction of the regulatory agencies to substantially reduce the plant's environmental impacts.  FEIS at 3-83 – 3-86 (AR0029676-79).  These include remedial actions Simplot has implemented pursuant to its 2002 Consent Decree under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") with the U.S. Environmental Protection Agency ("EPA"), AR0063186-63267, a 2008 Voluntary Consent Order ("VCO") with IDEQ, AR0064384-97, and the First Amendment to the CERCLA Consent Decree, AR0064651-64706.  In the latter two instruments IDEQ and EPA established regulatory targets and required Simplot to install an intermediate liner[6] on its existing gypsum stack.

Simplot has now fully implemented the intermediate liner and installed a comprehensive extraction well system.[7]  The progress from these remedial actions is routinely evaluated by EPA in five-year reviews and by IDEQ to determine if additional actions are needed to achieve the

---

[6] An "intermediate liner" is a liner placed on top of an existing unlined gypsum stack to allow for its continued use while protecting against leaching from above the liner.  Idaho Code § 39-176C(3) (2022).

[7] EPA officially found that Simplot had successfully completed installation of the intermediate liner on its existing gypsum stack and recognized the "enormous investment" Simplot has made towards these measures resulting in the reduction of contaminant loading. AR0012347.

environmental objectives in the First Amendment to EPA's CERCLA Order and the VCO with IDEQ. As described in more detail below, the FEIS discloses that these actions have resulted in dramatic improvements in Portneuf River water quality and a steadily declining trend in the concentrations of contaminants of concern ("COCs") in affected groundwater. AR0029679.

The considerable data, investigations, risk assessments and on-going monitoring not only tangibly show the environmental progress that has occurred at the plant, but also provided extensive environmental characterization to provide BLM with a much greater understanding of potential future effects of the RFAs, in particular the planned expansion of the gypsum stack.

**B. The FEIS meaningfully addresses the issues the Court identified in *Blackrock I*.**

The FEIS fully responds to the three major issues and environmental uncertainties the Court articulated in reviewing the 2007 Environmental Assessment ("EA") and earlier iteration of the exchange in *Blackrock I*. First, the Court found that BLM's 2007 EA lacked a sufficiently detailed analysis of the RFAs. *Blackrock I*, Slip Op. at **8-10. Second, the Court found the environmental effects of the planned gypsum stack expansion were uncertain due to concerns EPA had expressed about installing a gypsum stack liner in the relatively steeper terrain of the lands included in the 2007 exchange. Third, the Court concluded the record contained insufficient data on groundwater flows and potential contamination. Id. at *10. Fourth, the Court cited the proximity of lands in the 2007 Exchange to the Eastern Michaud Flats Superfund Site ("EMF Site") and possible controversy over potential effects of Simplot's prospective expanded gypsum stack as factors militating in favor of preparation of an EIS. Id. at **10-11.

Based upon a carefully crafted Feasibility Study and detailed water resources report that utilized state-of-the-art modeling, both of which are described in detail below, BLM conducted a detailed impact analysis that satisfactorily addresses each of these issues.

**1. The Feasibility Study provides a conceptual design of Simplot's RFAs.**

Appendix E to the FEIS is a July 2018 Feasibility Study that Simplot commissioned to explore and analyze different locations for the expansion of its gypsum stack and cooling ponds,[8] along with various potential processes to reduce fluoride emissions. FEIS at 1-1 (AR0029778).

First, the study assessed three different technologies to reduce fluoride emissions: cooling ponds, indirect water process cooling, and fluoride process condensate. *Id.* at 4-1 (AR0029798). The study concluded that indirect water process cooling was infeasible due to scaling tendencies and water balance implications. *Id.* The study similarly concluded fluoride process condensate would be infeasible as it would be prohibitively expensive and would still require the construction of cooling ponds. *Id.* By contrast, cooling ponds alone were identified as a feasible means for fluoride emission reductions "if adequate land is available" so that "ponds could be built with sufficient surface area to meet cooling requirements[.]" *Id.*

Next, the Feasibility Study examined ten potential sites to locate cooling ponds. *Id.* at 4-2–4-10 (AR0029799–807). The study found that all alternatives beyond the BLM land adjacent to the Don Plant presented significant operational challenges, such as lack of the necessary space, proximity to residences, public roads, and other property boundaries. *Id.* The study also found that the adjacent BLM lands offered further benefits given their proximity to the Don Plant

---

[8] Even though this brief refers to and focuses solely on "gypsum stack" for the sake of convenience and brevity, in fact, Simplot's gypsum stack is a primary component of the much larger and more sophisticated "phosphogypsum stack system." As defined in Idaho Code § 39-176C(9), "'[p]hosphogypsum stack system' means the defined geographic area associated with the phosphoric acid production facility in which phosphogypsum and process wastewater are disposed of or stored together, including pumps, piping, ditches, drainage, conveyances, water control structures, collection ponds, cooling ponds, decant ponds, surge ponds, auxiliary holding ponds, and any other collection or conveyance system associated with the transport of phosphogypsum from the plant to the phosphogypsum stack, its management at the stack, and the process wastewater return to phosphoric acid production to the phosphogypsum stack."

and distance from residences and public roads that might be affected by fog, freezing conditions, or emissions.  *Id.* at 4-5–4-7 (AR0029802–04).

The Feasibility Study similarly engaged in a systematic assessment of ways for Simplot to expand its gypsum stack capacity, including acquisition of lands on other adjoining property and vertical expansion of its current gypsum stack.  *Id.* at 4-10–4-12 (AR0029807–09).  The study rejects options for vertical expansion as infeasible.  *Id.*  The study also includes a detailed description of the volume estimates for the expanded gypsum stack, as well as the source control measures Simplot will implement in its expanded gypsum stack such as lined compartments for receiving gypsum, decant (leachate) collection systems, and lined decant ponds. *Id.*; *see also id.* at 2-8 (AR0029791).  The study also specifically relies on Simplot's experience with the intermediate liner it installed in its existing gypsum stack.  *Id.* at 3-85–3-86 (AR0029678–79).

### 2.   The Water Report analyzes impacts to water quality and projects that the RFAs will allow for continuation of ongoing environmental improvement.

Appendix H to the FEIS is a Water Resources Technical Report that provides a quantitative assessment of the potential cumulative impacts to ground and surface waters from ongoing operations at the Don Plant and the Proposed Action.  FEIS at H-1 (AR0029942).  The Water Report is informed by some 30 years of water quality monitoring from a network of nearly 200 monitoring sites at or near the plant.  IDEQ and EPA reviewed and provided technical input for the Water Report.  AR00000294 (IDEQ), AR0000309 (EPA).

The Water Report provides data from the last decade demonstrating that the extensive remedial measures Simplot has adopted are proving effective. AR0029679.  The combination of these measures has greatly reduced the concentrations of phosphorus in the Portneuf River. FEIS at H-36 & Fig. 3-10 (AR0029987).  For example, the report shows that installation of the intermediate, synthetic liner on the gypsum stack has significantly reduced infiltration of process

water into the subsurface.  As just one metric to this effect, the intermediate liner reduced the estimated seepage from 900 gallons a minute before lining to less than 1 gallon a minute afterward.  *Id.* at H-25 (AR0029976).  Groundwater data from wells downgradient of the gypsum stack reinforce this effectiveness by showing an overall pattern of declining concentration trends for arsenic and phosphorus (phosphate), as further bolstered by groundwater constituent load measurements.  *Id.* at H-22 & Tbl. 3-2, & H-30 & Fig. 3-5 (AR0029973 & AR0029981).

This significant phosphorus decline has in turn resulted in a significant improvement (i.e., increase) in dissolved oxygen concentrations in the Portneuf River.  AR 0012455.  Monitoring shows that dissolved oxygen fell below the water quality standard on only four days in 2019.  AR0012456.  The report notes no contaminant other than phosphorus associated with Simplot sources has ever exceeded water quality standards in the river.  *Id.* at H-27 (AR0029978).

In arriving at these results, the Water Report utilized a model to track migration of potential COCs from Simplot sources to the Portneuf River.  *Id.* at H-15 (AR0029966) (see Fig. 2-10).  The model shows that concentrations of phosphorus infiltrating from the existing gypsum stack into subsurface and then groundwater below the plant are greatly reduced by two major processes – natural attenuation and Simplot's source control– before it ever reaches the Portneuf River and then eventually flows onto the Reservation.  FEIS at H-39 – H-42 & Figs. 4-1 & 4-2 (AR0029990-93).  The upshot is that, between these two methods, approximately 98 percent of phosphorus entering the subsurface from the previously unlined lower portion of the gypsum stack is eliminated.  See id. at H-43 & Fig. 4-3 (AR0029994).

Based on this extensive data set, the model projected the RFAs would result in only a minor incremental increase in arsenic in groundwater and phosphorus in the Portneuf River, so small that it is effectively immeasurable.  *See, e.g.*, FEIS at 3-88 (AR0029681).  The projected

potential incremental increase in phosphorus concentrations is estimated to peak in the Portneuf

River at approximately 0.000156 parts per million, or 0.2% of the 0.075 mg/L Voluntary

Consent Order target for phosphorus in the Portneuf River.  *Id.*  The projected potential

incremental increase is similarly low for arsenic, with its groundwater concentration

downgradient of the gypsum stack projected to be just 0.000089 parts per million.  This reflects

less than one percent of the drinking water standard for arsenic.  The model's projection of

potential minor increases in phosphorus and arsenic concentrations were not found to interrupt

the ongoing overall downward trend in concentrations for both.  *Id.*

       Both the Feasibility Study and the Water Report provided a comprehensive assessment of

the RFAs to help lay the groundwork for BLM to properly analyze their effects in the FEIS.

### 3. Data from the regulatory agencies' oversight of the plant continues to yield valuable data related to all aspects of human health and the environment.

       As part of the CERCLA process, EPA has assessed the potential effects of contaminants

released by Simplot at off-plant locations, such as the Fort Hall Bottoms within the Reservation.

