UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHOSHONE-BANNOCK TRIBES OF THE FORT HALL RESERVATION, | Case No. 4:20-cv-00553-BLW |
| Plaintiff, | MEMORANDUM DECISION AND ORDER |
| v. | |
| LAURA DANIEL-DAVIS, Principal Deputy Assistant Secretary for Land and Minerals Management; UNITED STATES DEPARTMENT OF THE INTERIOR; and UNITED STATES BUREAU OF LAND MANAGEMENT, | |
| Defendants, | |
| and | |
| J.R. SIMPLOT COMPANY | |
| Defendant-Intervenor. | |

**INTRODUCTION**

This case involves a challenge to the Blackrock Land Exchange between the

United States and Defendant-Intervenor J.R. Simplot Company in southeast Idaho.

Plaintiffs Shoshone-Bannock Tribes allege that BLM's decision and analysis

**MEMORANDUM DECISION AND ORDER - 1**

approving the exchange is arbitrary and capricious in violation of the National

Environmental Protection Act, the Federal Land Policy Management Act, the 1900

Act, and the Administrative Procedures Act. Before the Court are the parties'

cross-motions for summary judgment. Dkts. 37, 60, 61. For the reasons set forth

below, the Court grants in part and denies in part the motions.

## BACKGROUND

### A.    The Fort Hall Reservation

In 1868, the Fort Bridger Treaty established the Fort Hall Reservation as the

permanent home of the Shoshone-Bannock Tribes, a federally recognized Indian

Tribe. AR0055983. Thirty years later, the Tribes agreed to cede a significant

portion of the Reservation to the federal government. Act of June 6, 1900, 31 Stat.

672, 672–76 (Art. I) (1900); AR0039297-301. Congress subsequently ratified the

1898 Cession Agreement in the 1900 Act, which incorporates the Agreement in its

entirety. *Id*.

As part of the 1898 Agreement, the Tribes retain rights to cut timber, pasture

livestock, hunt, and fish on ceded lands that "remain part of the public domain."

Act of June 6, 1900, 31 Stat. 672, 674 (Art. IV) (1900). Moreover, Section 5 of the

1900 Act delineates specific, limited processes by which the federal government

can remove the ceded lands from the public domain. For example, the Act provides

that the ceded lands "shall be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States *only* . . . .". *Id.* at 676 (emphasis added). In addition, "no purchaser shall be permitted in any manner to purchase more than one hundred and sixty acres" of ceded lands.  Finally, ceded lands within five miles of Pocatello "shall be sold at public auction." *Id.*

### B.  The Don Plant and the EMF Superfund Site

In the 1940s, two phosphate processing facilities—Simplot's Don Plant and the neighboring FMC plant—opened next to and on the Fort Hall Reservation. AR0029561. The Don Plant manufactures phosphoric acid through a process that creates a phosphogypsum byproduct containing radioactive materials. AR0029570. At the Don Plant, phosphogypsum waste is mixed with water and pumped into a storage-disposal facility called a gypstack. *Id.* The phosphogypsum solids settle in ponds at the top of the gypstack and the slurry water is then pumped back into the processing facility. AR0029571. Gradually, the gypsum deposits accrue, filling the gypstack. *Id.*

Both gypstacks had an (almost literally) fatal design flaw: they were unlined. Consequently, over the years, the gypstacks released contaminates such as arsenic, cadmium, lead, mercury, nickel, and nitrate into the groundwater. AR0029968. The contaminated groundwater discharged into the Portneuf River, which flowed

past the Don Plant and onto the Fort Hall Reservation. *Id*; *Shoshone-Bannock Tribes of the Fort Hall Reservation v. U.S. Dep't of Interior*, No. 4:10-cv-004-BLW, 2011 U.S. Dist. LEXIS 48492, at *3 (D. Idaho May 3, 2011).

EPA detected pollution from the phosphate plants in the late 1980s. *Id.* Because EPA found contaminants of concern in the groundwater, soil, and vegetation, it ultimately made 2,530 acres of land—including the Simplot and FMC phosphate facilities—part of a superfund site under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). In 1990, the Eastern Michaud Flats (EMF) superfund site was listed on the National Priority List. *Id.* In 1998, the agency finalized its decision designating the superfund site. AR0029561.

Then the cleanup started.

In 2001, EPA issued a consent decree and statement of work specific to the area around the Don Plant. AR0029562. The statement of work required Simplot to install a groundwater extraction system to remove groundwater contaminated by the unlined stack. *Id.*

In 2017, pursuant to a 2010 amendment to the 2001 consent decree and a 2008 voluntary consent order with the Idaho Department of Environmental Quality (IDEQ), Simplot installed a synthetic liner on top of the existing gypstack to

reduce groundwater contamination. *Id*. The voluntary consent order also requires the inclusion of a liner in the design of any new gypstack built at the Don Plant or other lands acquired for that purpose. *Id*.

In 2015 EPA and DOJ reached a settlement with Simplot to resolve alleged Clean Air Act violations at five Simplot facilities, including the Don Plant. *Id*. Simplot agreed to pay a civil penalty and install pollution controls and monitoring systems to reduce public health risks associated with sulfur dioxide emissions. *Id*.

In 2016, IDEQ and Simplot agreed to a consent order to address excess fluoride found in forage within a 1-to-2-mile radius of the Don Plant. *Id*. Simplot has to reduce its fluoride emissions by 2026. It can either replace the existing reclaim cooling towers with a low-emission alternative or incorporate other measures that reduce fluoride emissions by more than 50 percent from the cooling towers. *Id*.

### C.    The Blackrock Land Exchange

The Don Plant continues operating, but its longevity depends on the capacity of its gypstack. Without a method of storing waste, manufacturing comes to a halt. And here, Simplot faces a major dilemma. At current production rates, the Don Plant's gypstack—which now spreads out over nearly 500 acres—is projected to reach design capacity by 2031. AR0029548; AR0053590.

For a quarter century, Simplot has tried to extend the Don Plant's operational life by acquiring adjacent BLM land and building new gypstacks. AR0029545. Critically, the suitable land now belongs to the Federal Government because it was ceded by the Tribes in the 1898 Agreement.

Simplot first proposed solving its storage problem through a land exchange in 1994. *See 1994 Proposal* AR0062706 ("Simplot seeks to acquire this BLM land as a permanent storage area for the gypsum produced as a byproduct in its phosphate fertilizer manufacturing process. Simplot utilizes the land it owns immediately adjacent to the north boundary of this BLM land for gypsum storage."). Although BLM and EPA took steps towards approving the exchange, the process stalled pending EPA's EMF Superfund Site ROD. AR0063084-86; AR0063121; AR0063513.

Simplot came back to the proposal in 2004. AR0063513. This time, BLM approved the exchange, issuing an Environmental Assessment and a Finding of No Significant Impact. AR0064177-AR0064182. The Tribes challenged that administrative decision. In 2011, this Court granted summary judgment in their favor. The Court remanded the decision to BLM because the EA violated NEPA and the project required an EIS.

BLM revisited the land exchange once more in 2019. BLM posted a Notice

of Intent to prepare an EIS in the *Federal Register* on May 20, 2019 and provided a
45-day scoping period, during which BLM held two public scoping meetings.
AR0029563. BLM prepared a draft EIS, which it made available for comment in
late 2019. *Id.* The final EIS was published in May 2020. *Id.*

The EIS considered the proposed action, two action alternatives, and a no
action alternative. In August 2020, DOI issued the ROD approving Alternative B
and authorizing the exchange of 713.67 acres of Federal land for 666.46 acres of
non-Federal land along with 160 acres of non-Federal land in the form of voluntary
mitigation Parcel A. AR0039169-84.

