Steven B. Andersen, ISB # 2618
**KIRTON MCCONKIE**
999 W. Main Street, Ste. 100
Boise, Idaho 83702
Telephone: (208) 370-3325
E-mail: sandersen@kmclaw.com

Thomas C. Perry, ISB #7203
**J.R. SIMPLOT COMPANY**
1099 W. Front Street
Boise, Idaho 83707
Telephone: (208) 780-7430
E-mail: thomas.perry@simplot.com

Stephen J. Odell, OSB # 903530 (admitted *Pro Hac Vice*)
**MARTEN LAW, LLP**
1050 SW Sixth Ave., Ste. 2150
Portland, Oregon 97204
Telephone: (503) 241-2648
E-mail: sodell@martenlaw.com

*Attorneys for Defendant-Intervenor J.R. Simplot Company*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHOSHONE-BANNOCK TRIBES OF THE FORT HALL RESERVATION,<br><br>Plaintiff,<br><br>LAURA DANIEL-DAVIS, Principal Deputy Assistant Secretary for Land and Minerals Management; UNITED STATES DEPARTMENT OF THE INTERIOR; and UNITED STATES BUREAU OF OF LAND MANAGEMENT,<br><br>Defendants,<br><br>and<br><br>J.R. SIMPLOT COMPANY,<br><br>Defendant-Intervenor. | Case No. 4:20-cv-00553-BLW<br><br>**DEFENDANT-INTERVENOR J.R. SIMPLOT COMPANY'S OPENING BRIEF IN SUPPORT OF MOTION TO CERTIFY SUMMARY JUDGMENT MEMORANDUM DECISION & ORDER FOR INTERLOCUTORY APPEAL** |

## INTRODUCTION

The Court's order granting partial summary judgment to Plaintiff Shoshone-Bannock Tribes of the Fort Hall Reservation (Tribes) (ECF No. 89) rests primarily on its resolution of two fundamental questions concerning the federal government's powers to manage public lands. The Court's conclusions that (1) Section 5 of the 1900 Cession Agreement Act (1900 Act or Section 5) prohibits the land exchange and (2) the Federal Defendants' appraisal method is inconsistent with the Federal Land Policy and Management Act of 1976 (FLPMA) and regulations thereunder not only have dispositive significance in this case, but also portend far-reaching consequences. Defendant-Intervenor J.R. Simplot Company (Simplot) respectfully disagrees with both conclusions, and submits that reasonable jurists could decide each one differently. As the need for and scope of any remedies will also depend almost entirely on the ultimate resolution of those issues, certifying the order for appeal will materially advance the litigation. Moreover, both conclusions have implications for federal lands in Idaho and many other States. The appropriate procedural path in these circumstances is thus clear: the Court should certify an interlocutory appeal under 28 U.S.C. § 1292(b) so that the Court of Appeals can provide definitive guidance now—*before* this Court and parties expend substantial time and resources addressing questions the Court has acknowledged would need to be considered in crafting an appropriate remedy.

Indeed, as the Court has recognized, the remedial issues would be fraught: To grant the relief the Tribes seek, the Court would have to fashion (and find the Tribes are entitled to) an "injunction" unwinding the Blackrock Land Exchange. ECF No. 89 (SJ Order) at 17. If such an injunction were issued (and not stayed), Simplot and Federal Defendants would then have to implement it— unwinding the exchange (and possibly even steps taken since). All those efforts litigating and implementing any remedies will have been wasted if the Ninth Circuit reverses.

The Ninth Circuit will review this Court's order in any event; the only question is when. As Simplot explains below, by far the better course is to enable appellate review now.

## ARGUMENT

Section 1292(b) provides for certification of an interlocutory order for immediate appeal if three criteria are met.  First, the order must "involv[e] a controlling question of law." 28 U.S.C. § 1292(b).  "The interpretation of a statute" is a question of law, *Barden v. City of Sacramento*, 292 F.3d 1073, 1075 (9th Cir. 2002), and "[a]ll that must be shown in order for a question to be 'controlling' is that resolution of the issue on appeal could materially affect the outcome of litigation in the district court," *Hilliard v. Twin Falls Cnty. Sheriff's Off.*, No. 1:18-CV-550-CWD, 2023 WL 156822, at *3 (D. Idaho Jan. 11, 2023) (citation omitted). Second, the question must be subject to "substantial ground for difference of opinion." 28 U.S.C. § 1292(b).  That is not a high standard:  The matter need only be "uncertai[n]," as it typically is for "novel and difficult questions of first impression."  *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011) (internal quotation marks omitted).  Third, "an immediate appeal from the order" must "materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b), such as by narrowing the dispute by resolving certain "claims," *Reese*, 643 F.3d at 688.  If those criteria are met, the district court has a "duty" to "allow an immediate appeal."  *Ahrenholz v. Bd. of Trs. of Univ. of Ill.*, 219 F.3d 674, 677 (7th Cir. 2000).

Like other cases in which this Court has certified interlocutory appeals, this case is a paradigmatic candidate for certification under § 1292(b).  *McKinney v. Fisher*, No. 96-CV-177-BLW, 2006 WL 1275130, at *1–2 (D. Idaho May 9, 2006) (Winmill, C.J.); *Snake River Valley Elec. Ass'n v. Pacificorp*, ECF No. 48 at 1–2, Case No. 4:96-CV-308-BLW (D. Idaho Sept. 30, 1997) (Winmill, J.).  As in those cases, all of Section 1292(b)'s criteria are satisfied.