EPA concluded that a comprehensive characterization of potential ecological risks from

exposure to fluoride in solids and vegetation at Off-Plant locations have been completed, fluoride

levels in forage soils collected from the Bottoms Area are consistent with background conditions

and fluoride levels do not present human health risks above CERCLA risk thresholds.  Envt'l

Prot. Agency, Off-Plant Operating Unit Ecological Assessment, Implementation Actions –

Fluoride Remedy, Off-Plant OU, EMF (June 2020) (ECF No. 6-9).  The Tribes were invited to

participate in all planning and implementation efforts, including selection of the study sites.

Besides fluoride, EPA evaluated potential off-plant risks associated with radionuclides (radium-

226) and metals (cadmium).  EPA concluded for the purposes of CERCLA, "no hazardous

substances, pollutants or contaminants that may impair human health remain above levels that could prevent unlimited use and unrestricted exposure to humans." *Id.* at 5.

## III.     The 2020 Exchange Was Approved Under FLPMA's Land Exchange Authority.

In August 2020, BLM issued a Record of Decision ("ROD") approving the 2020 Exchange.  AR0039166–39263.  In approving that alternative the ROD relies on the public land exchange authority granted in FLPMA Section 206(a).  That section authorizes the Secretary of the Interior to engage in land exchanges for public land when the Department determines that the public interest will be "well served" by the exchange.  43 U.S.C. § 1716(a).

The ROD set out a robust public interest analysis, relying on the administrative record spanning more than 60,000 pages—including the extensive FEIS analysis described above. ROD at 3–6 (AR0039171–74).  The ROD explicitly weighed 13 factors in its public interest analysis, including: (1) the net gain of 113 acres available to the Tribes to exercise off-reservation treaty rights; (2) Simplot's plan to construct cooling ponds to decrease fluoride and $PM_{10}$ emissions; (3) the incremental additions to surface water and ground waters of phosphorus and arsenic due to potential leakage through the liners (note that there will still be a declining trend in total phosphorous concentrations due to remedial actions) from the RFAs; (4) the addition of federally managed crucial mule deer habitat; (5) enhanced opportunities for recreation and public access to the public lands in the area; (6) consolidation of federal land that will facilitate more efficient and effective management of BLM lands; (7) the stringent, additional regulatory requirements that will govern the RFAs; and (8) the economic benefits supporting 3,763 jobs which generate approximately $172.7 million labor income and contribute approximately $768.3 million in industry activity annually.  ROD at 3–6 (AR0039171–4).  The ROD also describes how the 2020 Exchange was modified in response to Tribal concerns to avoid cultural and tribal resources in

the West Canyon area. ROD at 3 (AR0039171).  After careful consideration, the ROD

determined that the land exchange would well serve the public interest.  *Id.*

In this same context, the ROD also evaluates the 2020 Exchange for conformance with

the Pocatello RMP and finds that it provides for the very consolidation of federal lands as

prescribed in the Pocatello RMP.  AR0065476.  The 2020 Exchange also has provided for new

recreational and public access opportunities, as well as acquisition of more than 500 acres of

crucial mule deer habitat.  AR0039171-72.

Following issuance of the ROD, BLM and Simplot s entered into a formal land exchange

agreement in November 2020. AR0031098–103. BLM's land transfer to Simplot was recorded

with Power County on December 15, 2020. AR0031357–59.  Simplot's land transfer to the

United States was recorded with Bannock County on December 15, 2020. AR0031360–62; see

also AR0031352–56 (transfer of mitigation parcel).  Simplot has since carried out preparatory

work on the former federal exchange lands, including drilling monitoring wells necessary to

evaluate groundwater impacts from the RFAs it eventually plans to construct.  Second

Declaration of Alan L. Prouty at ¶ 5 (July 21, 2021) (ECF No. 42-1).

## IV.    Simplot Must Obtain Further Approvals and Meet Environmental Requirements Before Implementing the RFAs.

Were this Court to uphold the 2020 Exchange, Simplot must still meet myriad

environmental requirements to fully implement the RFAs on the lands it acquired.  That is, the

ROD does not purport to authorize implementation of the RFAs and it is therefore by no means

the end of the story.  Rather, Simplot will still need to obtain a series of legally required

approvals from both state and federal regulators that involve still further extensive analysis and

opportunities for Tribal and public involvement before it can fully implement the RFAs.

For example, Idaho law requires that the expanded gypsum stack meet specific design and construction requirements.  Idaho Code §§ 39-176A–176F.  These design requirements include the use of a composite (synthetic and non-synthetic) liner (or equivalent), "safety factors" for geotechnical stability, and extensive quality control procedures.  *Id.* § 39-176E.  The design of the expansion must be submitted to IDEQ for approval to confirm that the design meets Idaho law.  Id. §39-176F; FEIS at 2-5 – 2-6 (AR0029570-71).  Furthermore, the 2008 VCO with the State of Idaho requires that a new or expanded gypsum stack have a liner, a siting evaluation, a background water quality study, a groundwater monitoring plan, an operation and maintenance plan, and finally a reclamation and closure plan.  All of these plans must be approved by IDEQ prior to the start of construction.  *See* AR0042779–92.  EPA has implemented similar requirements through its amended 2010 CERCLA Consent Decree with Simplot.  This includes EPA review and approval of the design, siting evaluation, background water quality study, a groundwater monitoring plan, a corrective action plan and a proposed schedule.  The Tribes have special consultation opportunities provided by EPA in that same Consent Decree.  *See* 2010 Consent Decree (AR0047667–766).

Simplot must also obtain an air quality "permit to construct" and modify its existing Title V Operating Permit issued by IDEQ and reviewed by EPA to certify compliance with the State Improvement Plan under the Clean Air Act.  Idaho Code §§ 39-105 & 39-107.  That permit process includes its own separate comment process and will ensure compliance with National Ambient Air Quality Standards ("NAAQS") and the National Emission Standards for Hazardous Air Pollutants from Phosphoric Acid Manufacturing Plants.  *See* 42 U.S.C. §§ 7411–12.  Each of these steps will provide appropriate substantive direction for  Simplot's design, construction, and operation plans on the exchanged lands.

These required permits and approvals that Simplot must secure to implement the RFAs are in addition to the ongoing CERCLA environmental requirements under which it continues to operate.  FEIS at 3-89 (AR0029682).  In totality, the welter of environmental regulatory constraints applicable to the RFAs serve to bolster the projected findings in the FEIS that the RFAs can reasonably be expected to have relatively minor incremental environmental impacts.

## STATUTORY FRAMEWORK

### I.    National Environmental Policy Act ("NEPA")

NEPA serves the dual purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions and ensuring that relevant information is made available to the public.  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  To achieve these dual purposes, NEPA requires that an agency prepare a comprehensive EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(c).

NEPA is a procedural statute.  It is "well settled" that NEPA "does not mandate particular results, but simply prescribes the necessary process" for analyzing and publicizing environmental effects of an activity.  *Robertson*, 490 U.S. at 350 (citing *Stryker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227–28 (1980) (*per curiam*)).  "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed—rather than unwise—agency action."  *Id.*

In reviewing an agency's NEPA analysis, a court should evaluate whether the agency has presented a "'reasonably thorough discussion of the significant aspects of the probable environmental consequences.'"  *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (quoting *Trout Unltd. v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974)). "This standard of review,

however, does not authorize a reviewing court to substitute its judgment for that of an agency concerning the wisdom or prudence of the proposed action." *Id.*  Under this rule of reason, "[t]he reviewing court may not 'fly speck' an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies."  *Association of Pub. Agency Customers v. Bonneville Power Admin.*, 126 F.3d 1158, 1183–84 (9th Cir. 1997) (alteration in original) (citation omitted).

## II.     Federal Land Policy & Management Act of 1976 ("FLPMA")

Starting with cessions by the original colonies and via treaties with European powers and various Tribes, the federal government obtained title to significant amounts of territory in the West.  *See* Paul W. Gates, *History of Public Land Law Development* 49–57, 75–86 (1968).  Over the first century and a half of U.S. history, the Congress gradually enacted a patchwork quilt of laws to provide individuals with the opportunity to "acquire title to, and rights in, vast portions of federally owned land."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 875 (1990).

Public land management under these various statutes "became chaotic."  *Id.* at 876; *see also Wilderness Soc'y v. Morton*, 479 F.2d 842, 881 (D.C. Cir. 1973) (*en banc*).  Congress, exercising its plenary authority over the public lands, enacted FLPMA to "repeal[] many of the miscellaneous laws governing disposal of public land" and establish a unified federal policy on federal land management.  *Lujan*, 497 U.S. at 877.

FLPMA provides BLM with authority to dispose of public lands through uniform processes for sale or exchange.  These methods largely replaced prior homesteading, mining, and timber laws.  *See* FLPMA, Pub. L. No. 94–579, §§ 701-07 (Oct. 21, 1976).  As relevant to this case, FLPMA authorizes the Secretary of the Interior to exchange public land for private land if the Secretary determines it would well serve the public interest.  43 U.S.C. § 1716(a).  BLM has issued regulations to implement its land exchange authority under FLPMA.  43 C.F.R. §§ 2200,

2201.  In making the Section 206(a) public interest determination, the regulations direct that the agency consider a variety of factors.  *Id.* § 2200.0-6(b).  *See also Lodge Tower Condo. Assn. v. Lodge Prop.*, 880 F. Supp. 1370, 1380 (D. Colo. 1995), *aff'd*, 85 F.3d 476 (10th Cir. 1996) ("Section 1716(a) requires merely that the agency consider and weigh the factors . . . [i]t does not give the factors any particular priority, nor does it require the agency to do so.").

## STANDARD OF REVIEW

Because none of the statutes that the Tribes assert BLM violated provide for judicial review, they are governed by the standards set forth in the Administrative Procedure Act ("APA").  5 U.S.C. § 706; s*ee, e.g.*, *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205 (9th Cir. 2004); *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 641 (9th Cir. 2010) (analyzing FLPMA and NEPA claims under APA standard).  Under the APA, a reviewing court may set aside a final agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Review under the arbitrary and capricious standard is narrow.  The Court cannot substitute its judgment for that of the agency. *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010).  The Court must be "at its most deferential" when reviewing agencies' scientific judgments and technical analyses.  *Baltimore Gas & Elec. v. Natural Res. Def. Council*, 462 U.S. 87, 103 (1983).