In December 2020, Simplot and BLM finalized the exchange and transferred
the deeds. AR0031352-53; AR0031357-59; AR0031360-62; AR0065394-95.
Simplot acquired federal land that is adjacent to the Don Plant and which the
Tribes ceded in the 1898 Agreement. AR0039210. In exchange, the federal
government acquired land near the Chinese Peak-Blackrock Canyon area. *Id.* That
same month, the Tribes filed this suit.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material
fact and the moving party is entitled to judgment as a matter of law. *Karuk Tribe of
Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc). Because

this is an administrative record review case, the Court may grant summary

judgment to either party based upon a review of the administrative record. *Id.*

A federal agency's compliance with environmental laws is reviewed under

the Administrative Procedure Act (APA). 5 U.S.C. § 706; see *Ctr. for Biological*

*Diversity v. U.S. Dep't of Interior*, 581 F.3d 1063, 1070 (9th Cir. 2009); *Earth*

*Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003). Under the

APA, the reviewing court must set aside the agency's decision if it is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5

U.S.C. § 706(2)(A). A decision is arbitrary and capricious if the agency has relied

on factors which Congress had not intended it to consider, entirely failed to

consider an important aspect of the problem, offered an explanation for its decision

that runs counter to the evidence before the agency, or is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise.

*O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n*, 92 F.3d 940, 942 (9th

Cir. 1996). An agency action is also arbitrary and capricious if the agency fails to

articulate a satisfactory explanation for its action, including a rational connection

between the facts found and the choice made. *Id.*

Thus, the agency must set forth clearly in the administrative record the

grounds on which it acted. *See Atchison T. & S.F. Ry. v. Wichita Bd. of Trade*, 412

U.S. 800, 807 (1973). A court may not accept an agency's post hoc rationalizations for its action. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (citation omitted). "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.* (citations omitted).

The reviewing court's inquiry must be "thorough," but "the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency." *Id.*; *see also Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 927 (9th Cir. 2008) (holding that although a court's review is deferential, the court "must engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it"). To withstand review under the APA, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43.

## ANALYSIS

### A.    1900 Act Claims

To survive APA review, BLM's decision to approve the Blackrock Land Exchange must comply with the 1900 Act. Because it does not, it is "not in

accordance with law" in violation of the APA and is a breach of the federal government's trust responsibility to the Tribes.

### 1. Trust Responsibility

The federal government has trust obligations to Indian tribes. *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 574 (9th Cir. 1998). The government must "take a specific action" for the benefit of a tribe that it has an express or implied duty to take under a "treaty, statute or agreement." *Gros Ventre Tribe v. United States*, 469 F.3d 801, 810 (9th Cir. 2006). In addition, the trust responsibility requires "compliance with general regulations and statutes not specifically aimed at protecting Indian tribes." *Id.*; *see also Gros Ventre Tribe*, 469 F.3d at 810 (holding that the trust obligation "does not impose a duty on the government to take action beyond complying with generally applicable statutes and regulations"). "Tribes cannot allege a common law cause of action for breach of trust that is wholly separate from any statutorily granted right." *Gros Ventre Tribe*, 469 F.3d at 810.

In this case, Article IV of the 1898 Cession Agreement protects the Tribes' rights to cut timber, pasture livestock, hunt, and fish on the ceded lands that remain in the public domain. The 1900 Act implements that agreement. Section 5 sets out the process for opening the residue of the ceded lands to settlement. That is, in

Section 5, Congress limited how the ceded lands can leave the public domain and become privately owned. The Act deals exclusively with the recently ceded lands. That indicates congressional intent to restrict the means of removing the ceded lands from public domain and, consequently, of terminating tribal members' usufructuary rights. This is the best reading of the statute even though Congress did not specifically state that it imposed the disposal methods for the Tribes' protection. Therefore, the 1900 Act imposes a specific duty to adhere to the Section 5 disposal requirements, which implicates the trust responsibility.

To be sure, the 1900 Act could also be read as a generally applicable statute. After all, the Tribes did not negotiate the disposal requirements as part of the 1898 Cession Agreement. But even then, if the federal government failed to follow the generally applicable law, it breached its trust responsibility. Either interpretation of the statue leads to the conclusion that the 1900 Act imposes an affirmative trust duty to comply with the Section 5 disposal requirements.

### 2.  Section 5 of the 1900 Act

BLM had a two-fold APA and trust obligation to ensure the Blackrock Land Exchange was consistent with the 1900 Act. The plain language of Section 5 provides that the ceded lands "shall be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States *only* . . . .". Act of

June 6, 1900, 31 Stat. 672, 676 (Art. V) (1900) (emphasis added). The statute's

terms are clear—these types of laws are the exclusive means of lawful disposal.

Here, BLM disposed of ceded lands through the Blackrock Land Exchange, which

it authorized pursuant to FLPMA. Because FLPMA is not a homestead, townsite,

stone and timber, or mining law, BLM violated the 1900 Act.[1] The upshot is that

because Congress has repealed nearly all the homestead, townsite, stone and

timber, and mining laws, the federal government does not currently have a viable

method for disposing of the ceded lands.

BLM argues that interpretation of the statute is wrong because the outcome

conflicts with the congressional intent of FLPMA. The agency's argument goes

something like this. In the 1900 Act, Congress named general categories of land

disposal statutes, rather than specific laws. This indicates intent to allow general

disposal laws to govern the ceded lands. In 1976, Congress replaced those prior

disposal laws with FLPMA. Therefore, Congress implicitly intended to add

FLPMA to 1900 Act's lawful means of disposal. FLPMA thus "supplant[s] the

means of disposal listed in that Act." *Brief*, Dkt. 80 at 6.

---

[1] As noted, Section 5 included two other disposal requirements: no purchaser could purchase more than 160 acres of ceded lands and ceded lands within five miles of Pocatello had to be sold at auction. The parties dispute the applicability of those requirements. The Court does not need to reach those issues, so will not.

Not so. Congressional intent does not change the 1900 Act's text. "There is no need to consult extratextual sources when the meaning of a statute's terms is clear. Nor may extratextual sources overcome those terms." *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2469 (2020). Further interpretation of the 1900 Act is not needed.

Moreover, even taking congressional intent into account, BLM still violated the 1900 Act. When Congress enacted FLPMA it repealed hundreds of laws. *See* Pub. L. 94-579, 90 Stat. 2744, 2787-91 (October 21, 1976). The 1900 Act was not one of them. Equally important, Congress specifically provided that FLPMA did not "repeal any existing law by implication." *Id*. at 2786. Those choices, combined with the text of the Act itself, indicate congressional intent to effectively close the door on disposal of the ceded lands. That outcome is not absurd, but a direct result of congressional action.

Beyond that, BLM's position fails to fully grapple with the governing canon of statutory interpretation. The Supreme Court has been consistent and clear that "the standard principles of statutory construction do not have their usual force in cases involving Indian law." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). Instead, courts apply the Indian canon of construction, which requires resolving ambiguities in agreements and treaties with tribes in the tribes' favor. *Navajo Nation v. United States DOI*, 26 F.4th 794, 802 (9th Cir. 2022) (quoting

*Winters v. United States*, 207 U.S. 564, 576 (1908)).

The Indian canon of construction guides the Court's interpretation of the 1900 Act because the statute implements the 1898 Cession Agreement.[2] The law codified a negotiated exchange: the Tribes gave up significant portions of land in exchange for certain rights, including retained usufructuary rights. If the Act is ambiguous because it provides for general categories of laws for disposal, that ambiguity must be read in the Tribes' favor. Applying that interpretive standard, FLPMA is not in the category of homestead, townsite, stone and timber, or mining statutes and so is not a lawful means of disposal.