The Court's order presents at least two "controlling question[s] of law," 28 U.S.C. § 1292(b):  the interplay between the land-disposal provisions of the 1900 Act and later statutes, principally FLPMA; and the legality of the appraisal methodology upon which the Federal Defendants relied in approving the land exchange.  And as to each of those questions, there is at least "substantial ground for difference of opinion."  *Id.*

The first question is an issue of first impression anywhere—no prior case addresses Section 5 or a directly analogous issue—and Simplot respectfully submits that the Court's holding is reasonably debatable.  Courts have a "duty to interpret Congress's statutes as a harmonious whole," *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1619 (2018), and the 1900 Act and FLPMA can and should be harmonized to avoid any conflict.  But if they do clash, the later-in-time, comprehensive FLPMA controls on the specific question whether the methods initially authorized in the 1900 Act—to sell ceded lands for private settlement and development, pursuant to broad categories of public-land-disposal statutes then in effect—are the "only" methods available today.  Although the Court stated that under its reading the two "laws are not in conflict," SJ Order 16, its holding in effect treats the 1900 Act as nullifying the independent authority to exchange lands expressly granted under FLPMA.  Reasonable jurists could take a contrary view—particularly given that the Court's reading of the 1900 Act would implicate many other federal statutes that are analogous to the 1900 Act and thus could hamstring the government's ability to manage and dispose of millions of acres of federal land under FLPMA.

The second issue—the lawfulness of the appraisal methodology approved by the Bureau of Land Management (BLM)—is likewise susceptible to reasonable disagreement.  Section 206 of FLPMA directs the government to arrange for "appraisal" of lands to facilitate substantially "equal" land exchanges.  43 U.S.C. § 1716(b), (d)(1).  BLM did so here, and the Tribes never

timely and substantively challenged that appraisal throughout the administrative process leading to the Land Exchange.  *See* ECF No. 60-1 at 31–32 n.12, 39 n.16.  In their motion for summary judgment, the Tribes belatedly objected only that the appraisal did not reflect "nonmonetary" values, ECF No. 37-1 at 20–21—a contention the Court rightly rejected, SJ Order 23 n.8.  Yet the Court found the appraisal inadequate on a new ground (one not timely raised by the Tribes), determining that the appraisal failed to reflect the land's "uniqu[e]" value *to Simplot*—as distinct from "generalized demand" for that parcel by "competing" parties.  *Id.* at 27–28.  Reasonable jurists could construe the requirement to appraise "market value" differently in this context. 43 C.F.R. § 2200.0-6(c).  The governing regulations make clear that "[m]arket value" means value "in a competitive and open market" for a legally available use.  *Id.* § 2200.0-5(n).  Case law and uniform standards for federal land acquisition alike recognize that "there must be demonstrated an actual profitable use or a market demand."[1]  Reasonable jurists applying those principles could analyze the market value of the land at issue here differently than this Court.

Finally, there is no doubt that "an immediate appeal from the [summary-judgment] order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  Section 1292(b) does not require that an immediate appeal "resolve all of [plaintiffs'] claims."  *Reese*, 643 F.3d at 688.  An appeal that could narrow the dispute is "sufficient to advance materially the litigation."  *Id.*  This case readily clears that bar.  If the Ninth Circuit disagrees with this Court's analysis of the 1900 Act and FLPMA, its ruling would dispose of the Tribes' 1900 Act and tribal trust obligation claims.  Should the Ninth Circuit disagree with this Court's ruling as to how "market value" is to be assessed under the governing regulatory definition, the need to revisit the

---

[1] Interagency Land Acquisition Conference, *Uniform Appraisal Standards for Federal Land Acquisitions* (UAS) §§ 4.3.2.1–4.3.2.2, at 103 n.293, 104 (2016), https://www.justice.gov/file/408306/download (quoting *United States ex rel. TVA v. 1.72 Acres of Land in Tenn.*, 821 F.3d 742, 754 (6th Cir. 2016)).

appraisal would likely disappear; at a minimum, if any revised appraisal is needed, an appeal could clarify the governing principles.  Conversely, if the Court of Appeals were to affirm both of those holdings, the need for and scope of remedial issues would be clarified.  Either way, appellate review now—not at the end of complicated remedial proceedings—is by far the more prudent course.  There is nothing to be gained, and much to be lost, by deferring such review.

The Court has acknowledged "the stakes of the matter for all parties."  SJ Order 17.  And it has rightly recognized the "substantial impact" of a decision invalidating the exchange on "not just the people that reside in this area," but also "the national economy."  12/15/22 Hr'g Tr. (Tr.) 96:21–24.  The Court can and should account for all of those interests by hewing to the more "careful" course, Tr. 97:3, of facilitating appellate review of its order now.