## ARGUMENT

### I.      BLM Complied Fully with NEPA.

BLM's environmental analysis in the Blackrock FEIS is particularly robust.  It relied on decades of study, longstanding expert input from IDEQ and EPA, and the benefit of copious amounts of comprehensive monitoring data.  It also recognized the effects of the ongoing remediation efforts strategically designed to address past environmental conditions.  And these

effects further served to inform the analysis as many of those same measures have already been implemented, studied, and have a track record of success.  BLM's analysis was therefore anything but conclusory, one-sided, or guesswork.  Rather, BLM engaged in a comprehensive analysis of the environmental effects with respect to all of the resources the Tribes identified in their scoping comments.  By contrast, the Tribes largely voice their disagreement or displeasure with BLM's analysis of environmental effects, but such contentions, no matter how fervently expressed, do not constitute a violation of NEPA's procedural mandate.

### A.  The FEIS takes a hard look at water quality effects on the Portneuf River.

BLM calibrated its detailed water-quality effects analysis to address "the potential consequences of the proposed land exchange and [RFAs] on surface water and groundwater quality[.]"  FEIS at 3-79 (AR0029672).  BLM examined water quality effects within a designated Analysis Area, which encompasses "downgradient areas [of the 2020 Exchange lands] including the Portneuf River."  *Id.*

The water quality analysis in the FEIS includes an in-depth overview of the historical and current baseline of surface water and groundwater quality in the Analysis Area.  *Id.* at 3-83 –3-86 (AR0029676–79); see also AR0012671.  As described above, data in the record show dramatic improvement in the key COCs, phosphorus and arsenic, over the last decade due to Simplot's remediation efforts.  FEIS at 3-85, 3-86 (AR0029678-79).  This pronounced trend in significant reductions in phosphorus has also served to improve dissolved oxygen concentrations in the Portneuf River, resulting in an improvement in the river's ecological health.  AR0012455.

The FEIS next provides a detailed projection of the cumulative water effects of the 2020 Exchange, including from the RFAs.  FEIS at 3-87–3-91 (AR0029680–84).  The FEIS discloses that the RFAs could result in minimal incremental increases in arsenic and phosphorus from the

potential leakage through the lined gypsum stack.  *See, e.g.*, FEIS 3-88 (AR0029681).  The

maximum impact to phosphorus concentration in the Portneuf River is estimated to be 0.000156

mg/L.  *Id.*  Importantly, the model projects that these potential minor incremental releases will

not interrupt the ongoing overall decreasing trend in contaminants in both groundwater and the

Portneuf River that has been evident now for more than a decade.  *Id.*

These findings have ample support in the record and ongoing history of the plant's

operations.  The historical contamination at the plant that led to its inclusion in a Superfund site

was largely due to the lack of source control requirements when it commenced operations in the

1940s.  AR0026322, 0029677, 0029968.  *That is no longer the case.*  As explained above, the

intermediate liner installed in the existing gypsum stack has already reduced seepage by some 99

percent.  AR0029976.  Because the planned lateral expansion will be lined from the beginning, it

is specifically designed to avoid the legacy problems that emerged because the existing gypsum

stack did not have any liner for around its first 50 years.  AR0030014–15.

The Tribes contend that this level of detail is not enough.  Specifically, the Tribes allege

that BLM failed to adequately consider effects of the 2020 Exchange on groundwater and surface

water, including the quality of the Portneuf River as it runs through the Reservation

approximately two miles downstream of the Don Plant.  *See, e.g*., ECF No. 37-1 at 24–26, 28,

34–35, 39.  The Tribes' allegations  lack any support in the record.

First, although the Tribes concede that the FEIS fully discloses water quality effects, they

contend that BLM failed to adequately study such effects.  ECF No. 37-1 at 24.  The Tribes

suggest that certain additional hydrologic studies of these effects of past actions could or should

have been conducted.  This is a somewhat puzzling argument given the extensive monitoring

data and studies produced through the CERCLA process over the past 30 years that is contained

in the record.  This is also not a case where the agency inappropriately relied on stale data.  *Cf.*

*Northern Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085-87 (9th Cir.

2011). Further, the Tribes have not identified how additional studies of past actions constitute

"information relevant to reasonably foreseeable significant adverse impacts" that "is essential to

a reasoned choice among alternatives," which agencies are generally obliged to obtain if feasible.

40 C.F.R. § 1502.21 (2019).  No further information was essential to BLM's reasoned choice.

Second, the Tribes argue that legacy effects from the Don Plant on groundwater and

surface water allegedly undermine BLM's conclusions regarding the projected environmental

effects of the expanded gypsum stack.  But this view wholly ignores the impact of the remedial

efforts validated by now a full decade of extensive data, and the resulting attendant material shift

in the environmental baseline.  Although the effects of past activities need to be taken into

account in addressing that baseline, which the FEIS does, the Council on Environmental Quality

("CEQ") Guidance indicates that "[t]he environmental analysis required under NEPA is forward-

looking, in that it focuses on the potential impacts of the proposed action that an agency is

considering."  Council on Envtl. Qual., *Guidance on the Consideration of Past Actions in*

*Cumulative Effects Analysis* 1 (June 24, 2005).[9]  Information regarding past actions may also be

useful in "illuminating or predicting the direct and indirect effects of a proposed action."  *Id.* at 2.

The Tribes' argument turns these settled principles on their head, arguing in effect that BLM

should have confined its analysis to effects of past actions before Simplot's implementation of

the lion's share of its remedial measures.  It also ignores the manifold differences between legacy

construction techniques (i.e., no lining on the historic gypsum stack dating back to the 1940s)

---

[9] Available at https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/Guidance_on_CE.pdf.

and the new regulatory requirements for gypsum stack construction as well as the strict
regulatory controls under which the plant is now operating, as described in some detail above.

Moreover, the Tribes do not contest BLM's characterization of baseline conditions as a
prerequisite to analyzing the effects of the Proposed Action. *See Great Basin Res. Watch v.
Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016) (stating agencies "may estimate
baseline conditions using data from a similar area, computer modeling, or some other reasonable
method.").  Nor did they put forward any contrary data or explanation showing how BLM's
analysis of such effects is arbitrary or unsubstantiated notwithstanding multiple opportunities
during the NEPA and Tribal consultation processes to do so.  BLM properly considered legacy
contamination in the area, and monitoring data of Simplot's extensive efforts to remediate those
legacy operations reveal a demonstrated track record of *success* in using the very same primary
control measure (i.e., a composite liner) prescribed for the RFAs to be implemented on the
exchange lands.  BLM reasonably took account of this new control measure in looking forward,
and there is no reasonable dispute on that point.  Indeed, Simplot's phosphoric acid plant in Rock
Springs, Wyoming, has used a similar liner since the mid-1980s to successfully avoid all but de
minimis impacts on groundwater.  AR0012443 at n.28.  BLM's water quality analysis explicitly
considers historical contamination as well as more recent environmental improvements.

Finally, the Tribes argue that BLM's cumulative effects analysis of water quality is too
narrow because it fails to analyze impacts on surface waters within the Reservation boundaries.
But, the FEIS examined water quality in the Portneuf River.  *See* FEIS at H-27 (AR0029978).
BLM's analysis also includes data from the off-Plant Operating Unit of the EMF Superfund Site
(the Superfund Site that includes the Don Plant).  As described above, the FEIS and its
appendices provide a detailed and explicit cumulative effects analysis on water resources.

Regarding the Reservation, an agency's selection of the geographic scope of an EIS is due especially strong deference because it falls within the special competency of the relevant agency. *See, e.g.*, *Kleppe v. Sierra Club*, 427 U.S. 390 (1976).  Here, BLM selected a reasonable geographic scope that encompasses the Portneuf River downstream of the Federal exchange lands. FEIS at 3-88 (AR0029681).  The river enters the Reservation less than two miles downstream from Batiste Spring.  FEIS at 3-88 (AR0029681).  The groundwater flow patterns are also well defined and understood based on the extensive groundwater monitoring efforts, described above.  As a result, it is eminently reasonable to estimate that effects on the Reservation will be similar to those at Batiste Spring.  *Id*.

The FEIS contains a thorough analysis of the water quality effects of the 2020 Exchange and RFAs that readily satisfies NEPA and is well-grounded in the administrative record.

**B.  The FEIS amply discloses and analyzes projected effects to air quality.**

BLM identified three main air quality issues to analyze in the FEIS:  compliance with air quality standards, fluoride emissions, and greenhouse gas emissions.  FEIS at 3-3 (AR0029596). The agency thoroughly examined each air-related issue.  BLM reasonably worked from baseline premise that Simplot would comply with applicable Clean Air Act standards as well as the 2016 IDEQ Consent Order.  BLM also reasonably focused on the most significant pollutants emitted at the Don Plant, which are fluoride, particulates ($PM_{10}$ and $PM_{2.5}$), and sulfur dioxide.  *Id.*

The FEIS details information about allowable emissions from the Don Plant. Relevant regulations permit emissions of 450.77 tons per year ("tpy") for $PM_{10}$, 397.62 tpy for $PM_{2.5}$, 1344.08 tpy for sulfur dioxide ($SO_2$), and 326.88 tpy for fluoride.  FEIS at 3-4 (AR0029597). The FEIS discloses that the Don Plant's actual emissions fall well below the limits provided in Simplot's Clean Air Act Title V permit.  *See* 42 U.S.C. §§ 7661–7661f; FEIS at 3-5 tbl. 3-2

(AR0029598).  Ambient air quality monitoring over the last two decades shows ambient air quality consistently below the NAAQS.  *Id.* at 3-6 (AR0029599).  Similarly, monitoring of particulate concentrations shows compliance with the 24-hour PM2.5 NAAQS since at least 2009.  *Id.* at 3-6–3-7 (AR0029599–600).  The FEIS discloses excess fluoride in forage exceedance (IDAPA 58.01.01.577) in the vicinity of the Don Plant; Simplot is required to reduce the fluoride emissions under its 2016 Consent Order with IDEQ.  *Id.* at 3-8–3-9 (AR0029601–02).  To reduce the plant's fluoride air emissions in accordance with the 2016 Consent Order, Simplot is moving forward with  decommissioning the cooling towers and replacing them with cooling ponds pursuant to IDEQ's direction.  FEIS App. E at 3-1 (AR0029792).