But the 1900 Act could also be read as an ordinary federal statute, rather than an agreement with the Tribes. Once more, the Indian canon of construction provides some guidance. "[F]ederal statutes and regulations relating to tribes and tribal activities must be construed generously in order to comport with traditional notions of Indian sovereignty and with the federal policy of encouraging tribal

---

[2] Notably, the Act and Agreement repeatedly refer to the cession agreement as a "treaty." Act of June 6, 1900, 31 Stat. 672, 673-74 (Art. II, Art. IV) (1900). Granted, it is not a traditional treaty because the agreement was reached after Congress prohibited treatymaking with tribes in 1871. *United States v. Lara*, 541 U.S. 193, 218 (2004) (Thomas, J., concurring in the judgment) (quoting 16 Stat 566, codified at 25 U.S.C. § 71). But the Supreme Court has consistently interpreted treaty substitutes—agreements reached with tribes and ratified by Congress, like the 1898 Cession Agreement—as essentially identical to formal treaties. *See, e.g.*, *Antoine v. Washington*, 420 U.S. 194, 201-02 (1975) (holding that agreements ratified by bicameral legislation are indistinguishable from treaties).

independence." *United States v. Smith*, 925 F.3d 410, 419 (9th Cir. 2019)

(quoting *Ramah Navajo Sch. Bd. v. Bureau of Revenue*, 458 U.S. 832, 846 (1982))

(cleaned up); *see also Bryan v. Itasca Cty.*, 426 U.S. 373, 392 (1976) ("[W]e must

be guided by that 'eminently sound and vital canon' that 'statutes passed for the

benefit of dependent Indian tribes . . . are to be liberally construed, doubtful

expressions being resolved in favor of the Indians.'") (citation omitted). As a

statute, rather than an agreement, the 1900 Act is incontrovertibly "relat[ed] to

tribes and tribal activities." *Smith*, 925 F.3d at 419. It is a cession-specific act. That

means the statute should be construed in the Tribes favor. Once again the Court

reaches the same conclusion: BLM cannot use FLPMA to remove ceded lands

from public domain.[3]

    At the end of the day, BLM had to comply with both the 1900 Act and

---

[3] There is a bit of a wrinkle here. Ninth Circuit precedent states that statutory ambiguities should not be resolved in the tribes' favor where there is a competing agency interpretation of the statue that deserves Chevron deference. *Rancheria v. Jewell*, 776 F.3d 706, 713 (9th Cir. 2015). It is not entirely clear whether that rule applies in cases involving statutes that specifically regulate tribes. *Id*. If it does, then there may be a strong argument that BLM's interpretation of the 1900 Act is entitled to Chevron deference and the Indian canon of construction should not apply. However, that is a hypothetical question. As stated previously, the 1900 Act is not ambiguous. If the intent of Congress is clear, Chevron deference does not apply because agencies—and courts reviewing their actions—must give effect to the unambiguously expressed intent of Congress. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). The Court does not owe deference to an agency's interpretation that contradicts the plain language of the statute. *Id.*

FLPMA. The laws are not in conflict. Congress enacted FLPMA to establish "uniform procedures for any disposal of public land, acquisition of non-Federal land for public purposes, and the exchange of such lands . . . ." 43 U.S.C. § 1701(a)(10). Adherence to FLPMA's procedure is necessary for a lawful land exchange, but it is not automatically sufficient. Because this case involves ceded lands with particular restrictions, FLPMA's procedure is only one component of the land exchange's legality—the 1900 Act is another. That law has a plain, clear meaning that is inconvenient for Simplot and BLM. But the Court cannot and will not rewrite the statute. Section 5 says what it says. The Blackrock Land Exchange violated the Act.

BLM's decision to approve the Blackrock Land Exchange is therefore "not in accordance with law" in violation of the APA and represents a breach of the federal government's trust responsibility to the Tribes. Although courts ordinarily vacate unlawful agency action, that remedy is not required. *All. for the Wild Rockies v. United States Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018). Instead, the "decision to grant or deny injunctive or declaratory relief under APA is controlled by principles of equity." *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (citations omitted).

The question of remedy in this case is fairly unusual. BLM cannot correct its

failures on remand, because congressional action to repeal, supersede, or amend the 1900 Act is required. From that starting point, it seems the only remedy is vacating the ROD and issuing an injunction. At the same time, because the Blackrock Land Exchange was completed more than two years ago, unwinding the deal is no simple matter. Given the stakes of the matter for all parties, the Court will invite full briefing on the issue of remedy. The parties should address both the appropriate remedy and any necessary steps or procedures to provide it.

## B.    FLPMA Claims

BLM's decision to approve the Blackrock Land Exchange must comply with FLPMA. Because it does not, it is "not in accordance with law" and violates the APA. 5 U.S.C. § 706(2)(A).

### 1.  Public Interest Determination

FLPMA provides that the Secretary of the Interior may authorize a public land exchange after "determin[ing] that the public interest will be well served by making that exchange." 43 U.S.C. § 1716(a). FLPMA's implementing regulations set out factors that "the authorizing officer shall give full consideration to . . . [w]hen considering the public interest." 43 C.F.R. § 2200.0-6(b). These mandatory factors are:

- Protection of fish and wildlife habitats, cultural resources, watersheds, wilderness and aesthetic values;

- Enhancement of recreation opportunities and public access;
- Consolidation of lands and/or interests in lands, such as mineral and timber interests, for more logical and efficient management and development;
- Consolidation of split estates;
- Expansion of communities;
- Accommodation of land use authorizations;
- Promotion of multiple-use values; and
- Fulfillment of public needs.

43 C.F.R. § 2200.0-6(b)[4]; *see also Nat'l Coal Asso. v. Hodel*, 675 F. Supp. 1231, 1243 (D. Mont. 1987) ("The Secretary has discretion, of course, to consider any other factor deemed relevant. However, his mandated obligation ceases when the specifically enumerated factors have been considered.").

After appropriately considering the mandatory public interest factors, the authorizing officer must make two findings:

(1) The resource values and the public objectives that the Federal lands or interests to be conveyed may serve if retained in Federal ownership are not more than the resource values of the non-Federal lands or interests and the public objectives they could serve if acquired, and

(2) The intended use of the conveyed Federal lands will not, in the determination of the authorized officer, significantly conflict with established management objectives on adjacent

---

[4] The statute itself directs the Secretary of the Interior, in considering the public interest, to "give full consideration to better Federal land management and the needs of State and local people, including needs for lands for the economy, community expansion, recreation areas, food, fiber, minerals, and fish and wildlife." 43 U.S.C. § 1716(a). The Court will apply the factors set out in the regulations because they are the more specific standard.

**MEMORANDUM DECISION AND ORDER - 18**

> Federal lands and Indian trust lands. Such finding and the supporting rationale shall be made part of the administrative record. [5]

*Id.* After that, the authorizing officer may find that the land exchange will serve the public interest.

The Court "review[s] the BLM's compliance with FLPMA under the deferential 'arbitrary and capricious' standard." *Ctr. for Biological Diversity v. United States DOI*, 623 F.3d 633, 641 (9th Cir. 2010) (citing *Webb v. Lujan*, 960 F.2d 89, 91 (9th Cir. 1992)). The public interest finding is arbitrary and capricious if BLM fails to consider any mandatory factors or to make the necessary determinations.

The Court turns first to consideration of the mandatory factors. To determine whether BLM's "decision was based on a reasonable consideration of the relevant

---

[5] Here, BLM correctly made this second finding. FLPMA does not define "Indian trust lands." However, the term's plain language explains its meaning—lands that the federal government holds in trust for the benefit of Indian tribes. *See* Cohen's Handbook of Federal Indian Law § 5.01 ("Although Indian trust lands are owned in fee by the United States, they are administered for the benefit of the tribes and individuals who are the equitable owners of the land."); *see also* Frank Pommersheim, *Land into Trust: An Inquiry into Law, Policy, and History*, 49 Idaho L. Rev. 519 (2013).