## I.  The Court's order involves controlling questions of law about which reasonable minds can disagree.

Section 1292(b)'s first two criteria are met because the Court decided at least two "controlling" legal questions on which "substantial ground for difference of opinion" exists, 28 U.S.C. § 1292(b):  (1) whether the 1900 Act bars BLM's exercise of FLPMA authority to authorize the Blackrock Land Exchange; and (2) whether FLPMA requires an appraisal based on a property's "unique" (SJ Order 29) value to a private party who is acquiring it principally for a use for which no open, competitive market exists.  And because "§ 1292(b) contemplates an appeal from an *order*, rather than a certified *question*," *McKinney*, 2006 WL 1275130, at *2 n.3, to certify an immediate appeal the Court need only conclude that either issue meets those criteria.  Both the 1900 Act and appraisal issues satisfy the § 1292(b) standard.

### A.  The Court's 1900 Act holding warrants interlocutory review.

The Tribes' contention that the 1900 Act categorically bars BLM's exercise of its plenary authority under FLPMA here is indisputably a controlling legal question.  It is a purely legal

issue that "come[s] down to a question of statutory interpretation." Tr. 96:25–97:2. Rejection of

that contention would eliminate the Tribes' only asserted basis for attacking the land exchange's

legality wholesale; without it, any putative invalidity and any relief would be confined to the

Federal Defendants' appraisal method and satisfying two procedural duties under FLPMA and

NEPA. There would be no need for the parties and this Court to confront, for example, whether

the Tribes can carry their heavy burden of justifying under Supreme Court precedent the

extraordinary affirmative injunctive relief they have not timely moved for (but likely will seek).

Conversely, affirmance on that issue would make it necessary to address those matters. The

1900 Act issue is also one on which substantial ground for difference of opinion exists.

  1.  The interpretation of Section 5 of the 1900 Act is an issue of first impression,

which strongly supports certification. "Courts traditionally will find that a substantial ground for

difference of opinion exists where . . . novel and difficult questions of first impression are

presented." *Reese*, 643 F.3d at 688 (alteration and internal quotation marks omitted; textual

omission in original). Courts in this district and Circuit have certified appeals to address "a 'gap'

in circuit authority," *Muzinich & Co. v. Raytheon Co.*, ECF No. 69 at 3, No. 1:01-cv-284-BLW

(D. Idaho July 1, 2002), or because "the Ninth Circuit is without controlling precedent" on a

question, *Shell Gulf of Mex., Inc. v. Ctr. for Biological Diversity, Inc.*, No. 3:12-CV-96-RRB,

2012 WL 12871660, at *3 (D. Alaska Sept. 13, 2012). This Court itself has previously certified

interlocutory appeal where the "case law" was "sparse." *McKinney*, 2006 WL 1275130, at *2.

  Here, pertinent precedent directly addressing the specific issue presented is nonexistent.

There is precedent highly *relevant* to proper resolution of that issue, however. Courts have

recognized that FLPMA "is a comprehensive land-management act," *Bolt v. United States*, 944

F.2d 603, 608 (9th Cir. 1991), enacted "to provide guidance and a comprehensive statement of

congressional policies concerning the management of the public lands," *Rocky Mountain Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 737 (10th Cir. 1982), and to supersede the various means for disposing of properties scattered in "chaotic" fashion across the statutes at large, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 876 (1990).  But no party has identified any case addressing the meaning of Section 5 of the 1900 Act and its interplay with FLPMA.  The Tribes cited no case adopting their position and have acknowledged that the issue presents "difficult" questions.  Tr. 14:16–18.  This concededly "novel issue" thus should "be certified for interlocutory appeal without first awaiting development of contradictory precedent."  *Reese*, 643 F.3d at 688.

2.     Novelty aside, the 1900 Act question is at least "'an issue over which reasonable judges might differ[,]' and such 'uncertainty provides a credible basis for a difference of opinion,'" justifying interlocutory appeal.  *Reese*, 643 F.3d at 688.  A reviewing court could conclude that the 1900 Act does not bar the exchange here for at least two principal reasons.

*First*, a reviewing court could determine that nothing in the 1900 Act precludes disposition of these lands by the government pursuant to the independent exchange authority conferred in FLPMA.  Courts have a "duty to interpret Congress's statutes as a harmonious whole" under longstanding precedent.  *Epic Sys.*, 138 S. Ct. at 1619, 1624 (citing *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).  That principle applies with "special significance" to "allegedly conflicting public land laws."  *Wilderness Soc'y v. Morton*, 479 F.2d 842, 881 (D.C. Cir. 1973) (en banc).  Here, the 1900 Act and FLPMA could be harmonized in multiple ways.

For example, other jurists could agree with this Court that the 1900 Act identifies the exclusive *categories* of laws pursuant to which ceded lands may be disposed, but hold (contrary to the Court's order) that FLPMA falls within those categories.  As the Federal Defendants explained, the 1900 Act notably "does not refer to the disposal laws by specific name, such as

the Homestead Act of 1862, but instead more generally" by "category."  ECF No. 80 at 3–4; *see also* SJ Order 12 (acknowledging this feature of the Act).  Under the "well established" "'reference' canon, when a statute refers to a general subject, the statute adopts the law on that subject as it exists whenever a question under the statute arises," including "subsequent amendments."  *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 769 (2019).  The later-enacted FLPMA is *the* comprehensive modern law governing public lands.  It specifies the two overarching means authorized by Congress for disposal of public lands, which have been used many times over the past half century.  FLPMA occupies the heartland of the categories to which the 1900 Act refers—"'including, but not limited to'" uses for "'timber'" and "'minerals.'"  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004) (quoting 43 U.S.C. § 1702(c)); *see also Nat'l Wildlife Fed'n*, 497 U.S. at 875–77.  Reasonable jurists could conclude that BLM's exercise of its authority under FLPMA was consistent with, not contrary to, the 1900 Act's conditions.