The FEIS properly placed the Don Plant's emissions in context to analyze the cumulative effects of the 2020 Exchange.  The Don Plant is the only major source of fluoride emissions in the tri-County area comprised of Bannock, Power, and Bingham Counties.  The FEIS discloses that the main short-term and ongoing impact of the exchange will be a decrease in emissions due to replacement of cooling towers with cooling ponds.  *Id.* at 3-11 (AR0029604).  The FEIS estimates a net decrease of 16.3–74.9 tpy in fluoride emissions, and net decrease of 117.8 tpy for PM.  *Id*.  The FEIS discloses that cumulative total emissions over several decades might eventually be greater than the no-action alternative because the land exchange will extend the life of the Don Plant by about 65 years.  *Id.* at 3-12 (AR0029605).  The FEIS also indicates that certain emission sources will be moved closer to residential areas but anticipates that the action will still cause a net decrease in emissions.  *Id*.

The Tribes generally do not take issue with these calculations.  Instead, they claim that the differences between the Proposed Action and Alternative B were not sufficiently analyzed.  To the contrary, BLM explicitly analyzed the difference and concluded that annual fluoride

emissions would decrease, on net, under either alternative.  *Id.*; *see also* AR0012355.  BLM further acknowledged that fluoride concentrations in forage to the east of the Don Plant could be slightly higher under Alternative B than under the Proposed Action but found they would still be lower than current levels.  FEIS at 3-13 (AR0029606).  The Tribes' arguments all ignore this salient point ample support exists in the record for BLM's projected finding that the 2020 Exchange will result in reduced air emissions about which the Tribes have expressed concern.

### C.  The FEIS discloses and analyzes projected effects to cultural resources.

BLM's analysis of cultural resources implicates both NEPA and the National Historic Preservation Act ("NHPA").  NHPA requires that agencies consider effects "of [an] undertaking on any historic property."  54 U.S.C. § 306108.  Like NEPA, the NHPA imposes procedural rather than substantive requirements on agencies.  *Wild Earth Guardians v. Provencio*, 923 F.3d 655, 676 (9th Cir. 2019).  Historic properties are those eligible for, or listed on, the National Register of Historic Places ("NRHP").  54 U.S.C. §§ 300308, 300311.  The NHPA provides that "[p]roperty of traditional religious and cultural importance to an Indian tribe," or traditional cultural properties, may be listed as historic properties.  54 U.S.C. § 302706(a).

BLM took the requisite "hard look" at cultural effects in the FEIS.  It consulted with both the Tribes and the state historic preservation office and conducted a "Class III cultural resources inventory" of all involved properties—the most detailed level of inventory.  FEIS at 3-15, 4-3–4-4 (AR0029608, AR0029704–05).  *See Quechan Indian Tribe v. U.S. Dep't of Interior*, 547 F. Supp. 2d 1033, 1046 (D. Ariz. 2008).  BLM recognized and disclosed that operations of the Don Plant have "contributed to the cumulative degradation of the visual and auditory setting of cultural resources on the Federal lands."  FEIS at 3-19 (AR0029612).  Under the Proposed Action, "the reasonably foreseeable construction of cooling ponds and gypsum stacks on the

Federal lands may damage or result in permanent loss of cultural resources." *Id.* These disclosures met BLM's procedural obligations.

In addition to meeting its procedural obligations, BLM developed an alternative that was eventually adopted so as to wholly avoid the impacts it identified would have resulted from the Proposed Action. *Id.* at 3-20 (AR0029613); *id.* at 2-11 (AR0029576). BLM developed Alternative B that was ultimately approved in the ROD "to avoid cultural and tribal resources in the West Canyon area on the north side of Howard Mountain." ROD at 9 (AR0039177).

The 2020 Exchange retains federal ownership of NRHP-eligible site 10PR666. ROD at 3 (AR0039171). It also retains federal ownership of four other sites (10PR93, 10PR664, 10PR667, and 10PR978 (SB-02-CLC)), despite their ineligibility for the NRHP, as well as the "cave dwelling in the Wind Canyon cliffs area that is culturally significant" to the Tribes. FEIS at 3-20 (AR0029613). The 2020 Exchange further includes a "reconfigured layout of the cooling ponds and gypsum stack expansions" to "avoid NRHP-eligible Site 10PR979 (SB-02-HL)." FEIS at 3-19 (AR0029612). The ROD notes a now-recorded deed restriction to protect site 10PR979 and ensure Tribal access to that site in perpetuity. AR0031077 (Executed Covenant). Simplot has further preserved Tribal access to site 10PR93 despite its ineligibility for NHPA listing. ROD at App. C (AR0039226); FEIS at 3-15 (AR0029608).

Despite these measures to avoid cultural impacts, the Tribes nonetheless assert that the BLM did not adequately consider effects on cultural resources. ECF No. 37-1 at 31–33. They raise generalized concerns relating to the cultural significance of the area's landscape, potential cliff burial and cliff dwelling locations, and cultural rangeland use. However, BLM disclosed landscape impacts, *see* FEIS at 3-19 (AR0029612), altered the land exchange to avoid and minimize cultural impacts, and conducted thorough surveys to identify cultural resources.

BLM also analyzed whether other sites may exist in the area.  In the FEIS, the agency determined that "[b]ased on [1] recent Class III inventories conducted for the Blackrock Land Exchange EIS [;] and [2] review of previous inventories, the potential for undiscovered cultural sites in the analysis area is low."  FEIS at 3-14 (AR0029607).  The Tribes speculate that it is "very likely" that additional cultural sites would be found on the exchanged parcel.  ECF No. 37-1 at 31.  In the absence of data, such "highly speculative" statements do not meet a plaintiff's burden under NEPA and the NHPA.  *See*, *e.g.*, *Safari Club Int'l v. Haaland*, 31 F.4th 1157, 1176 (9th Cir. 2022) (quotation omitted).  BLM conducted a thorough review and concluded "[t]here have been no specifically documented or recorded burial sites on the Federal lands and no burial sites were identified during the cultural resource surveys conducted on the Federal lands."  FEIS App. I at I-19–I-20 (AR0030056–57).[10]

BLM acknowledged the high intrinsic value the Tribes placed on the area, *see* FEIS App. I at I-21 (AR0030058), and it made all reasonable efforts to consult with the Tribes on surveys.  The agency disclosed potential impacts on historic sites.  BLM went on to design and adopt Alternative B specifically to avoid those impacts.  BLM met its NEPA and NHPA obligations.

### D. The FEIS considers environmental justice impacts consistent with applicable guidance.

Executive Order 12,898 directs federal agencies to "make achieving environmental justice part of [their] mission[.]"  59 Fed. Reg. 7629, 7629 (Feb. 11, 1994).  CEQ guidance

---

[10] The Tribes criticize BLM's designated area of potential effects ("APE") for historic and cultural properties pursuant to 36 C.F.R. § 800.16(d).  ECF No. 37-1 at 33 n.35.  Establishing an APE "requires a high level of agency expertise, and as such, the agency's determination is due a substantial amount of discretion."  *Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1091 (10th Cir. 2004).  BLM established an expansive APE containing "parcels where the proposed land exchange could affect Federal protection of cultural resources and where [NRHP]-eligible properties on the Federal lands could be directly affected by reasonably foreseeable future actions."  FEIS at 3-14 (AR0029607) (emphasis added); AR0028343.

directs agencies to consider environmental justice impacts during the NEPA process, but clarifies there is "not a standard formula" for study. Council on Envtl. Qual., *Environmental Justice Guidance Under the National Environmental Policy Act* 8 (Dec. 10, 1997).[11]   As with all NEPA analysis, the agency must engage in a reasonably thorough examination of environmental justice issues. *See Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017) BLM cleared that bar.

BLM's analysis included a demographic breakdown of populations impacted within the study area, cumulative effects analysis that compares the effects of the alternatives to baseline contamination exposures, and solicitation of input from the Tribes. FEIS at 3-92–3-105 (AR0029685–98). BLM's detailed analysis included impacts on rent in the region, *id.* at 3-102 (AR0029695), air and water quality effects on the Tribes and other communities, *id.* at 3-103 (AR0029696), as well as the effects of groundwater contamination on fishery resources utilized by the Tribes, which is not anticipated to be adversely affected. *id.* at 3-104 (AR0029697). BLM conservatively disclosed, for example, that the RFAs "would result in minor incremental increases in phosphorous and arsenic in groundwater, resulting in impacts on minority populations" including on the Fort Hall Reservation. *Id.* at 3-103 (AR0029696).

The Tribes argue that the FEIS "fails to address the disproportionate impacts of the land exchange on the reservation[.]" ECF No. 37-1 at 43. The Tribes do not point to a particular gap in analysis, but rather allege a complete failure to address disproportionate impact. The Tribes, however, ignore the pages of FEIS that directly address environmental justice. FEIS at 3-92–3-105 (AR0029685–98); *see also Sierra Club v. FERC*, 867 F.3d at 1368 ("Perhaps [Plaintiffs] would have a stronger claim if the agency had refused entirely to discuss the demographics of the populations that will feel the [project's] effects"). In performing this analysis, BLM did exactly

---

[11] Available at https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf.

what the Tribes seek:  the agency analyzed whether the land exchange and RFAs "have a disproportionately adverse effect on the Fort Hall Reservation[.]"  FEIS at 3-92 (AR0029685).