In this case, there is no Indian trust land adjacent to the federal property exchanged. There is one parcel of land that is directly adjacent to the federal lands and that is within the Fort Hall reservation. But that land is owned by FMC, not the federal government and it is not held in trust for the Tribes. AR0039172. It is not Indian trust land. BLM's determination was correct.

factors," the Court "review[s] the entire record." *Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1069 (9th Cir. 2010) (citing *Hjelvik v. Babbitt*, 198 F.3d 1072, 1074 (9th Cir. 1999)). Here, the EIS and ROD adequately considered the mandatory factors. The considerations that the Tribes say BLM ignored—which are not even mandatory public interest factors—were adequately addressed in the EIS.[6] BLM discussed in detail the value of the uses and historical context of the federal lands to be exchanged, the Tribes' exercise of off-reservation treaty rights protected by the Fort Bridger Treaty, the potential presence of burial grounds on the exchanged federal lands, and the impacts on the Tribes' cultural landscape. AR0029615-21. Both the ROD and the EIS acknowledged that the exchange would negatively affect the Tribes' historical and cultural uses of the lands. *See* AR0039172 (ROD) and AR0029618 (EIS).[7] The EIS also considered the Tribes' Policy for Management of Snake River Basin Resources. AR0029611, AR0029920.

---

[6] The EIS did not consider in detail the Tribes' plans to offer housing in the Michaud Creek area, but the Tribes did not raise that issue during the scoping or drafting process. AR0039198. The information the Tribes did provide was too vague as to time and place for it to affect the public interest determination.

[7] This analysis also demonstrates that BLM took NEPA's requisite hard look at the issues that will affect the Tribes' treaty rights as provided for in the Fort Bridger Treaty, the 1898 Agreement, and the 1900 Act. *See, infra,* Part C.2. The EIS and ROD contained numerous acknowledgements of those rights and examined issues that will affect them. AR0029613-21.

**MEMORANDUM DECISION AND ORDER - 20**

Because BLM adequately considered the mandatory public interest factors, the Court turns to the agency's determination that the land's "resource values and public objectives" if retained "are not more than the resource values . . .  and the public objectives they could serve if acquired." 43 C.F.R. § 2200.0-6(b). For this question, the Court considers the ROD only. As a NEPA document, the EIS did not—and could not—include the FLPMA public interest determination. Therefore, the question is whether the ROD offered an adequate explanation for BLM's determination the Blackrock Land Exchange serves the public interest.

It did not. True, the ROD evenhandedly listed many advantages and disadvantages of the land exchange. AR0039171-74. It certainly balanced the mandatory factors of recreation opportunities and public access (¶¶ 1-2, 9), consolidation of lands (¶ 3), protection wildlife habitats (¶ 5), expansion of communities and fulfillment of public needs (¶¶ 6-7), and protection of watersheds (¶¶ 8, 12-13). But the ROD failed to balance the protection of cultural resources. At best, the ROD explained that,

> Following conveyance the Federal lands will no longer be available for exercise of off reservation tribal treaty rights; however, exercise of tribal treaty rights will be available within the acquired non-Federal land and voluntary mitigation parcel A. There would be a net gain of 113 acres of lands available for exercise of off reservation tribal treaty rights.

AR0039172 (¶ 4). This assessment neglected many of the considerations noted in the EIS. For instance, the ROD did not discuss how the public interest determination weighed the "great intrinsic value [that the Tribes place on] the Federal lands offered for exchange" or the fact that although the newly obtained lands "may support the same general activities as the Federal land (e.g. opportunities for hunting, fishing, gathering, and livestock grazing), the non-Federal lands likely do not contain the same tribal significance as the Federal lands." AR0029617. BLM's failure to weigh these considerations—which the EIS indicated are significant—in the ROD gives the Court no basis to review the public interest determination. This black box decision-making process runs afoul of the basic administrative law principle that agencies must engage in reasoned decision-making. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020).

### 2.  Equal Value

FLPMA requires that "[t]he values of the lands exchanged . . . either shall be equal, or if they are not equal, the values shall be equalized by the payment of money." 43 U.S.C. § 1716(b). To meet that requirement, BLM must appraise lands before approving an exchange. *Id.* at § 1716(d)(1).

An appraisal must "set[] forth an opinion regarding the market value of the lands . . . supported by the presentation and analysis of relevant market information." 43 C.F.R. § 2200.0-5(c). Market value "means the most probable price . . . that lands or interests in lands should bring in a competitive and open market . . . where the buyer and seller each acts prudently and knowledgeably." *Id.* at § 2200.0-5(n). To estimate market value, the appraiser must "[d]etermine the highest and best use of the property," "[e]stimate the value of the lands and interests as if in private ownership and available for sale in the open market," and "[i]nclude historic, wildlife, recreation, wilderness, scenic, cultural, or other resource values or amenities that are reflected in prices paid for similar properties in the competitive market."[8] *Id.* at § 2201.3-2(a).

---

[8] The Tribes argue that the appraisal in this case did not accurately consider "historic, wildlife, recreation, wilderness, scenic, cultural, or other resource values or amenities . . . ." of the land. Specifically, the Tribes take issue with the failure to factor "the adverse impacts the land exchange would have on the Shoshone-Bannock Tribes" into the evaluation. *Brief*, Dkt. 37 at 20-21. The Tribes argue that "a mere comparison of dollar amounts is inadequate and a land exchange with significant adverse effects cannot be valued solely from a monetary standpoint because of BLM's trust responsibilities to the Tribes and its obligation to consider environmental justice concerns." *Brief*, Dkt. 74 at 24.

This argument is not consistent with the text of the regulations, which direct the appraiser to consider "historic, wildlife, recreation, wilderness, scenic, cultural, or other resource values or amenities *that are reflected in prices paid for similar properties in the competitive market*." 43 C.F.R § 2201.3-2(a)(3) (emphasis added). The regulation limits the requirement to consider those other values. The Tribes do not present evidence or argument that the prices paid for similar properties in this competitive market reflect the adverse effects on them. There is no evidence that the appraiser deviated from the regulatory standard in this regard.

The appraisal must also comply, to the extent appropriate, with the separate requirements of the Uniform Appraisal Standards for Federal Land Acquisitions (UAS). 43 C.F.R. § 2201.3. Under the UAS definition, highest and best use is "'[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.'"[9] The Appraisal Institute, Uniform Appraisal Standards for Federal Land Acquisitions 101 (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934)), *available at* https://www.justice.gov/file/408306/download. The highest and best use must also be: (1) physically possible; (2) legally permissible; (3) financially feasible; and (4) must result in the highest value. *Id.* at 64. "[A] specific highest and best use can only be considered if the use is likely to be reasonably probable in the reasonably near future. Accordingly, there must be proof of present or future demand, the connecting link from adaptability to value." *Id.* at 102 (quotations and citations omitted).

─────────────────

[9] As the Ninth Circuit has observed, "Department of Interior regulations define highest and best use as the 'most probable' use of land, [but] the Uniform Standards only require 'reasonable probability' of a given use." *Nat'l Parks & Conservation Ass'n*, 606 F.3d at 1067; *see also Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1181 n.10 (9th Cir. 2000). As in *Desert Citizens*, the choice of standard is not dispositive in this case, because the gypstack use was the most probable use of the lands at the time the appraisal was made. "The essential point of either probability standard is that the highest and best use must not be merely speculative or conjectural. The fact that the [gypstack] use was not considered at all is what makes the appraisal flawed." *Desert Citizens*, 231 F.3d at 1181 n.10.