Alternatively, a court could construe the word "only" in Section 5 of the 1900 Act to serve a more limited function than this Court ascribed to it.  The Court read the phrase "shall be subject to disposal under the homestead, townsite, stone and timber, and mining laws of the United States only" to prevent the government from using any other federal laws (such as FLPMA) to dispose of ceded lands.  SJ Order 11–12.  But in this context, "only" might simply identify *whose* laws govern disposal of the lands.  The "'rule of the last antecedent'" counsels that a "limiting" modifier "should ordinarily be read as modifying only the noun or phrase that it immediately follows."  *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003).  Here, "only" follows "of the United States," 31 Stat. at 676, suggesting that it serves to bar disposal of lands under state law—not to exclude any other means statutorily authorized by Congress.  That interpretation also accords with evidence of how the 1900 Act was construed immediately after enactment.  A 1903

House report described Section 5 as opening the ceded lands "to settlement and appropriation *under the general laws of the United States*." ECF No. 80 at 4 (emphasis in original) (quoting H.R. Rep. No. 3161, 57th Cong., 2d Sess. 2 (1903)); *see* ECF No. 82 at 30 (same). That report cannot definitively reveal the subjective intentions of Congress in 1900, but it illuminates how the 1900 Act was originally understood. *See* ECF No. 82 at 30 n.21.

Finally, Section 5 can be read to provide instructions for the *initial* disposition of the ceded lands that were to be opened to settlement, and thus inapplicable to later dispositions of land after they were opened pursuant to Congress's instructions. *See* ECF No. 60-1 at 41–43. This reading comports with the purpose of the 1900 Act (and of the 1898 Agreement) to secure additional land for the public domain for purposes of disposing of it to private parties.

Reading Section 5 not to restrict disposition of ceded lands pursuant to additional, later-enacted statutes is reinforced by several statutes enacted after the 1900 Act, and before FLPMA, that provided for other disposition methods—and that by their terms applied to these ceded lands. ECF No. 82 at 43. For example, in the Act of May 19, 1926, Congress specifically "made applicable to the ceded lands on the former Fort Hall Indian Reservation," 44 Stat. 566, a prior statute authorizing the Interior Secretary to sell "any isolated or disconnected tract or parcel of the public domain . . . which in his judgment it would be proper to expose to sale," R.S. 2455, 28 Stat. 687 (1895); *see also, e.g.*, Act of May 12, 1920, 41 Stat. 596 (authorizing conveyance of lands near Pocatello to the City and State of Idaho). Congress later further supplemented those authorities with more general powers to dispose of ceded lands, including via land exchanges. *See* Taylor Grazing Act, 48 Stat. 1269 (June 28, 1934). Those statutes strongly signal that Congress perceived Section 5 as perfectly compatible with other, later-enacted disposition methods, and saw no need to amend the 1900 Act expressly by striking "only" in Section 5.

Alternatively, those statutes can be read to show that, prior to FLPMA, Congress had *already* expressly superseded any exclusivity of Section 5's means of disposal. *Infra*, at 12. Either way, when FLPMA was enacted, the 1900 Act posed no impediment to enacting additional methods.

*Second*, a reviewing court could agree with the Court's analysis of the 1900 Act as originally enacted, but hold that Congress in multiple subsequent legislative enactments, including FLPMA, necessarily supplemented or superseded the 1900 Act to the extent the word "only" made the listed methods exclusive. Construing a later law to expand upon or transcend an earlier one is appropriate—indeed, required—where "'necessary to make the later enacted law work.'" *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976) (brackets omitted). Courts must give effect to a "later act" if it "covers the whole subject of the earlier one and is clearly intended as a substitute." *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936).

Congress enacted FLPMA to establish a "comprehensive" legal framework for the use of public lands. *Bolt*, 944 F.2d at 608. FLPMA's expressly codified purposes include imposing "comprehensive rules" and "uniform procedures for any disposal of public land." 43 U.S.C. § 1701(a)(5), (10). FLPMA broadly defines "public lands" to include "any land and interest in land owned by the United States . . . without regard to how the United States acquired ownership." *Id.* § 1702(e). That expansive definition indisputably encompasses the ceded lands at issue. And it strongly supports viewing FLPMA's disposal methods in Sections 203 and 206 as supplementing, or subsuming, the disposal methods specified in Section 5 of the 1900 Act.

This Court recognized that FLPMA's comprehensive framework applies to this land exchange. That was the premise of its correct conclusion that "BLM's decision to approve the Blackrock Land Exchange must comply with FLPMA." SJ Order 17; *see also id.* at 29–30 (concluding that BLM needed to, and did, satisfy other FLPMA requirements apart from

appraisal standards).  The only question is whether Congress intended the disposal portions of

FLPMA's otherwise-applicable, comprehensive framework to be inoperative as applied to land

covered by the 1900 Act—and thus to leave that land an island (and, together with lands covered

by analogous cession acts, an archipelago) among the millions of acres to which FLPMA applies.