**E.  The FEIS addresses the Tribes' off-reservation treaty rights.**

BLM conducted a detailed analysis of how the land exchange would impact the ways Tribal members may exercise their off-reservation treaty rights.  The FEIS recognized that the "Tribes place great intrinsic value on the Howard Mountain area and the Federal lands offered for exchange."  FEIS at 3-23 (AR0029616).   It also disclosed that past actions have caused "cumulative degradation of certain tribal uses and resources" which include "cultural resource sites, visual resources, the natural soundscape; and hunting, fishing, harvesting, wood gathering, and livestock grazing opportunities."  *Id.* at ES-8 (AR0029551).  The FEIS also detailed how past practices have cumulatively impacted the Tribes' homeland.  *Id.* at 3-26 (AR0029619).  At the same time, BLM importantly acknowledges that the 2020 Exchange has increased the amount of land available for the Tribes to exercise their off-reservation treaty rights.  ROD at 4–5 (AR0039172–73).  BLM also explained how the 2020 Exchange will avoid and mitigate many of the impacts about which the Tribes expressed concern, while at the same time not sweeping any such ultimate impacts under the rug, recognizing that some would still occur.  *Id.* at 3-28 (AR0029621).  BLM also found that the 2020 Exchange and RFAs would have no adverse impact on fisheries of importance to the Tribes.  *Id.* at 3-77–3-78 (AR0029670-71).

The FEIS shows that BLM directly considered treaty rights and Tribal interests and disclosed impacts to them.  The Tribes nonetheless contend that BLM failed to adequately examine the effect of the land exchange on treaty rights.  ECF No. 37-1 at 28–31.  The Tribes assert that, in its evaluation of the exchange, BLM should have directly compared Tribal benefits and impacts, exclusive of the broader public interest.  *Id.* at 29–30.  No such requirement exists,

nor have the Tribes cited to any authority to support that proposition.  The Tribes further assert

that the FEIS should have considered additional unspecified mitigation efforts.  *Id.* at 30.

"NEPA requires only that an EIS contain 'a reasonably complete discussion of possible

mitigation measures.'"  *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 979 (9th Cir. 2006)

(quoting *Robertson*, 490 U.S. at 352).  Here, the FEIS contains a thoughtful explanation of

possible mitigation measures, including Simplot's voluntary donation of 160 acres of private

land described as Parcel A.  FEIS at 3-107–3-108 (AR0029700–01).  It also recognizes that some

effects are unavoidable.  FEIS at 3-106–3-107 (AR0029699–700).  This consideration of

mitigation measures and transparent disclosure of effects satisfied NEPA's requirements..

### F.  BLM fully evaluated the effects of Alternative B in both the DEIS and FEIS, and neither a revised or supplemental EIS is required.

Primarily in response to Tribes' scoping comments, BLM crafted Alternative B for

detailed consideration and public comment in the Draft EIS.  DEIS at 2-10–11 (AR0026336–37).

The DEIS provides analyses of Alternative B's effects under each of the different subcategories

of resource values addressed in the document.  *See, e.g.*, DEIS at 3-18–19 (AR0026370–71)

(cultural resources); DEIS at 3-25–27 (AR0026377–79) (tribal treaty rights, trust responsibilities,

and tribal uses).  As a result, BLM fully apprised the public about Alternative B and its projected

environmental effects in the DEIS such that they could meaningfully comment on them.  Indeed,

BLM then went on to reinforce its analysis of Alternative B in the FEIS in light of the Tribes'

comments on the DEIS.  *See, e.g.*, FEIS at 3-20 (AR0029613); FEIS at 3-25–26 (AR0029618-

19); FEIS at 3-47 (AR0029640).  That is how NEPA is supposed to work.  The agency fully took

all comments into account in designing and analyzing alternatives to the Proposed Action.[12]

---

[12]  The Tribes present several arguments in their opening summary judgment brief that they
failed to raise at the appropriate time in the NEPA process. Parties have a responsibility to raise

The Tribes nonetheless contend that the Draft EIS required supplementation because BLM did not adequately analyze Alternative B before selecting it over the Proposed Action. ECF No. 37-1 at 24–26, 37–38.  The Tribes' allegation is  undermined by the record as the DEIS and FEIS both considered Alternative B in detail.  The Tribes further cite NEPA implementing regulations that require a supplemental EIS in certain circumstances.  S*ee* ECF No. 37-1 at 37–38 (citing 40 C.F.R. § 1502.9).  But those regulations only apply if there are "substantial changes to the proposed action" or "significant new circumstances or information" arises following publication of the Draft or Final EIS.  40 C.F.R. § 1502.9(d).  Neither the Proposed Action nor Alternative B underwent any changes between the DEIS and FEIS.  *Compare* DEIS at 2-10–11 (AR0026336–37) (DEIS description of Alternative B) *with* FEIS at 2-11–12 (AR0029576–77).  Nor has any significant new information relating to the effects of the 2020 Exchange arisen following publication of the FEIS.  *See Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 373 (1989); *Idaho Wool Growers' Assn. v. Vilsack*, 816 F.3d 1095, 1106-07 (9th Cir. 2016).

Nor does the fact that BLM relied in part on a comparison of the effects of the Proposed Action in analyzing the effects of Alternative B render that analysis inadequate simply because that alternative is modestly different from the Proposed Action, as the Tribes suggest.  FEIS at

deficiencies with NEPA analysis during the comment period so that the agency may correct its analysis. *See, e.g., Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991). A party that fails to do so forfeits its ability to seek judicial review of those issues. *See id.; Department of Transp. v. Public Citizen*, 541 U.S. 752, 764–65 (2004). The Court should therefore decline to review arguments that the Tribes did not raise at the appropriate time. These include: (1) a challenge to BLM's public-interest finding on the ground that it allegedly did not take into account the impact of the 2020 Exchange on the Tribes' putative housing plans (ECF No. 37-1 at 18); (2) a challenge to BLM's equal-value appraisal on the ground that it allegedly did not consider non-economic factors (*id.* at 20–21); (3) a challenge to the FEIS on the ground that it allegedly does not address how the 2020 Exchange complies with the Migratory Bird Treaty Act (*id.* at 27); (4) a challenge to the FEIS on the ground that BLM did not adequately consider the history of Simplot's environmental compliance record at the Don Plant (*id.* at 40–41).

App. C (AR0029736).  As an initial matter, there is considerable overlap between the Proposed

Action and Alternative B.  *Id.*  Moreover, NEPA's implementing regulations expressly call for

using a comparative approach in evaluating the environmental impacts of different alternatives in

an EIS.  *See* 40 C.F.R. § 1502.14 (2019) ("environmental impacts of the proposal and the

alternatives" should be presented "in comparative form"); *Ctr. for Biological Diversity v. U.S.*

*Dep't of the Interior*, 623 F.3d 633, 645 (9th Cir. 2010) ("It is black letter law that NEPA

requires a comparative analysis of the environmental consequences of the alternatives[.]").

Moreover, with specific respect to the two resource categories about which the Tribes

raise concerns in this regard, water and air, the record supports the comparative approach BLM

used in evaluating Alternative B.  In regard to water resources, the FEIS notes that the overall

effects of Alternative B are likely to be similar to those of the Proposed Action largely because

(1) the reconfigured gypsum stack expansions under both Alternative B and the Proposed Action

had approximately the same waste disposal capacity; and (2) both alternatives recognize the

requirement for Simplot to use the same state-of-the-art liner and other source-control methods

that the modeling projected would protect against any but the most minimally incremental water-

quality impacts.  AR 0029684.  Moreover, the Water Report also examined groundwater flows

near the Don Plant and found that they migrate toward the Portneuf River upstream of the Fort

Hall Reservation from both the West and East sections of the canyon.  AR 0029675-76 & Figs.

3-6 & 3-7. This finding is consistent with decades of extensive monitoring data gathered

pursuant to the ongoing CERCLA process.  Thus, the record supports BLM's finding that water-

quality effects of the 2020 Exchange are likely to be similar to those of the Proposed Action

notwithstanding that the federal lands in the latter are somewhat farther to the east.

With respect to air, the FEIS acknowledges that the 2020 Exchange is likely to result in slightly higher ambient concentrations of fluoride and PM closer to residences to the east of the Don Plant as compared with the Proposed Action.  AR0029606.  The FEIS goes on to explain, however, that any such marginal increases in emissions for these residences would be negated by the overall reduction in both fluoride and PM emissions projected under the 2020 Exchange.  *Id.*

The Tribes further assert that BLM failed to address the possibility that Simplot's final engineering and design details for its RFAs may change from what was analyzed in the FEIS. ECF No. 37-1 at 38–40.  As an initial matter, certain aspects of the RFAs are governed by existing requirements, such as gypsum stack design standards and approval process.  Moreover, as the FEIS reasonably explains, many other more specific on-the-ground details necessarily will depend on how IDEQ and EPA carry out future independent regulatory processes.  FEIS at 2-4 (AR0029569), 2-6 (AR0029571), 2-15 (AR0029580).  As explained above, Simplot must obtain separate permits and/or approvals from these regulatory agencies that may result in adjustments and prescriptions not reasonably foreseeable at this time. The FEIS therefore complies fully with NEPA because it "provides as much environmental analysis as is reasonably possible under the circumstances."  *Native Village of Point Hope v. Jewell*, 740 F.3d 489, 498 (9th Cir. 2014).

This level of detail in the FEIS is wholly consistent with the Court's approach as outlined in its ruling on Simplot's Motion to Reconsider in *Blackrock I*.  *Blackrock I,* 4:10–CV–004–BLW, 2012 WL 314038 (D. Idaho Feb. 1, 2012). As the Court explained, "The point here is not that the Simplot plan [for its RFAs to inform the effects analysis in the EIS to be prepared on remand] will nail down every uncertainty. Obviously the plan will be an estimate of a project years in the future and as such, it cannot be expected to predict every twist and turn that the future will take."  *Id.* at *1.  The Court properly distinguished between the land exchange and the

need under NEPA for BLM to disclose the indirect and cumulative effects of the RFAs likely to be carried out following the land exchange.  In fact, accepting the Tribes' invitation "to nail down every detail", or give NEPA more "bite" with respect to Simplot's anticipated uses risks usurping the statutory and regulatory roles of EPA and IDEQ.

### G.  The FEIS considers reasonable alternatives to the Proposed Action.

The Tribes raise several arguments that the FEIS failed to consider a reasonable range of alternatives.  An agency must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14(a) (2019).  A "'rule of reason' guides both the choice of alternatives as well as the extent to which the [EIS] must discuss each alternative."  *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997) (quoting *Citizens Against Burlington v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991)).  An EIS "need not consider an infinite range of alternatives, only reasonable or feasible ones."  *Id.* BLM studied a sufficient range of alternatives for a reasoned choice.