In this case, a private firm prepared an appraisal report for the federal land. *See* AR0032811-942. The appraisal report noted that adjacent land uses "are recreational and agricultural in nature and include livestock grazing, hunting, and wildlife habitat." AR0032856. The appraisal consequently determined that the land at issue had "limited" potential uses that were "similar to other parcels located in the general area." AR0032857. Ultimately, the appraisal report concluded the highest and best use for the federal land was "continued agriculture and recreational uses, wildlife habitat, watershed, with speculative investment potential." AR0032867. Then, based on analysis of recent sales of comparable properties, the appraiser valued the federal land at $900 per acre, or about $645,000 total. AR0032868-75.

The appraisal report did not consider using the federal land for gypstack development. It failed to acknowledge the most relevant and critical economic fact: the Don Plant's continued operation depends on the acquisition of additional land and construction of new gypstacks. At best, the appraisal noted that "the property has appeal to an adjacent property owner [Simplot] for expansion and investment purposes." AR0032867. But that vague gesture to Simplot's intentions did not meaningfully consider the use of the land to build gypstacks. That land use is not

only reasonably probable, it is the specific intent of the land exchange, and should have been considered.

In many respects, this case is on all fours with the Ninth Circuit's landfill land exchange cases. *See Desert Citizens Against Pollution v. Bission*, 231 F.3d 1172 (9th Cir. 2000); *Nat'l Parks & Conservation Ass'n*, 606 at 1058. Both cases involved land exchanges designed to turn the public lands into landfills. In both cases, BLM approved the exchange even though the appraisals did not consider a landfill as a potential highest and best use. In both cases, the Ninth Circuit found that BLM erred because "'uses that are reasonably probable must be analyzed as a necessary part of the highest and best use determination.'" *National Parks & Conservation Ass'n*, 606 F.3d at 1067 (quoting *Desert Citizens*, 231 F.3d at 1181). In both cases, the Circuit found that one private party's "proposed use of a parcel of property is certainly relevant to showing a market demand for that use." *Desert Citizens*, 231 F.3d at 1183.

Here, Simplot intends to use the federal lands for gypstack development. It has stood by that plan for nearly 30 years. Under *Desert Citzens* and *National Parks & Conservation Association*, that is sufficient to show a market demand for

that use.[10]

Still, the Blackrock Land Exchange is distinguishable from the landfill cases because a gypstack is only valuable to Simplot. There is not a generalized demand for gypstacks. Nor are other parties competing to build gypstacks on the federal lands. Even so, no regulatory provision or UAS standard justifies excluding gypstack use from the appraisal simply because its value is particular to Simplot.

The most relevant regulation provides that the "government's intended use of the property after acquisition is an improper highest and best use and cannot be considered" because the appraisal must estimate "the property's *market value . . .* not the property's value to the government." UAS at 23. "If it is solely the government's need that creates a market for the property, this special need must be excluded from consideration by the appraiser." *Id.; see also United States v. Cors*, 337 U.S. 325, 333 (1949) ("It is not fair that the government be required to pay the enhanced price which its demand alone has created."); *United States v. Weyerhaeuser Co.*, 538 F.2d 1363, 1366, 1367 (9th Cir. 1976) ("[V]alues resulting

---

[10] In *Desert Citizens* and *National Parks & Conservation Association*, the Circuit went on to consider the physical, legal, and financial feasibility of landfill use. That analysis is a necessary component of the highest and best use determination. In this case, however, there is not even enough information in the administrative record to assess all the factors. The appraiser—and, by extension, BLM—erred by failing to consider gypstack use at all.

from the urgency or uniqueness of the government's need for the property or from the uniqueness of the use to which the property will be put do not reflect what a willing buyer would pay to a willing seller."). No provision makes similar exceptions for a private party's intended use or need. That comports with basic economics: a private party's need is—definitionally—what drives market value.

Put another way, the fact that the land here is uniquely valuable to Simplot must be considered in the appraisal because it profoundly affects the most basic underpinnings of market value: supply and demand. *See United States v. New River Collieries Co.*, 262 U.S. 341, 345 (1923) (holding that when prices are "controlled by the supply and demand[, t]hese facts indicate a free market"). Here, Simplot has a high demand for land that can be used to construct a gypstack that extends the life of the Don Plant. Such land is in limited supply. These facts would *determine* "the value of the lands . . . if in private ownership and available for sale in the open market." 43 C.F.R. § 2201.3-2(a). Yet they played no role in the appraisal.

The particularity of Simplot's position underscores that the comparables used in the appraisal are not actually comparable. Of the comparables considered in the report, the appraiser selected six "for direct comparison purposes" because they were "most similar to the subject with regard to physical characteristics."

AR032850. This is undoubtably an important consideration, but it is not the full story. The appraiser did not include any comparable where the land was uniquely valuable to one buyer for gypstack or other similar industrial construction. True, the appraisal did consider that in one instance the purchaser "was the adjacent property owner who purchased the property for expansion and investment purposes." AR0032869. But the appraisal did not consider what those purposes were or how they might affect the market value of the land. In short, the comparables did not effectively estimate a reasonable market for this land's unique value.

BLM was "willfully blind" to the potential value of the land involved in the Blackrock Land Exchange for gypstack use. *Desert Citizens*, 231 F.3d at 1184. A gypstack may or may not be highest and best use of the land, but it cannot be ignored. BLM's reliance on an appraisal that neglects this issue is arbitrary and capricious because entirely failed to consider an important aspect of the problem. *O'Keeffe's, Inc.*, 92 F.3d at 942.

### 3.  Pocatello Resource Management Plan

FLPMA requires that BLM's land management decisions be "in accordance with the land use plans." 43 U.S.C. § 1732(a); *see also* 43 C.F.R. § 1610.5-3(a) (2003); *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 67 (2004);

*Western Watersheds Project v. Bennett*, 392 F.Supp.2d 1217, 1227-28 (D. Idaho 2005). If a proposed action is not consistent with the land use plan, BLM must rescind its ROD and amend the plan. 43 C.F.R. §§ 1610.5-3, 1610.5-5.

For the Blackrock Land Exchange, the relevant land use plan is the 2012 BLM Approved Resource Management Plan (ARMP) for the Pocatello Field Office. The Tribes argue that the ROD conflicted with the ARMP Goal SW-2 to "[p]rotect and maintain watersheds so that they appropriately capture, retain and release water of quality that meets state and national standards and do not impair source water protection areas" and Goal TR-1 to "[p]rovide for Tribal Treaty Rights and Interests on unoccupied lands and public lands with[in] the ceded reservation boundary." (ARMP 19-20).

The ROD did not conflict with Goal SW-2, which concerns watershed management. As outlined further in the discussion of the Tribes' NEPA claims, BLM carefully considered impacts to ground and surface water from the land exchange. *See Part C.2*; AR0029683. The agency reasonably concluded that total concentrations of arsenic and phosphorous would continue to decline due to implementation of source controls and groundwater extraction activities at the Don Plant. That analysis indicates that the Blackrock Land Exchange is in accordance with the ARMP.

Nor did the ROD conflict with Goal TR-1, which relates to tribal rights and interests in unoccupied public land. Under this Goal, the ARMP provides two action items: to make land management decisions in consideration of the 1868 Fort Bridger Treaty and to consult with Tribal governments on actions that could affect treaty rights. ARMP-10. BLM did both here.

The ROD was consistent with the ARMP.

## C.   NEPA Claims

"NEPA imposes procedural requirements, but not substantive outcomes, on agency action." *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005) (citing *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989)). NEPA requires federal agencies to "assess the environmental impact of proposed actions that 'significantly affect[ ] the quality of the human environment.'" *Wildearth Guardians v. Provencio*, 923 F.3d 655, 668 (9th Cir. 2019) (quoting 42 U.S.C. § 4332(C)).