The better view, and one that other reasonable jurists could find persuasive, is that

FLPMA's comprehensive framework supplements or supersedes any exclusivity limitation

imposed by the 1900 Act.  That reading is more consistent with courts' obligation to "make

sense rather than nonsense out of the *corpus juris.*"  *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S.

83, 101 (1991); *see also Yellowfish v. City of Stillwater*, 691 F.2d 926, 930 (10th Cir. 1982).  It

also explains why the Congress that enacted FLPMA—which expressly repealed other laws in

their entirety, including the major categories of disposal methods specified in Section 5 of the

1900 Act that remained in effect at that time, SJ Order 13—found it unnecessary to repeal

Section 5.  A statute that authorizes parties to conduct a particular transaction by "methods A, B,

and C only" is necessarily overtaken by a later statute additionally authorizing "method D."  That

is the case here:  The 1900 Act specified disposal methods entailing the sale of public lands, and

FLPMA (and other laws) later authorized additional methods—including land exchanges.

That conclusion applies with even greater force where—as in this case—the preexisting

methods (A, B, and C) have been expressly repealed or otherwise rendered unavailable in the

interim.  As the Federal Defendants have explained, the prior laws in the categories enumerated

in Section 5 "are no longer used to dispose of federal lands":  Congress has either repealed them

or, as to the mining laws, rendered them unavailable for disposing of federal lands (by imposing

a moratorium on the patenting of new mining claims or sites and on processing of existing

applications).  ECF No. 80 at 2 & n.1.  Moreover, as discussed above, the 1926 Act and other

intervening statutes had already necessarily superseded Section 5's exclusivity limitation by making new disposition methods available for these ceded lands specifically.  The Congress that enacted FLPMA thus had no need to explain that, by enacting a comprehensive new statute governing disposition of federal lands, it was eschewing prior provisions (to the extent not already overtaken) that had once made other, now-obsolete methods exclusive.

That conclusion is not altered by Congress's uncodified proviso, which the Court noted, SJ Order 13, stating that FLPMA does not "repeal any existing law by implication."  Pub. L. No. 94-579, § 701(f), 90 Stat. 2743, 2786 (1976).  That proviso incorporates into FLPMA the general presumption against implied repeals, which "is hardly absolute" and can be overcome by contrary evidence.  A. Scalia & B. Garner, *Reading Law* 327 (2012).  Like the presumption, FLPMA's proviso does not justify disregarding the plain import of FLPMA's other enacted provisions.  To the extent "only" in Section 5 purported to freeze the specified categories of statutes as they then stood and forbid the use of any other legal authority, that limitation was overtaken by later-enacted text *expressly* authorizing other means of disposal—most prominently in FLPMA itself.  *See* 43 U.S.C. §§ 1716(a) (authorizing land exchanges), 1713 (sales), 1721 (conveyances to other governments).  That these additional independent authorities supplemented and superseded the supposed exclusivity of Section 5 follows inexorably from the provisions Congress enacted, not any attenuated inferences ungrounded in text.  In short, if both the 1900 Act and FLPMA were each read as exhaustively addressing the available means of disposal of ceded lands, both settled interpretive principles and all indicia of congressional intent would compel resolving that conflict by concluding that FLPMA's later mandate must control.

3.     The broader legal context reinforces both the reasonableness of disagreement over the interpretation of the 1900 Act and the importance of this issue for other potential disputes

involving the 1900 Act and many other similar statutes.  As to the 1900 Act itself, the Court

acknowledged that its ruling "effectively close[s] the door on disposal of the ceded lands" and

that "the federal government does not currently have a viable method for disposing of the ceded

lands."  SJ Order 12–13.  That is a remarkable outcome of statutory analysis that courts should

strive to avoid.  Foreclosing the federal government from exercising any possible mechanism for

disposal of public lands is an especially unusual result in the historical context of the last 150

years, over which Congress has repeatedly added to and expanded (not cut off) the Executive's

"plenary authority" over public land disposal, *Silver State Land, LLC v. Schneider*, 843 F.3d 982,

989 (D.C. Cir. 2016), by enacting "various" means "for the Executive to remove public lands

from the operation of [federal] statutes," *National Wildlife Fed'n*, 497 U.S. at 875.  Congress has

over time authorized multiple methods for disposing of the lands; it would be extraordinary if

Congress intended that *no* relevant method be available today.

The Court described that "outcome" as "not absurd," SJ Order 13, but it would be highly

incongruous if Congress foreclosed applicability of FLPMA to a land exchange that FLPMA

authorizes.  Whether that is an absurdity that could justify "overrid[ing] the literal terms of [the]

statute," *United States v. Lucero*, 989 F.3d 1088, 1098 (9th Cir. 2021) (citation omitted),

however, is beside the point.  In construing statutes holistically, courts properly take account of

anomalous outcomes that varying readings would yield.  *See Atl. Richfield Co. v. Christian*,

140 S. Ct. 1335, 1353 (2020) ("straightforward reading of [a] text" should "avoi[d]" creating

"anomalies").  Courts should require the utmost clarity from Congress before construing a statute

to bar the Executive from disposing of federal property—especially a law that, like the 1900 Act,

has "long coexisted" with FLPMA without any "suggestion they might conflict."  *Epic Sys.*,

138 S. Ct. at 1620.  Reasonable jurists could debate whether the 1900 Act contains such clarity.

The Court's interpretation is especially debatable and deserving of immediate review in light of its extremely important implications for the federal government's abilities to dispose of federal property under FLPMA (and potentially other statutes) across the Nation. "[D]istrict courts should not hesitate to certify an interlocutory appeal" of an order that "involves a new legal question or is of special consequence." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009). The Ninth Circuit has entertained an interlocutory appeal in particular when cases concerning the status of ceded tribal lands "raise[d] important issues of Indian law and require[d] the interpretation of a century of Indian and public land policy." *United States v. S. Pac. Transp. Co.*, 543 F.2d 676, 680 (9th Cir. 1976). Those considerations strongly support certification here.