The Tribes challenge the elimination of two fluoride reduction alternatives on the basis of economic feasibility.  ECF No. 37-1 at 36–37.  They claim the  Feasibility Study does not support elimination of those alternatives.  The Tribes misread the record.  The FEIS states that the indirect process water cooling alternative was eliminated from detailed consideration because of technical concerns about its feasibility due to scaling and water balance.  *see* FEIS App. E at 4-1 (AR0029798).  The fluoride condensate alternative was determined infeasible because it would not eliminate the need for Simplot to still need to construct a cooling pond to meet its fluoride reduction obligations.  AR0029579; *see also* FEIS App. E at 4-1 (AR0029798).  These statements in the FEIS convey the "brief explanation" NEPA requires.

BLM eliminated several alternatives because they did not meet the project objectives. The Tribes nevertheless argue that the agency ran afoul of the D.C. Circuit's 50-year-old admonition not to "disregard alternatives merely because they do not offer a complete solution to the problem." *Natural Res. Def. Council, Inc. v. Morton*, 458 F.2d 827, 836 (D.C. Cir. 1972). Like others, the Tribes "overread *Morton*." *See, e.g., City of Alexandria, Va. v. Slater*, 198 F.3d 862, 869 (D.C. Cir. 1999). The D.C. Circuit itself has clarified "that a 'reasonable alternative' is defined by reference to a project's objectives." *Id.* at 869. The Ninth Circuit has since approvingly reiterated that alternatives that "do not accomplish [both] purposes of [a] project may properly be rejected as imprudent." *League of Wilderness Defenders v. U.S. Forest Serv.*, 689 F.3d 1060, 1072 (9th Cir. 2012) (quoting Arizona Past & Future Found. v. Lewis, 722 F.2d 1423, 1428 (9th Cir. 1983) (alterations in original)). BLM considered and developed a reasonable range of alternatives for detailed consideration in the FEIS and adequately explained the reasons for declining to consider other alternatives in detail. Such satisfied its NEPA duties.

## II.      BLM Properly Authorized the Land Exchange Under FLPMA.

### A.   The Blackrock Land Exchange well serves the public interest.

The ROD sets forth the public-interest benefits of the 2020 Exchange, many of which BLM has recognized since 1995. The 2020 Exchange resulted in a net gain of public lands available for recreation, crucial winter range mule deer habitat, as well as expanded acreage for the exercise of off-reservation Tribal treaty rights. ROD at 4 (AR0039172). The exchange enables new permanent access to trails in the Chinese Peak-Blackrock Trail system. *Id.* at 3–4 (AR0039171–72). Access to this trail system previously required entry through Simplot's private property. The ROD further found that the federal lands to be exchanged held "lower

resource values since they are located directly adjacent to the Simplot's Don Plant and are within the off-site operable unit of the Eastern Michaud Flats Superfund Site." *Id.* at 4 (AR0039172)*.*

BLM also carefully considered and disclosed potential adverse effects to the public interest as well.  Leveraging its robust environmental analysis, the ROD evaluated projected "incremental additions to phosphorous and arsenic loading due to potential leakage through the liners" of the expanded gypsum stack, *id.* at 5 (AR0039173); loss of recreational opportunity on the exchanged lands, ROD at 3 (AR0039171); loss of certain areas for exercise of off-reservation Tribal treaty rights, *id.* at 4 (AR0039172); and loss of available mule deer habitat, *id*.  BLM also appropriately determined that the 2020 Exchange complies with its regulations, as it would not interfere with established objectives for federal lands or adjacent Indian trust lands.  *Id.* at 4–5 (AR0039172–73); *see* 43 C.F.R. § 2200.0-6(b)(2).

Based on the above analysis, the FEIS,[13] and the extensive record, BLM reasonably concluded that the 2020 Exchange "provides the greatest net benefit to the public based on relevant factors that include economic and technical considerations, agency missions, and considerations of national policy."  AR0039267.

The Tribes contend that this public interest finding is flawed because the 2020 Exchange will impact cultural resources, Tribal housing plans, and water quality.  ECF No. 37-1 at 18–20.  But BLM fully considered these issues and determined they were outweighed by the benefits of the exchange.[14]  ROD at 3–4 (AR0039171–72).  The agency considered the public interest in the

---

[13] The FEIS also notes the important employment and economic benefits associated with continued operation of the Don Plant.  AR0029692-94.  In addition, evidence of the public interest is revealed in numerous letters of support from virtually all of the affected state and county agencies, including IDEQ.  AR 0012340-58.

[14] The Tribes allege that BLM did not have an accurate picture of the 2020 Exchange because the public interest factors listed in the ROD do not explicitly identify the Tribes' cultural interest.  ECF No. 37-1 at 18.  The ROD explicitly discusses areas available for exercise of off-reservation

lands on both sides of the exchange.  "The Secretary's public interest determination is one

involving a variety of factors, the relative weights of which are left in [her] discretion."  *Nat'l*

*Coal Ass'n v. Hodel*, 825 F.2d 523, 532 (D.C. Cir. 1987).

The Tribes argue that the 2020 Exchange will interfere with management objectives of

adjacent Indian trust lands.  The ROD determined that there is no trust land adjacent to the lands

involved in the exchange.  ROD at 4–5 (AR0039172–73).  BLM made this determination using a

straightforward interpretation of BLM's unambiguous regulation.  BLM acknowledged that a

small area of federal lands included in the 2020 Exchange abuts the Fort Hall Reservation.

However, that portion of the Reservation is privately owned by FMC Corporation—it is not held

in trust by the United States for the benefit of an Indian Tribe.[15]  *See id.*  "Indian trust land"

refers to allotment parcels or acquired lands in which the United States holds the title for the

benefit of a Tribe or individual Tribal members.  *See* 25 U.S.C. § 2201(4).

The Tribes further assert that the 2020 Exchange conflicts with two goals of the Pocatello

RMP related to water and treaty rights.  ECF No. 37-1 at 19–20.  BLM regulations provide that

an action conforms with an RMP if "specifically provided for in the plan, or if not specifically

mentioned, shall be clearly consistent with the terms, conditions, and decisions of the approved

plan or plan amendment."  43 C.F.R. § 1601.0-5(b).  The Pocatello RMP zoned the property for

---

treaty rights, ROD at 4 (AR0039172), and BLM analyzed cultural interests in the FEIS, FEIS at
3-19 (AR0029612).  Moreover, the ROD discusses how Alternative B was selected to avoid
impacts to the Tribes' cultural resources in the West Canyon area. ROD at 9 (AR0039177).  The
Tribes further claim BLM inadequately analyzed effects of the exchange on management
objectives relating to the Tribes' ostensible plans to offer housing in Michaud Creek.  ECF No.
37-1 at 18.  But the Tribes do not explain whether any such plans are on trust lands adjacent to
the 2020 Exchange lands or how it *significantly* interferes with those management objectives.

[15] Even if the FMC on-reservation lands were trust lands, the land exchange still does not
interfere in the management objectives of these lands.

exchange and a previous plan designated the private lands for acquisition.  The Tribes did not

challenge the Pocatello RMP's designation within the six-year statute of limitations.  28 U.S.C. §

2401(a).  They do not raise any plan provisions with which the exchange is not clearly

consistent.  The Tribes fail to carry their burden to show plan inconsistency.  *See Oregon Nat.*

*Desert Ass'n v. Cain*, 17 F. Supp. 3d 1037, 1060 (D. Or. 2014) ("Under FLPMA, BLM has 'a

great deal of discretion in deciding how to achieve' compliance with [an RMP]") (quoting

*Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1235 (D. Or. 2013)).

In sum, the ROD reasonably concluded that the public interest would be well-served by

the 2020 Exchange.  The agency expressly considered and fairly balanced the positive and

negative benefits of the exchange, and ultimately found "benefits to recreation opportunities,

wildlife habitat, and consolidated management of Federal lands."  ROD at 7 (AR0039175).

These determinations are supported by the record and consider all relevant factors.  They also

fulfill FLPMA's policy that "the public lands be managed in a manner which recognizes the

Nation's need for domestic sources of minerals[.]"  43 U.S.C. § 1701(a)(12).  Courts ordinarily

do "not pass upon the wisdom of the agency's perception of where the public interest lies."  *Nat'l*

*Coal Ass'n v. Hodel*, 675 F. Supp. 1231, 1245 (D. Mont. 1987), *aff'd sub nom. Northern Plains*

*Res. Council v. Lujan*, 874 F.2d 661 (9th Cir. 1989) (quoting *Telocator Network of America v.*

*FCC*, 691 F.2d 525, 538 (D.C. Cir. 1982)).  The Tribes have not met their burden to show that

BLM's public interest determination was arbitrary and capricious in any respect.[16]

---

[16] Even though they did not raise the issue during the extensive opportunities they had to
participate in the administrative process leading to the 2020 Exchange, the Tribes also argue that
BLM failed to satisfy the "equal-value" requirement in FLPMA at 43 U.S.C. § 1716(b).  ECF no.
37-1 at 20-21.  The Tribes do not challenge the appraisals, but instead contend that "a mere
comparison of dollar amounts is inadequate" in light of BLM's environmental justice policies
and the federal government's trust duties.  ECF No. 37-1 at 20–21.  There is nothing in FLPMA
or applicable case law that prescribes any such policy thumb on the appraisal scale.

III.     **BLM Approved the 2020 Exchange Pursuant to its Authority in FLPMA and Section 5 of the 1900 Act Does Not Apply to the Exchange.**

Section 206(a) of FLPMA provides BLM with explicit authority to conduct land exchanges.  BLM used this authority to approve the 2020 Exchange. The Tribes erroneously assert BLM could only dispose of the ceded lands by selling them in accordance with directions given to the Interior Department pertaining to the lands' original disposal in section 5 of the 1900 Cession Agreement Act (31 Stat. 672) ("1900 Act"), and that it therefore violated the procedures of that century-old Act in approving the 2020 Exchange.  *See* ECF No. 37-1 at 10–16.