NEPA "serves two fundamental objectives. First, it ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Id*. (citation and internal quotation marks omitted). "[S]econd, it requires that the relevant information will be made available to the larger audience that may also play a role

in both the decision-making process and the implementation of that decision." *Id.*
(citation and internal quotation marks omitted). The purpose of these two
objectives "is to ensure that the agency will not act on incomplete information,
only to regret its decision after it is too late to correct." *Id*. (citations and internal
quotation marks omitted).

"[T]o accomplish this, NEPA imposes procedural requirements designed to
force agencies to take a 'hard look' at environmental consequences." *Powell*, 395
F.3d at 1027 (citation omitted). Further, courts are to "strictly interpret the
procedural requirements in NEPA to the fullest extent possible consistent with the
policies embodied in NEPA. [G]rudging, pro forma compliance will not do."
*WildEarth Guardians*, 923 F.3d at 668 (citations, ellipses, and quotation marks
omitted). Finally, "agencies must ensure 'that environmental information is
available to public officials and citizens before decisions are made and before
actions are taken. The information must be of high quality. Accurate scientific
analysis, expert agency comments, and public scrutiny are essential to
implementing NEPA.'" *Id.* (quoting 40 C.F.R. § 1500.1(b)).

With this statutory framework in mind, the Court turns to its analysis of the
Tribes' NEPA claims.

### 1.  Alternative B Plans for Gypstack and Cooling Pond Construction

BLM identified three reasonably foreseeable actions (RFAs): the construction of cooling ponds, gypstacks, and the associated infrastructure. AR0029547. The EIS analyzed RFAS thoroughly for the proposed action but noted that Alternative B would require modifying "the location and extent of the gypsum stacks." AR0029577. As a result,

> The location and extent of the reasonably foreseeable actions on Federal lands under Alternative B are based on preliminary conceptual designs. Additional research and engineering is necessary to ensure that these preliminary configurations would be technically and economically feasible. Actual design of the reasonably foreseeable actions under Alternative B would be finalized during design and permitting and are subject to change based on technical changes, final engineering, Don Plant production, and other factors. If no feasible options are identified for gypsum stack expansion within the reconfigured Federal land boundaries, the operational life of the Don Plant would be reduced compared to the Proposed Action and Alternative A.

AR0029577-78. Nevertheless, the EIS opted not to consider "specific design options" for several reasons.

> Requirements for a more specific review of design options for the cooling ponds and expanded gypsum stacks, that may be necessary under existing or future consent orders with the IDEQ and/or EPA, is beyond the scope of this EIS because these facilities would be on private land following the land exchange. Following transfer of the Federal lands into private ownership, Simplot would be responsible for determining final engineering and design details of the gypsum stack expansions and the cooling ponds and permitting these facilities in accordance with other Federal and State requirements.

AR0029580. BLM's refusal to consider design options for cooling ponds and gypstack expansion in Alternative B violates NEPA.

At the very least, NEPA requires BLM to analyze Simplot's preliminary plans in the EIS. *See* AR0029740 (depicting Simplot's "preliminary conceptual locations of the gypsum stacks and cooling ponds for Alternative B based on current information."). It did not.

The bigger problem is BLM's unjustified assumption that it could rely on other agencies' enforcement capabilities. This cropped up twice. First, BLM determined that NEPA would not require analysis of the Alternative B gypstack plans because the agency could rely on oversight from IDEQ and EPA. Second, BLM "assume[ed] that the transferred lands will be managed in conformance with all applicable statutes, regulations, and rules governing the actions and/or inactions of private local, State, tribal, and Federal interests that acquire jurisdiction in some capacity over said lands."[11] AR0029545.

---

[11] The Court is not otherwise persuaded by the Tribes' claim that BLM failed to consider Simplot's history of non-compliance at the Don Plant. The EIS appropriately discussed the Don Plant's history, including environmental contamination from phosphate facilities and efforts to address the contamination. AR0029561-62. In Chapter 3, which considered the affected environment, the EIS discussed existing conditions of air and groundwater quality, including in-depth analysis of past and present emissions and contaminations from the Don Plant. (Continued)

In both instances, BLM's assumption of effective enforcement was not justified. Although "an agency may assume effective enforcement in the ordinary case," that reliance is not appropriate "when credible evidence seems to undercut the assumption." *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 803 (D.C. Cir. 2022) (quotation and citation omitted). Here, there is a decades-long history of enforcement with mixed results. BLM concedes that, as the Tribes argue, "Simplot has not yet completely addressed existing contamination or met agreed-upon goals to reduce phosphorous concentrations in the Portneuf River." *Brief*, Dkt. 80 at 37. At a minimum, NEPA required BLM to analyze the past efficacy of enforcement before relying on the other agencies.

BLM failed to "carefully consider detailed information concerning significant environmental impacts" of the Blackrock Land Exchange. *Wildearth Guardians*, 923 F.3d at 668. It acted, openly, "on incomplete information." *Id.* In so doing, it failed to comply with NEPA.

## 2. Hard Look at Relevant Considerations

---

AR0029596-607; AR0029672-84. Moreover, the EIS highlighted the multiple consent decrees and orders that Simplot has entered into with IDEQ and EPA and remedial actions taken on the site to address past contamination and reduce future pollution. AR0029561-62; AR0029677. The EIS accurately depicted the historical contamination, the efforts to reduce pollution, and the results of those efforts.

The Tribes argue that BLM did not take NEPA's "hard look" at certain environmental consequences. None of these arguments are persuasive.

### a.  No Action Baseline

The EIS said that without the Blackrock Land Exchange—the "no action alternative"—"[c]urrent ownership and existing use of Federal and non-Federal lands would persist for the reasonably foreseeable future." AR0029578. Simplot would not construct a new gypstack or new cooling ponds on the Federal lands. *Id*. Instead, it would necessarily evaluate other measures to reduce fluoride emissions and dispose of its gypsum byproducts. *Id.* The Tribes contend this is the wrong baseline. They assert the no action alternative is closing the Don Plant and remediating the area, because at current production rates, the gypstack will soon reach capacity.

BLM's no action alternative met NEPA's requirements. Granted, Simplot has indicated that if the land exchange does not go forward it will reduce production and eventually cease operations. AR0029576. But it is unclear what that would involve or when that would occur. AR0029571, AR0029576. Simplot undoubtably has numerous options about when and how to reduce production or close the plant altogether. Many factors would influence that critical strategic decision. As such, the Tribes' proposed baseline in simply too speculative. BLM's

baseline is the most reliable.[12] *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016).

### b. Environmental and Health Impacts

The Tribes allege that BLM failed to adequately analyze the overall environmental and health impacts and those specifically resulting from Alternative B. The Court disagrees.

### i. Water Quality

The Tribes take issue with the water quality impact analysis. In the water resources section of the EIS, BLM analyzed in detail the RFAs' potential impacts on surface water and groundwater quality. AR0029680–84; *see also* AR0029944–30033 (Appendix H, showing comprehensive modeling and technical analysis performed to assess the potential impacts to groundwater and surface water from the Proposed Action over the projected life of the Don Plant). The analysis showed that "concentrations of contaminants of concern in monitoring wells, springs, and the Portneuf River have shown declining trends since source controls and extraction activities were implemented." AR0029679. Therefore, BLM concluded that under the Proposed Action, "[o]peration of the cooling ponds and gypsum

---

[12] The Tribes cumulative impact arguments also rely on the premise that BLM used a bad baseline. Because that is not the case, those arguments fail.

stack expansions on the Federal lands would result in minor incremental additions of phosphorous, arsenic and other constituent loading due to leakage of leachate through the liner." AR0029680. Despite these minimal incremental increases, BLM anticipated that total concentrations of arsenic and phosphorous would continue to decline given the Don Plant's implementation of source controls and groundwater extraction activities. AR0029683.