Many statutes are analogous to the 1900 Act and might be affected by the Court's reasoning. Congress enacted hundreds of other Indian cession acts through the late 19th and early 20th centuries, covering millions of acres, ECF No. 60-1 at 45, and many use language similar in key respects to Section 5. To take just one, the Act of August 15, 1894, 28 Stat. 286, 332, stated that lands ceded by the Nez Perce "shall be subject to disposal only under the homestead, town-site, stone and timber, and mining laws of the United States." *See also, e.g.*, Act of July 4, 1884, 23 Stat. 76, 80 ("shall be disposed of . . . under the homestead laws only"). Congress also used similar language in statutes disposing of non-Indian properties, such as former military reservations.[2] The prevalence of such language and the potential implications of the Court's rulings for any number of those other laws magnify the importance of this issue and implications for the government's ability to manage and dispose of particular lands.

---

[2] *E.g.*, Act of Oct. 1, 1890, 26 Stat. 561, 561–62 (military reservation "shall . . . be subject to disposal . . . according to the provisions of the homestead laws only"); Act of Mar. 3, 1893, 27 Stat. 555, 555 (military reservation "shall be open to settlement under the homestead law only"); Act of March 3, 1877, 19 Stat. 404 (lands not used for railroad development "shall be . . . opened to settlement and purchase under the homestead laws of the United States only").

4.      The Court's certitude in its own reading of the statutes does not support denying certification.  Indeed, appeals exist on the theory that lower courts may "make mistakes," as the Supreme Court has recognized.  *Willy v. Coastal Corp.*, 503 U.S. 131, 139 (1992).  That this Court believes that it "correct[ly]" applied the governing statutory-interpretation principles should not preclude it from "agree[ing] with [Simplot] that reasonable jurists could debate" these principles' "proper application" to the novel question of whether the 1900 Act prohibits BLM's exercise of FLPMA authority on ceded lands.  *McKinney*, 2006 WL 1275130, at *2 (certifying an appeal in analogous circumstances).  That sensible approach, in fact, is commonplace.[3]

Likewise, the Court's belief that the meaning of the 1900 Act is "clear," SJ Order 12–13, poses no obstacle to § 1292(b) certification.  Section 1292(b) allows, and courts including the Ninth Circuit have approved, interlocutory appeals even where a district court ruling rests on the statute's "plain language."  *Lucas v. Natoli*, 936 F.2d 432, 432 (9th Cir. 1991) (per curiam); *see, e.g.*, *United States v. 594,464 Pounds of Salmon, More or Less*, 687 F. Supp. 525, 527–28 (W.D. Wash. 1987) (holding "that the [statutory] term at issue here . . . is not ambiguous" and that the

---

[3] *E.g.*, *Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066, 1071 (9th Cir. 2006) (district court certified appeal even though it had "'no doubt'" that it correctly resolved a question of law); *Ovando v. City of Los Angeles*, 92 F. Supp. 2d 1011, 1025 (C.D. Cal. 2000) (certifying issue, although "the Court believes its analysis is correct," absent "any case which expressly addresses this issue"); *Reynolds v. Philip Morris USA Inc.*, No. 05-CV-1876-JAH, 2007 WL 9724374, at *1 (S.D. Cal. Sept. 5, 2007) (granting certification, "given the lack of controlling precedent," even though "the Court believes its analysis is correct"); *Nat'l Ass'n of African-Am. Owned Media v. Charter Commc'ns, Inc.*, No. 16-CV-609-GW, 2016 WL 10647193, at *5 (C.D. Cal. Dec. 12, 2016) (finding certification appropriate "[a]lthough this Court does not believe that Defendant can be correct in its argument" due to the "novelty" of the question); *Brown v. Hain Celestial Grp., Inc.*, No. 11-CV-3082-LB, 2012 WL 4364588, at *3 (N.D. Cal. Sept. 24, 2012) (granting certification even though "the court does not believe that there are strong arguments for [movant]'s . . . position" because "the issue [movant] seeks to certify" is a "complex" one "that has not previously been addressed by the Ninth Circuit"); *North v. Super. Hauling & Fast Transit, Inc.*, No. 18-CV-2564, 2019 WL 6794211, at *2 (C.D. Cal. July 10, 2019) (granting certification despite "believ[ing] that [the court's] prior Order reached the correct outcome on this question," in part because "[t]he Ninth Circuit has yet to rule on this issue").

statute's meaning "is clear," but nonetheless certifying appeal), *cert. accepted, aff'd*, 871 F.2d 824 (9th Cir. 1989). After all, one jurist's conclusion that a statute has a single clear meaning does not preclude others from finding another reading to be equally or more plausible.[4]