Most fundamentally, the Tribes' arguments fail because they completely ignore FLPMA, which provided BLM with a wholly independent source of authority to lawfully approve the 2020 Exchange that in no way poses a conflict with section 5. Such authority renders the Tribes' section 5 arguments irrelevant.  Nor by its own terms does section 5 apply to the 2020 Exchange given that the government complied with its terms and the lands at issue were long ago withdrawn from entry and settlement, the disposal mechanisms it references.  Finally, even if section 5 retained any ongoing applicability 120 years after its enactment, it cannot be read as a straitjacket that would serve to preempt or foreclose the Congress from granting BLM authority in FLPMA to engage in land exchanges as another valid method to dispose of the ceded lands. Such a reading would lead to an untenable result inconsistent with Congress's plenary authority over federal lands and even the Tribes' own interests, as it would result in fewer acres of public lands on which the Tribes may exercise their off-reservation Treaty rights.

**A. BLM approved the 2020 Exchange using its authority under FLPMA**.

In exercising its plenary authority over public lands, Congress enacted FLPMA as a comprehensive consolidation and revision of public land laws.  Sen. Comm. On Energy & Nat. Resources, 95th Cong., 2d Sess. Legislative History of FLPMA at vi (1978) ("For the first time in

the long history of the public lands, one law provides comprehensive authority . . . for the administration and protection of the Federal lands[.]").  In so doing, Congress sought to establish "uniform procedures for any disposal of public land . . . and the exchange of such lands." 43 U.S.C. § 1701(a)(10).  One such procedure is in Section 206, which authorizes the Secretary of the Interior to exchange a "tract of public land or interests therein" upon a determination "that the public interest will be well served by making that exchange."  *Id.* § 1716(a).

BLM made the requisite public interest determination in the ROD approving the 2020 Exchange.  ROD at 3–6 (AR0039171–74).  That finding served as the factual predicate activating BLM's lawful authority to conduct the exchange.

**B.    Section 5 of the 1900 Cession Agreement Act does not apply to the 2020 Exchange.**

Nevertheless, the Tribes argue that BLM did not have authority to undertake the 2020 Exchange because it did not dispose of the federal exchange lands in accordance with public land laws referenced in section 5 of the 1900 Act.  These obsolete directives would require that the lands ceded under the 1898 Cession Agreement could forever only be disposed of via sales under general public land laws in effect as of 1900, be limited to 160 acres per purchaser, or occur at a public auction that has already been held.  ECF No. 37-1 at 13–15.  The Tribes' arguments rely on a misreading of section 5 and are meritless.

In the 1898 Cession Agreement between the Tribes and the United States, the Tribes "cede[d], grant[ed], and relinquish[ed] to the United States all [of their] right, title, and interest" in 418,560 acres of reservation land ("Ceded Lands") in exchange for per-capita payments. *See* 1900 Cession Act, 31 Stat. 672 (June 6, 1900) ("1900 Act").  The Congress adopted the 1900 Act to "accept[], ratif[y], and confirm[]" the 1898 Cession Agreement. 31 Stat. 675; AR0039297.

The plain language of the 1900 Act demonstrates that this Act does not apply to the 2020 Exchange and certainly did not foreclose the United States from approving and implementing it.

Section 5 of the 1900 Act, on which the Tribes premise their claim, has no counterpart in the Cession Agreement.[17]  Rather, section 5 merely directs that lands remaining after individual Tribal allotments are accounted for be opened for entry and settlement "by proclamation of the President" for disposal "under the homestead, townsite, stone and timber, and mining laws of the United States, only, excepting as to price and excepting the sixteenth and thirty-sixth sections in each Congressional township, which shall be reserved for common school purposes and be subject to the laws of Idaho [.]"  31 Stat. 676; AR0039301.  As such, section 5 is framed in the past tense and simply directed that the lands be *opened* to purchase for settlement upon the occurrence of the three conditions specified above.  Like the Homestead Act, it limited any single *purchaser* at that time to 160 acres.  *See* Act of May 20, 1862, 37th Cong., ch. 75, § 1, 12 Stat. 392.  The General Land Office (the predecessor to BLM) carried out its obligations under the provision when it opened lands to settlement pursuant to the direction in section 5 following the requisite proclamation by the President.  The Tribes do not dispute this occurred.[18]  That the United States was not permanently constrained from ever disposing of the ceded lands other than

---

[17] Thus, the Tribes' multiple representations that the original disposal methods for ceded lands are contained in both in the 1898 Agreement and section 5 of the 1900 Act are erroneous.  See ECF No. 37-1 at 10, 47, & 48.

[18] The historical record shows that the Interior Department complied fully with this direction in section 5.  President Theodore Roosevelt proclaimed the opening of the ceded lands to settlement on May 7, 1902.  Pres. Proclamation No 472.  This proclamation set a land rush on the 418,000 ceded acres at noon on June 17, 1902.  *Id.; see also* https://blog.cetrain.isu.edu/blog/did-you-know-1902-pocatello-land-rush.  President Roosevelt's proclamation also called for an auction for the lands within five miles of Pocatello. Presidential Proclamation 472.  The federal government held that public auction in the city in July 1902.  Robert L. Wrigley, Jr., The Early History of Pocatello, Idaho, 34 The Pacific Northwest Q. 353, 365 (1943).

pursuant to the methods in section 5 is also evinced by the fact that Congress passed a follow-on statute providing for disposal of ceded lands within five miles of Pocatello that did not sell at the original public auction.  Pub. L. No. 58-153, An Act Relating to ceded lands on the Fort Hall Indian Reservation (Mar. 30, 1904).  The Tribes' arguments flatly ignore this history as well as all the other significant public land developments that have occurred since 1900.

Moreover, the homestead era the provision invokes ended in the 1930s with "a series of congressional and executive actions" by which "all unappropriated federal lands were withdrawn from *every form* of entry or selection."  *Andrus v. Utah*, 446 U.S. 500 (1980) (emphasis added).  The Taylor Grazing Act of 1934 withdrew up to 80 million acres from entry or settlement, with all remaining western lands withdrawn by Executive Order 6910 of November 26, 1934.  *See id.* at 511–14 & n. 19.  Congress confirmed the executive withdrawals in 1936 amendments to section 7 of the Taylor Grazing Act, giving the Interior Secretary authority to re-designate areas for entry or settlement.  43 U.S.C. § 315f; 43 C.F.R. § 2400.0-3. Thus, by no later than 1936, the lands at issue had been withdrawn from entry and settlement such that the methods of disposal referenced in section 5 could have no further applicability.  Section 5 has been fully carried out and has long been—and remains—a dead letter.

## C.  Section 5 does not prevent BLM from utilizing Section 206 of FLPMA.

Despite the plain language of section 5 and the events subsequent, the Tribes seek to zero-in on the use of the word "only" in section 5 to argue that it somehow serves to constrain the Interior Department's potential methods of disposal of the ceded lands in perpetuity.  ECF No. 37-1 at 13.  Even if section 5 still had any effect, it cannot support the Tribes' overly cramped reading.  Most importantly, the statutes can readily be harmonized because FLPMA provides an independent source of land exchange authority by which BLM can dispose of public

land.  43 U.S.C. § 1716(a).  This harmonization is readily achieved given that FLPMA provides for exchange authority "[n]otwithstanding" any other provision of law.  *Id.* § 1715(a).  Next, the word "only" cannot bear the weight the Tribes seek to impose on it as serving as a permanent restriction on the United States' ability to dispose of its lands, particularly in light of Congress's plenary authority over public lands in the Property Clause.  U.S. CONST., Art. IV, Sec. 3, cl. 2.

     Section 5 by its plain meaning does not apply to the 2020 Exchange.  Even though unnecessary for resolving this dispute, the legislative history only serves to bolster that conclusion.  That history reveals that the General Land Office crafted section 5 at the request of the Commissioner of Indian Affairs only after the Tribes specifically rejected the opportunity to be involved in how the 1900 Act would provide for disposal of the ceded lands.  *See* S. Doc. No. 169, 55th Cong., 2nd Sess., at 11 (1898) ("As has been stated, the plan of the [Interior] Department had been to dispose of [the ceded] lands by appraisal and sale to the highest bidder for the benefit of the Indians.  The latter have, however, ceded the same outright, thus leaving it to Congress and the Department to dispose of the same in such manner as may be determined").  As a result, the General Land Office developed the provision that became section 5 wholly apart from the negotiations that led to the Cession Agreement and the Tribes played no role in it.

     The Tribes incorrectly argue that "the scheme was designed to ensure that the land was settled by small landowners . . . who would make specified productive uses of the land that were compatible with the Tribes' continued interests[.]"  ECF No. 37-1 at 12–13.  The Tribes cite no authority to support this reading because no support exists.  As noted above, both the plain meaning and legislative history undermine the Tribes' convenient narrative, and to the degree the Tribes benefitted from the Ceded Lands remaining in the public domain over the years, that benefit was merely incidental to section 5 not *because of* those Interior disposal directives.

Finally, prudence favors the plain reading and legislative history of the 1900 Cession Act. The United States entered into more than 700 Indian land cessions in the 110-year period before the 1898 Cession Agreement.  *See* Library of Congress, *Indian Land Cessions in the U.S., 1784-1894*, https://memory.loc.gov/ammem/amlaw/lwss-ilc.html.  As a result,  accepting the Tribes' flawed interpretation of the 1900 Cession Act may well have implications both around Pocatello and much further beyond.  Further, this constrained interpretation would actually harm many citizens concerned about public lands management as FLPMA's requirements for equal value, public interest, and analyzing environmental conditions in these ceded areas could potentially be undermined.  The Court should decline this invitation to unsettle a half-century and more of public land law.  *See American Water Works Ass'n v. EPA*, 40 F.3d 1266, 1271 (D.C. Cir. 1994)

## IV.    The Land Exchange is Consistent with the Trust Duties of the United States.

The Tribes seek to rely on a recent Ninth Circuit case, *Navajo Nation v. U.S. Dept. of the Interior*, as precedent in support of their tribal breach of trust claim for non-monetary relief. *Navajo Nation*, 26 F.4th 794, 807–09 (9th Cir. 2022).  The panel in *Navajo Nation* lays out the longstanding standard for establishing a breach of trust:  "an Indian tribe cannot force the government to take a specific action unless a treaty, statute or agreement imposes, expressly or by implication, that duty.'" *Id.* at 808 (quoting *Gros Ventre Tribe v. United States*, 469 F.3d 801, 810 (9th Cir. 2006)).  The Tribes assert that the 2020 Exchange violates the United States'  trust duties in two respects.  First, the Tribes allege the exchange is inconsistent with the disposal provisions of Section 5.  Second, the Tribes argue that the exchange conflicts with Articles 2 and 4 of the Fort Bridger Treaty of 1868.  The Tribes have failed to meet the high burden established by *Navajo Nation*, *Gros Ventre*, and previous breach of trust cases because the provisions that the Tribes raise fail to impose an enforceable duty on the United States.