BLM adequately studied Alternative B's impacts on water quality. The EIS explained that "the reconfigured gypsum stack expansions under Alternative B would have approximately the same gypsum waste disposal capacity as the gypsum stack expansions that would be developed as a result of the Proposed Action." AR0029684. BLM acknowledged that the different location of the gypstack expansions under Alternative B "could result in higher phosphorous and arsenic loading to groundwater extraction wells on the eastern side of the Don Plant site," but concluded that Alternative B "is unlikely to affect the overall downward trend in concentrations resulting from the lining of the existing gypsum stacks and continued application of other source controls." AR0029684. Moreover, analysis of groundwater flow paths demonstrated that alternative B would not materially alter the flow of contaminants. AR0030001. BLM thus determined that the existing groundwater flow analysis was sufficient to predict the water quality

impacts of Alternative B. The agency's reliance on the technical report and its conclusions regarding water quality impacts are scientific judgments squarely within its expertise, and are thus entitled to deference. *See Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983) ("When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential."); *see also San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 997 (9th Cir. 2014) (agency given "substantial discretion" in its reasoned choice of and reliance on modeling methods).

BLM's analysis of groundwater at one monitored point—Batiste Spring— was sufficient. The EIS explained that water quality impacts at Batiste Spring would be similar to "water quality impacts in the river at Fort Hall" because "site affected groundwater enters the Portneuf River within a small stretch of the river between Swanson Road Spring and Batiste Spring." AR0029681. There is no apparent reason this is incorrect, unreasonable, or would result in inaccurate or deficient results. It was appropriate NEPA analysis.

### ii.  Air Quality

The Don Plant is a major source of air pollutant emissions. AR0029597. "The largest single source of $PM_{10}$ and particulate matter 25 microns or less in diameter ($PM_{2.5}$) emissions at the Don Plant is the evaporative cooling towers . . . .

Fluoride emissions originate primarily from the cooling towers and the gypsum stack." *Id.* Following the Blackrock Land Exchange, Simplot plans to replace its cooling towers with cooling ponds, which will reduce the Don Plant's fluoride air emissions, consistent with the 2016 IDEQ Consent Order. AR0029792

The EIS detailed current and past emissions from the Don Plant. AR0029595-602. BLM concluded that the exchange's primary air quality impact would be a *decrease* in emissions as the cooling towers are replaced with cooling ponds. AR0029604. But it also noted that because the land exchange would "extend the life of the Don Plant by an estimated 65 years," it "would increase the duration of annual emissions associated with the Don Plant." AR0029605.

Specific to Alternative B, the EIS concluded that "[e]ffects on air quality and climate change would generally be the same as those of the Proposed Action." AR0029606. However, because "the location of the gypsum stack expansions and associated releases of fluoride and particulate matter emissions would be situated farther east than under the Proposed Action[,] . . . the gypsum stacks would be closer to residences east of the Don Plant." *Id*. As a result, "Alternative B could result in slightly higher ambient concentrations of fluoride and particulate matter as well as higher fluoride in forage concentrations closer to residences." *Id.* Nevertheless, the EIS noted, "the overall reduction in fluoride and particulate

matter emissions is anticipated to negate the effects of moving some of the emissions closer to nearby populations." *Id.; see also* AR0028696-97 ("[T]he net effect of these reasonably foreseeable actions would be a decrease in $PM_{10}$, $PM_{2.5}$, and fluoride emissions at the Don Plant. Furthermore, because of the decrease in the fluoride emissions from the cooling towers closure, the fluoride in forage concentrations are anticipated to decrease in all forage sampling areas with no concentrations exceeding State standards. Similarly, the overall reduction in particulate matter emissions is anticipated to negate the effects of moving some of the emissions closer to nearby populations.").

This is an adequate analysis of Alternative B's air quality impacts. BLM appropriately discussed the impacts and identified the particular risks of Alternative B. It's conclusions that fluoride and other emissions would decrease overall are supported, as are its conclusion that the relevant emissions do not pose an unacceptable risk to public health. AR0063536; AR0002992; AR0029629.

### iii. Visual Resources

The EIS adequately evaluated the land exchange's impacts on visual resources. AR0029636-40. The EIS acknowledged that the construction of cooling ponds and gypstacks would introduce contrasts to the landscape, altering the existing visual character from a generally natural landscape to a modified industrial

landscape. AR0029639. It further explained where those changes would be most visible. *Id*. It noted that Alternative B would convert 36 more acres of Federal lands and 15 more acres of Simplot private lands to a modified industrial landscape and that the different gypstack configuration would change the visibility of the embankments as seen from certain spots on the most commonly traveled routes where the lands are in view. AR0029640. BLM met NEPA's requirement to take a hard look at impacts to visual resources.

### iv. Public Health and Safety

The EIS stated that "public safety issues associated with the land exchange and reasonably foreseeable actions include potential failure of the gypsum stacks and cooling ponds, exposure to hazardous or solid wastes, and air and water quality degradation and associated health and safety effects." AR0029630. BLM discussed and considered each of these possibilities in detail. *See* AR0029621-27 (Geotechnical Stability); AR0029627-30 (Hazardous or Solid Wastes); AR0029596-607 (Air Quality and Climate Change); AR0029672-84 (Water Resources).  For NEPA purposes, BLM adequately analyzed these considerations.

### v. Wildlife

BLM conducted wildlife surveys on the lands to be exchanged. AR0029665. The agency focused on information about potential wildlife mortalities from the

gypstacks. The administrative record showed none. Based on that information,

BLM reasonably concluded that wildlife avoid the gypstack due to human activity,

the absence of desirable habitat characteristics, and the proximity of extensive

aquatic and wetland habitat associated with the nearby American Falls Reservoir.

AR0029664. That is all NEPA requires.

*vi. Socioeconomics*

BLM reasonably analyzed potential impacts on housing and nonmarket

values, such as social and quality-of-life impacts. AR0029695-96. The agency

appropriately focused on the communities most likely to be impacted by the

Blackrock Land Exchange. *See* AR0029884-940 (Socioeconomic Technical

Report).

*c.* Cultural Resources

"[A]n EIS is required to include 'discussions' of 'historic and cultural

resources.'" *N. Idaho Cmty. Action Network v. United States DOT*, 545 F.3d 1147,

1156 (9th Cir. 2008) (quoting 40 C.F.R. § 1502.16(g)). BLM met that standard

here.

In 2019, a private firm conducted a Class III cultural resources inventory on

the Federal lands, non-Federal lands, and voluntary mitigation Parcel A.

AR0029608. It also conducted a cultural resources survey for voluntary donation

Parcel B. *Id*. The upshot was three sites that are eligible for listing on the National Register of Historic Place and ten that are not eligible but that "do provide important cultural history and significance for the Shoshone-Bannock Tribes." *Id*. The EIS listed and discussed the cultural sites and historic isolated finds on the lands involved in the exchange. AR0029608–10. BLM examined the direct and indirect impacts, as well as the cumulative effects, of each alternative on cultural resources. AR0029610–12.