Nor does any Indian canon of construction preclude other reasonable jurists from taking a contrary view. The Court acknowledged that the canon might not apply here at all: Ninth Circuit precedent requires *Chevron* deference to the government's reasonable interpretation. SJ Order 15 n.3. The canon might be inapplicable for other reasons. For example, it does not apply where "all tribal interests are not aligned." *Rancheria v. Jewell*, 776 F.3d 706, 713 (9th Cir. 2015). The key language in Section 5 has analogues in many cession acts and other statutes, and so the Court's interpretation might affect other tribes—not necessarily to their uniform benefit. Moreover, even where it applies, the canon cannot overcome contrary statutory "context, history, and purpose." *Penobscot Nation v. Frey*, 3 F.4th 484, 503 (1st Cir. 2021) (en banc), *cert. denied sub nom. United States v. Frey*, 142 S. Ct. 1668 (2022). The 1900 Act's context, history, and purpose all contemplate that the ceded lands here would be subject to disposal under federal laws, not unalterably forever strait-jacketed as a permanent "part of the public domain" for the benefit of the Tribes. 31 Stat. at 674. As the Court acknowledged, the Tribes never bargained for the initial means of disposal of the ceded lands set forth in Section 5. SJ Order 11.

## B.    The Court's invalidation of BLM's appraisal warrants interlocutory review.

Interlocutory review is also warranted on the Court's interpretation of FLPMA's appraisal requirement. Briefing on that issue was sparse—because the Tribes did not timely

---

[4] *See, e.g.*, *United States v. Palomares*, 52 F.4th 640, 642 n.1, 646 (5th Cir. 2022) (finding statute "unambiguous" in the face of a circuit split, and over dissent arguing that the provision's "plain meaning" was the opposite); *Bautista v. Att'y Gen. of U.S.*, 744 F.3d 54, 58 (3d Cir. 2014) (holding that statute's plain meaning was clear over a dissent arguing that "disagreement over the construction of the statute" made it "at best ambiguous"), *abrogated by Torres v. Lynch*, 578 U.S. 452 (2016) (interpreting statute contrary to Third Circuit's decision).

raise the issue at all.  Even had it been properly presented, the Tribes' contention lacks merit, and the Court's conclusion is subject to reasonable disagreement.

1.      The Tribes' summary-judgment motion did not argue that BLM should have assessed the exchanged lands' "uniqu[e] valu[e]" to Simplot rather than the market at large—the sole ground on which the Court invalidated BLM's appraisal.  SJ Order 28; *see* Tr. 67:22–24.  The Tribes gestured at this argument only briefly, in one paragraph of their reply.  ECF No. 74 at 24.  But "arguments raised for the first time in a reply brief are waived."  *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 672 F.3d 1160, 1166 n.8 (9th Cir. 2012) (citation omitted).  The Court properly rejected the sole appraisal claim the Tribes did raise on summary judgment (consideration of nonmonetary values).  SJ Order 23 n.8; ECF No. 37-1 at 20–21.

2.      The Court nevertheless held that the federal land appraisal was invalid because it did not appropriately consider the land's "uniqu[e]" value to Simplot, as distinct from "generalized demand" for that parcel by "competing" parties.  SJ Order 27–28.  That holding turned on the Court's interpretation of the appraisal standard under the governing statute and regulations, *see* 43 U.S.C. § 1716; 43 C.F.R. § 2200.0-2 *et seq.*  This, too, is a question of law appropriate for interlocutory appeal.  *See, e.g.*, *Steering Comm. v. United States*, 6 F.3d 572, 575 (9th Cir. 1993) (interlocutory appeal appropriate over question of applicable legal standards); *McKinney*, 2006 WL 1275130, at *1 (same).  It is "controlling" because reversal of the Court's appraisal ruling would dispose of any appraisal "clai[m]," *Reese*, 643 F.3d at 688, and either obviate or greatly simplify the remedial questions stemming from that claim, *see infra*, at 19-20.

Once again, "'reasonable jurists might disagree'" with the Court's resolution of this issue.  *Fortyune v. City of Lomita*, 766 F.3d 1098, 1101 n.2 (9th Cir. 2014).  Substantively, its analysis relied on just two cases, which the Court recognized are "distinguishable" in a key

respect.  SJ Order 27.  In *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172 (9th Cir.

2000), the court had held only that a "proposed use" by multiple private parties is "relevant to"—

not dispositive of—"showing a market demand for that use."  *Id.* at 1183.  And in *National Parks*

*& Conservation Ass'n v. Bureau of Land Management*, 606 F.3d 1058 (9th Cir. 2010), the Ninth

Circuit applied *Desert Citizens* to "virtually identical" facts.  *Id.* at 1067.