First, "[t]he government's fiduciary responsibilities necessarily depend on the substantive laws creating those obligations." *Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476, 1482 (D.C. Cir. 1995).[19]  Section 5 of the 1900 Act, as discussed *supra*, does not abrogate FLPMA exchange authority.  With respect to the claims under the Fort Bridger Treaty, the Tribes' usufructuary rights on ceded lands are explicitly contingent upon whether those lands remain in federal ownership.  *See* Art. 4 ("so long as these lands remain within the federal domain").  The Treaty does not impose any substantive restraint on land disposition.  Thus, the ceded lands do not constitute trust assets and there is no statutory or other prohibition on the authority of the United States to dispose of its lands.  *Cf. Reno*, 56 F.3d at 1482 (rejecting Tribes' fiduciary-duty claims based on conditional off-reservation hunting rights).  The Tribes do not claim any mismanagement of a trust asset, but rather that the exercise by the United States of its general authorities may result in some generalized harm.  As such, "their claim is no different from that which might be brought under the generally applicable environmental laws available to any other affected landowner, subject to the same statutory limitations."  *Gros Ventre*, 469 F.3d at 811.

The Tribes contend that two clauses of the Treaty create enforceable duties.  Article 2 states that the Fort Hall Reservation is "set apart for the absolute and undisturbed use and occupation" of the Tribes.  *See* Fort Bridger Treaty of 1868 Art. 2.  The Tribes contend this constitutes a right of quiet enjoyment enforceable by a fiduciary-duty claim.  But the context of the Treaty indicates that the "absolute and undisturbed use and occupation" is enforceable as

---

[19] Plaintiffs asserted in that case that the United States' role as trustee required the government to make filings in a stream adjudication to protect off-reservation water rights that the Tribes claimed were needed to support their off-reservation hunting treaty rights. The D.C. Circuit held the determination whether to make such filings was entirely discretionary with the United States and that "an Indian tribe cannot force the government to take a specific action unless a treaty, statute, or agreement imposes, expressly or by implication, that duty."  *Reno*, 56 F.3d at 1482.

against others who may "pass over, settle upon, or reside in the territory described." *Id*.  Article 4 provides that the reservation is the Tribes' permanent home and establishes conditional off-reservation treaty rights.  *See id.* at Art. 4.  Neither of those provisions gives rise to a specific duty.  *See Reno*, 56 F.3d at 1482; *Shoshone-Bannock Tribes v. United States*, 575 F. Supp. 3d 1245, 1263 (D. Idaho 2021), *on reconsideration in part*, No. 4:18-CV-00285-DCN, 2022 WL 1605267 (D. Idaho May 20, 2022) (general trust obligation does not convert a discretionary authority into a discrete, nondiscretionary duty for purposes of compelling agency action).

The facts here resemble the rejected trust duty claims made in *Gros Ventre Tribe* and lack the legal foundation found in the successful trust duty claims made in *Navajo Nation*.  The Tribes challenge a land exchange approved pursuant to BLM's authority under FLPMA.  The Tribes assert that the United States' approval of the land exchange constitutes a breach of trust because the land subject to the exchange will enable continued operation of the Don Plant, which the Tribes claim is a source of pollution that negatively impacts the Reservation.  This is the same type of off-reservation harm regarding management of non-tribal resources rejected in *Gros Ventre Tribe.  See Gros Ventre Tribe*, 469 F.3d at 806 (rejecting claim that the United States breached its trust obligations "by approving, permitting, and failing to reclaim" two cyanide heap-leach gold mines upriver from the Tribe's reservation).

By contrast, the recent decision in *Navajo Nation* concluded that a trust claim was available because the Navajo Nation identified specific trust property at issue.  *See Navajo Nation*, 26 F.4th at 809–10; *Paloma Inv. Ltd. Partnership v. Jenkins*, 978 P.2d 110, 115 (Ariz. App. 1998) ("water rights are property rights").  The Navajo Nation claimed that the United States failed to uphold its trust responsibility with regard to water rights reserved appurtenant to the creation of the Navajo Reservation under *Winters v. United States*, 207 U.S. 564 (1908).

When *Winters* rights are at issue, the federal government has "an irreversible and dramatically important trust duty requiring them to ensure adequate water . . . [for the Tribe's] permanent home reservation." *Navajo Nation*, 26 F.4th at 805. *Winters* rights were not at issue in any cases where the Ninth Circuit found no fiduciary duty applicable, and *Winters* rights are not at issue here. Having failed to identify a trust duty, the Tribes cannot succeed in a breach of trust claim. Instead, they must rely on their claims under NEPA, FLPMA, and the APA—all claims that fail as a matter of law. Accordingly, BLM fully discharged its general trust obligation to the Tribes.

## V.   The Tribes Have Not Shown They are Entitled to any Remedy on Summary Judgment.

As explained above, the Tribes have not carried their burden to demonstrate that BLM's decision to approve the 2020 Exchange was arbitrary and capricious or otherwise contrary to law, and are entitled to no relief whatsoever. To the extent this Court were to find reversible legal error in one or more particulars in BLM's approval of the 2020 Exchange, however, the Tribes' Opening Brief offers no showing that the Court could provide the extraordinary remedy the Tribes seek on summary judgment in any event.[20] Indeed, at the very end of their Opening

---

[20]  Likewise, the Tribes have not met their burden to establish that the injuries of which they complain in their standing declarations are redressable by this Court. Instead, they simply provide a single conclusory statement to that effect. See ECF No. 37-1 at 9 (alleging without any explanation that their alleged standing injuries "can be redressed by this Court's vacatur of the ROD approving the land exchange"). This statement elides the current state of facts because the 2020 Exchange has been fully implemented and title has changed hands to the lands at issue. The Tribes' declarations and extensive extra-record exhibits submitted in support of their standing are of no help, either. See ECF nos. 37-4 – 37-17. Most of the declarations' averments and extra-record exhibits on which they rely stray far beyond standing purposes and therefore appear designed as an impermissible collateral attack on the merits of BLM's decision or to evade the Court's order on record supplementation. ECF no. 24 at ¶2. The vast majority of such averments are also inconsistent with or directly rebutted by the record and suffer from various evidentiary infirmities. Simplot is concurrently filing a motion to strike to address these issues.

Brief the Tribes simply ask for the Court to "order titles to the land at issue transferred back to the respective owners," or a return to the *status quo ante*.  ECF No. 37-1 at 50.

The Tribes are not entitled to summary judgment as to any such remedy because that would require the Court to engage in a separate inquiry focused on additional factors and equitable evidence extending far beyond the scope of Federal Defendants' administrative record. *See Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) ("The court's decision to grant or deny injunctive or declaratory relief under the APA is controlled by principles of equity.").  An injunction is "a drastic and extraordinary remedy, which should not be granted as a matter of course."  *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010); *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Moreover, as the Supreme Court has repeatedly reaffirmed, courts cannot impose any injunctive relief, especially of an affirmative nature, in the absence of a showing of irreparable injury and upon a consideration of a balancing of the equities and the public interest.  *See Monsanto*, 561 U.S. at 156–58.

The Tribes have not addressed any of these equitable factors or sought to justify their request for affirmative injunctive relief.  Any such remedy would implicate complex factual and legal issues regarding the prospect of seeking to unwind a completed land swap. It also would raise questions about hindering Simplot's ability to meet a key regulatory milestone with IDEQ – namely, the massive $70-80 million dollar investment to decommission the cooling towers and replace that cooling capacity with the construction of cooling ponds to reduce fluoride emissions. FEIS at 3-8–3-9 (AR0029601–02).  Finally, that inquiry would need to address Simplot's critical permitting and construction to laterally expand the gypsum stack, which is projected to reach capacity no later than 2031.  *Id.* at ES-5 (AR0029548).  The Court would also need to consider evidence addressing the public interest, including facts relating to Simplot's role in providing

critical domestic agricultural resources at the Don Plant. *See, e.g.*, White House, *President Biden Announces New Actions to Address Putin's Price Hike, Make Food More Affordable, and Lower Costs for Farmers* (May 11, 2022); U.S. Dep't of Agriculture, *Request for Comment, Access to Fertilizer: Competition and Supply Chain Concerns*, 87 Fed. Reg. 15,191 (Mar. 17, 2022); Executive Order 14,017 *America's Supply Chains*, 86 Fed. Reg. 11,849 (Mar. 1, 2021).

In sum, were the Court to find that any relief is appropriate, Simplot respectfully requests the opportunity to submit additional briefing and evidence on all of the variables relevant to fashioning an appropriate remedy under the circumstances as well as a separate remedial hearing.

## CONCLUSION

For the foregoing reasons, Simplot respectfully submits that the Court should grant Simplot's and Federal Defendants' Cross-Motions for Summary Judgment Pursuant to the APA and deny the Tribes' Motion for Summary Judgment.

Respectfully submitted this 17th day of August 2022.

<u>s/ Steven B. Andersen</u>
Steven B. Andersen
KIRTON MCCONKIE
Stephen J. Odell
MARTEN LAW, LLP
Thomas C. Perry, Senior Counsel
J.R. SIMPLOT COMPANY

Attorneys for Defendant-Intervenor J.R. Simplot Company