Moreover, the EIS also addressed the Tribes' concerns that the historic sites—including burial sites[13] and other culturally significant sites—would lose protection once the lands were transferred to Simplot.  For instance, the EIS noted that several historical sites "are not within the footprints of the planned facilities, but would not be subject to protection under Federal laws and regulations, and could be damaged or destroyed in the course of future construction or operational activities." AR0029612. Nevertheless, according to a Memorandum of Agreement

---

[13] The Tribes' concern on this point is particularly sensitive. The Court recognizes the importance of these sites to the Tribes. Their traditions and cultural preservation work clearly indicate a real possibility that additional burial sites are located in the area. That deserves to be taken seriously. However, NEPA's standard for a discussion of cultural resources is a fairly low bar. Here, BLM's response that the cultural resource surveys—which the Tribes do not challenge—did not identify any burial sites, and "[t]here have been no specifically documented or recorded burial sites on the Federal lands" clears that bar. AR0030356.

**MEMORANDUM DECISION AND ORDER - 44**

prepared under National Historic Preservation Act requirements, sites that were eligible for the National Register of Historic Place were inventoried, recorded, and mitigated before being transferred out of Federal ownership. *Id*. The ROD, meanwhile, indicated that BLM would issue a patent for the federal lands "subject to a deed restriction which would protect [the National Register of Historic Place eligible site] and provide tribal access to the site in perpetuity." AR0039170.

BLM's consideration of cultural resources ultimately led the agency to select Alternative B, which "was developed based on comments received during scoping to adjust the boundary of the Federal lands to avoid cultural and tribal resources in the west canyon area on the north side of Howard Mountain." AR0029576. The EIS stated that this alternative would "[r]esult in BLM retention of 368 acres of Federal lands in the west canyon area that the BLM would continue to manage in accordance with the Pocatello RMP (BLM 2012), including identified cultural and tribal resources." AR0029577. Several important cultural sites "would be retained in Federal ownership and, therefore, would not be damaged or destroyed from construction of the reasonably foreseeable actions of the cooling ponds and gypsum stacks on the Federal lands." AR0029613. This alternative also reconfigured the layout of gypstack expansion and cooling ponds to avoid an National Historic Preservation Act site. *Id*.

In sum, the EIS considered and fully disclosed the impacts of the proposed project on cultural resources. It adequately discussed corresponding mitigation measures. This satisfies NEPA's requirement.

### d.   Environmental Justice

Executive Order 12,898 requires every federal agency to "make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States." Exec. Ord. No. 12,898, 59 Fed. Reg. 7629, 7629 (Feb. 11, 1994). The Council on Environmental Quality (CEQ)—the independent agency that implements NEPA—has promulgated environmental-justice guidance for agencies. *Environmental Justice Guidance Under the National Environmental Policy Act* (Dec. 10, 1997).

Although the executive order, and presumably the implementing guidance, "does not create a private right to judicial review. . . a petitioner may challenge an agency's environmental justice analysis as arbitrary and capricious under NEPA and the APA." *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330 (D.C. Cir. 2021); *see also Latin Ams. For Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 756 F.3d 447, 465 (6th Cir. 2014); *Coliseum*

*Square Ass'n v. Jackson*, 465 F.3d 215, 232 (5th Cir. 2006).[14] But "[a]s always with NEPA, an agency is not required to select the course of action that best serves environmental justice, only to take a 'hard look' at environmental justice issues." *Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017) (citing *Latin Ams.*, 756 F.3d at 475–77).

There is no question that the Fort Hall Reservation is an environmental justice community. AR0029688-89. Much of BLM's environmental analysis implicitly considered the Reservation by virtue of its proximity to the Don Plant. As discussed previously, BLM also considered certain statutory factors that are uniquely relevant to the Tribes, such as their cultural resources and treaty rights. Moreover, the EIS's environmental justice analysis specifically discussed how the proposed action and Alternative B would affect the high indicators on the EJSCREEN—ozone concentration, proximity to superfund sites, and wastewater discharge. AR0029689; AR0029696-98. The analysis is sufficient to show that BLM took a hard look at environmental justice issues.

  *e.*  Reasonable Range of Alternatives

---

[14] The Ninth Circuit has not squarely held that an agency's analysis of environmental justice issues implicated by E.O. 12,898 can be challenged as arbitrary and capricious under NEPA, but the Court finds this analysis appropriate.

An agency must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). A "'rule of reason' guides both the choice of alternatives as well as the extent to which the [EIS] must discuss each alternative." *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997) (quoting *Citizens Against Burlington v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991)). An "EIS only needs to consider in detail alternatives that would address both of the Project's stated purposes and needs." *League of Wilderness Defs.-Blue Mts. Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1072 (9th Cir. 2012).

Here, the EIS identified the land exchange's purpose and need for both BLM and Simplot. AR0029562. BLM's purpose and need was evaluating and responding to the land exchange proposal. *Id.* Simplot's purpose and need was "to implement legally enforceable controls as directed by the EPA and IDEQ . . . and to maximize the operational life of its ongoing phosphate processing operations at the Don Plant by expanding gypsum stacks onto adjacent lands." *Id.* BLM analyzed four alternative proposals in detail. AR0029578-80.

More importantly, BLM briefly explained that it eliminated certain other alternatives from further analysis because they did not meet the project objectives.

*Id; League of Wilderness Defs.*, 689 F.3d at 1072. Notably, BLM eliminated two fluoride reduction alternatives. The EIS stated that BLM eliminated indirect process water cooling alternative from detailed consideration because of technical concerns about its feasibility due to scaling and water balance. AR0029798. BLM determined that the fluoride condensate alternative was not feasible because Simplot would still need to construct a cooling pond to meet its fluoride reduction obligations. AR0029579. These statements satisfy NEPA's "brief explanation" requirement.

### *f.* Supplemental EIS

BLM must prepare a supplemental EIS if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c). Here, BLM's selection of Alternative B, which is considered in the EIS, is neither. As such, the agency did not need to prepare a supplemental EIS.

### 3.  Responding to Tribes' Comments

NEPA does not require an agency to resolve all concerns raised in comments on a DEIS and FEIS. The regulations require that "[a]n agency preparing a final environmental impact statement shall assess and consider comments both

individually and collectively, and shall respond . . . in the final statement." 40
C.F.R. § 1503.4(a). They also provide that an agency "may request comments on a
final environmental impact statement before the decision is finally made," but do
not require the agency to specifically respond to comments or resolve all issues. 40
C.F.R. § 1503.1. Here, Appendix I to the EIS shows that BLM met those
requirements and adequately responded to the Tribes' comments by referencing the
portions of the EIS that dealt with the relevant issues.

## ORDER

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment (Dkt. 37) is
GRANTED in part and DENIED in part, and Defendants' and Intervenor's cross
motions for summary judgment (Dkts. 60, 61) are GRANTED in part and
DENIED in part as follows:

1. Summary judgment is granted in favor of Plaintiffs on their Trust
   Responsibility and APA claims that BLM violated the 1900 Act.

2. Summary judgment is granted in favor of Plaintiffs on their FLPMA claim
   that BLM failed to make an adequate public interest determination.

3. Summary judgment is granted in favor of Plaintiffs on their FLPMA claim
   that BLM failed to adequately appraise the lands to be exchanged.

4. Summary judgment is granted in favor of Defendants and Intervenor on

Plaintiffs' FLPMA claim that the Blackrock Land Exchange is not consistent

with the Pocatello Resource Management Plan.

5.   Summary judgment is granted in favor of Plaintiffs on their NEPA claim

that BLM failed to take a hard look at Alternative B's design options for the

cooling ponds and gypstack expansion.

6.   Summary judgement is granted in favor of Defendants and Intervenor on all

of Plaintiffs' remaining NEPA claims.

**IT IS FURTHER ORDERED** that the parties are directed to confer and, if

possible, jointly propose a briefing schedule on the issue of remedy within 7 days

of this order. If the parties cannot agree on a briefing schedule, each party should

submit its own proposal by that deadline. The Court anticipates ordering the

remedy briefs not exceed 15 pages in length.

DATED: March 31, 2023

B. Lynn Winmill
U.S. District Court Judge