    Here, in contrast, BLM fully complied with the Ninth Circuit's direction in those

decisions.  Its appraisal did "t[ake] into consideration the reasonably foreseeable uses of the

lands acquired by Simplot."  ECF No. 80 at 15–16 (collecting record citations); *see also*

AR0032943 (BLM review of the appraisal).  And, as this Court acknowledged, neither *Desert*

*Citizens* nor *National Parks* endorsed the Court's further step of interpreting FLPMA to make

Simplot's intended use dispositive, by requiring an appraisal equal to a property's "uniqu[e]

valu[e]" to Simplot "only."  SJ Order 27–28.  That "novel" holding is a significant step beyond

existing precedent.  *Reese*, 643 F.3d at 688.  And reasonable jurists could at least debate whether

the Court's novel reading of the requirement to appraise "market value," 43 C.F.R. § 2200.0-

6(c), is the best view.  The regulations define "[m]arket value" as value "in a competitive and

open market."  *Id.* § 2200.0-5(n).  The Court's interpretation is also one on which another jurist

could reasonably come to a different outcome in that it adopts an unworkable standard not

readily susceptible of objective guideposts to guide government decisionmakers.  The value of

property to a particular purchaser, who may have a range of subjective motivations for acquiring

it, is not reasonably ascertainable.  Such a standard conflicts with FLPMA's express purpose to

establish "objective" standards for administration of public lands.  43 U.S.C. § 1701(a)(5).

    The Court's holding is also in tension with authoritative guidance in the Uniform

Appraisal Standards (UAS), which "set forth the guiding principles, legal requirements, and

practical implications for the appraisal of property in all types of federal acquisitions."  UAS 3.
The UAS is promulgated by the Interagency Land Acquisition Conference, an organization
established by the Attorney General composed of representatives of federal agencies engaged in
land acquisition for public use.  41 C.F.R. § 102-73.280.  As this Court recognized, the guidance
in the UAS is expressly incorporated into the regulations governing BLM's appraisals.  *See* SJ
Order 24 (citing 43 C.F.R. § 2201.3).  And, as relevant here, the UAS—drawing on uniform
precedent from the Fifth, Sixth, and Eighth Circuits—states that "there must be demonstrated an
actual profitable use or a market demand for the prospective use."  UAS 103 n.293, 104
(alteration and citation omitted); *see also id.* at 103 n.294, 104 nn.296–98 (collecting cases).  The
UAS also reaffirms that its definition of value has been "long held" by the Supreme Court and
other federal courts to be the "norma[l]" and "fair measure of just compensation."  *Id.* at 90.

Like the 1900 Act issue, the proper appraisal standard under FLPMA is also an issue of
national importance to the government and regulated parties.  By mandating a valuation method
based on an exchange party's subjective and unique need for a particular parcel—and thus
uncertain (though likely increased) valuations—the Court's holding has the potential to hinder or
complicate not only land exchanges, but also other types of federal land transactions subject to
similar appraisal requirements.  *See, e.g.*, 43 C.F.R. § 2741.8(b) (conveyances of lands to other
government entities); UAS 4 (appraisal requirements for eminent-domain litigation).  These
potentially broad ramifications of the Court's holding provide further reason that reasonable
jurists could reach different conclusions and ample reason to certify an interlocutory appeal.

## II.    Interlocutory review will materially advance this litigation.

Interlocutory review is warranted on the 1900 Act issue, appraisal issue, or both because
resolution of each "may materially advance the ultimate termination of the litigation."  28 U.S.C.
§ 1292(b).  The Court's holdings on these questions implicate remedial issues qualitatively

different from, and more complex than, the "relatively straightforward" questions of remand or vacatur for the Court's other NEPA and FLPMA holdings.  ECF No. 92 at 3.  This Court has already recognized "that it is more 'just, speedy, and inexpensive'" to consider first whether to certify an interlocutory appeal on these questions before turning to remedies issues.  ECF No. 93 at 2.  For much the same reasons, the 1900 Act and appraisal-standard issues both qualify for interlocutory review under § 1292(b), because their resolution could head off "needless expense and delay of litigati[on]."  *Kuehner v. Dickinson & Co.*, 84 F.3d 316, 319 (9th Cir. 1996).

In this respect, this case is on all fours with the Court's prior decisions certifying interlocutory appeals.  The Court explained in certifying an interlocutory appeal in *McKinney* that, "if the Court of Appeals were to reverse on this issue, such a decision could save substantial time and resources that would otherwise be expended while litigating."  2006 WL 1275130, at *1.  Similarly, in *Snake River Valley*, ECF No. 48, Case No. 4:96-CV-308-BLW, it explained that "protracted and expensive litigation may be avoided by permitting an interlocutory appeal," *id.* at 1.  Here too, if the Ninth Circuit were to agree with Federal Defendants and Simplot that FLPMA authorized the land exchange and the appraisal complied with governing rules, any remedial issues would be greatly simplified and would concern at most potential revisions to the government's NEPA and FLPMA documents.  There would be no need to address "unusual" questions of whether or how to unwind an over-and-done-with land exchange between third parties, which this Court recognized "is no simple matter."  SJ Order 16–17.

## CONCLUSION

For the foregoing reasons, Simplot respectfully submits that the Court should grant Simplot's motion to certify its Order on the parties' cross-motions for summary judgment, ECF No. 89, for interlocutory appeal under 28 U.S.C. § 1292(b).

Respectfully submitted this 19th day of May 2023.

s/ Steven B. Andersen
Steven B. Andersen
KIRTON MCCONKIE
Stephen J. Odell
MARTEN LAW, LLP
Thomas C. Perry, Senior Counsel
J.R. SIMPLOT COMPANY

Attorneys for Defendant-Intervenor J.R. Simplot Company